UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
In re BLACK FARMERS DISCRIMINATION        )
LITIGATION                                )
                                          )
_____ )
                                          )
This document relates to:                 )          Misc. No. 08-0511 (PLF)
                                          )
ALL CASES                                 )
_____ )

OPINION

This matter is before the Court on the motion of named plaintiffs James Copeland,

Earl Moorer, and Marshallene McNeil ("the Moving Plaintiffs") for final certification of a

plaintiffs' class and approval of a settlement agreement that would resolve the pending claims of

approximately 40,000 plaintiffs and compensate thousands of victims of race discrimination

whose complaints have gone unanswered for decades. The defendant, the United States

Department of Agriculture, supports the motion.

After careful consideration of the arguments made by the Moving Plaintiffs and

the defendant, the comments and objections offered by interested parties, the statements made by

interested persons at the Fairness Hearing on September 1, 2011, and the long history of this case

and that of its predecessor, Pigford v. Glickman, Civil Action No. 97-1978 (D.D.C.), the Court

will grant the motion, certify a class pursuant to Rule 23(b)(1)(B) of the Federal Rules of Civil

Procedure, and approve the settlement.[1] Although, like any compromise, the settlement

_____

[1]     The papers considered by the Court in connection with this matter include the
following: Amended Class Action Complaint to Determine Merits and Damages Pursuant to
Section 14012 of the Food, Conservation and Energy Act of 2008, as Amended, Docket No. 163
("Am. Compl."); Certain Plaintiffs' Motion to Stay the Class Certification Proceedings, Docket

agreement before the Court will not satisfy everyone, it offers class members their best option for

obtaining meaningful redress of longstanding injuries.

---

No. 66 ("Mot. to Stay"); Motion for Leave to Withdraw the July 6, 2009 Reply in Support of the
Motion to Stay Class Certification Proceedings, Docket No. 108 ("Mot. to Withdraw"); Motion
for Preliminary Approval of Settlement, Certification of a Rule 23(b)(1)(B) Settlement Class, and
for Other Purposes, Docket No. 161 ("Mot. for Prelim. Approval"); Class Counsel's Motion for
an Award of Attorneys' Fees and Expenses, Docket No. 180 ("Mot. For Fees"); Plaintiffs'
Motion for Final Approval of Settlement, Docket No. 187 ("Mot. for Final Approval");
Supplemental Memorandum in Support of Consent Motion to Approve Appointment of Track A
and Track B Neutral, Docket No. 192 ("Supp. Mem."); Notice of Revision of Proposed Claim
Form, Docket No. 226; Letter from Dewayne L. Goldmon on behalf of the National Black
Agricultural Alliance, Docket No. 211 ("NBAA Letter"); Letter from Eddie Lee Gray, Docket
No. 206 ("Gray Letter"); Letter from Ralph Paige on behalf of the Federation of Southern
Cooperatives Land Assistance Fund, Docket No. 204 ("Federation Letter"); Notice of
Appearance on behalf of the Black Farmers and Agriculturalists Association, Docket No. 208
("Burrell Notice"); Notice of Appearance, Docket No. 212 ("Price Notice"); Notice of Objection
to Settlement, Docket No. 183 ("Martin Obj."); Objection, Docket No. 215 ("Bates Obj."). The
Court also reviewed the following materials: Motion by John W. Boyd for Leave to Appear and
Speak at Fairness Hearing of September 1, 2011, Docket No. 203; Letter from William V.
Paramore requesting permission to participate in September 1, 2011 fairness hearing, Docket
No. 205; Letter to the Court from Joyce A. Smith requesting permission to participate in
September 1, 2011 fairness hearing, Docket No. 207; Letter to the Court from Gloria Davis
Gilmore requesting permission to participate in September 1, 2011 fairness hearing, Docket
No. 209; Letter to the Court from Bernice C. Atchison requesting permission to participate in
September 1, 2011 fairness hearing, Docket No. 210; Objection to Proposed Settlement
Agreement by Henry Barris Muhammad Robbalaa, Docket No. 214; Objection to Proposed
Settlement Agreement by Ada C. Bates, Ava L. Bates, Brad E. Bates, Kerry F. Bates, Theodore
B. Bates, Jr., Karla K. Bates-Adams, Terrie L. Bates-Best, Docket No. 215; Objection to
Proposed Settlement Agreement by Lillie M. Wingard, Docket No. 216; Objection to Proposed
Settlement Agreement by Doris Gray, Docket No. 217; Objection to Proposed Settlement
Agreement by Robert E. Walker, Docket No. 218; Objection to Proposed Settlement Agreement
by Errol Von Hart, Docket No. 219; Objection to Proposed Settlement Agreement by Diahann C.
Stevens, Docket No. 220; Objection to Proposed Settlement Agreement by Booker T. Woodard,
Docket No. 221; Objection to Proposed Settlement Agreement by Justin G. Fouts and Willa G.
Fouts, Docket No. 222; Defendant's Response to Objection to Settlement Agreement Based on
Propriety of Class Certification Under Rule 23(b)(1), Docket No. 190 ("Def.'s Certification
Resp."); and Reply to Plaintiffs' Response to Objection 11 to the Settlement Agreement, Docket
No. 213 ("Martin Reply"). The Court also reviewed the transcript of the September 1, 2011
Fairness Hearing ("Sept. 1 Tr.").

# I. BACKGROUND

## A. *Pigford v. Glickman ("Pigford I")*

1. Claims of Pigford I Plaintiffs and Their Resolution by Consent Decree

In 1997, a group of African-American farmers brought suit in this Court against Dan Glickman, at that time the Secretary of the United States Department of Agriculture ("USDA"). Their final amended complaint alleged that, from January 1983 through January 1997, the USDA discriminated on the basis of race in allocating benefits under various federal agricultural programs, denying African-American farmers loans and other benefits that were freely granted to similarly situated white farmers. See Pigford v. Glickman, Civil Action No. 97-1978, Seventh Amended Complaint at 4 (D.D.C. Oct. 26, 1998) ("Pigford I Compl."). The Pigford plaintiffs further alleged that, when they attempted to protest that discrimination by filing complaints with the USDA, the Department failed to investigate those complaints, flouting its responsibilities under federal civil rights laws, including the Civil Rights Act of 1964 and the Equal Credit Opportunity Act ("ECOA"). Pigford I Compl. at 4. According to the complaint, that history of discrimination in the administration of USDA farm programs, combined with the agency's long-standing refusal to investigate and remedy specific instances of discrimination, deprived countless farmers of desperately needed credit and payments under various aid programs, with the result that many farmers suffered severe financial losses and even, in many cases, lost title to their farms. See, e.g., id. at 7-34 (summarizing the damages claimed by the named plaintiffs); see generally Pigford v. Glickman, 185 F.R.D. 82, 86-89 (D.D.C. 1999).

3

The plaintiffs thus alleged that the USDA had committed and then exacerbated a vast array of civil rights violations over a period spanning nearly twenty years. Their claims, though broad in scope, were no exaggeration. The USDA itself, in a report commissioned by Secretary Glickman at the behest of then-President Clinton, noted that the "USDA's painful history of individual and class action lawsuits, court orders, media exposés, numerous Congressional hearings, and reports depicts the Department as a stubborn bureaucracy that refuses to provide equal opportunity for all as the law requires." USDA CIVIL RIGHTS ACTION TEAM, CIVIL RIGHTS AT THE UNITED STATES DEPARTMENT OF AGRICULTURE 6 (1997).

Congress acknowledged the scope of the civil rights problems plaguing the USDA by giving new life to thousands of claims of past discrimination by the agency. Claims alleging violations of ECOA typically have a short life; they must be brought within two years of the occurrence of the statutory violations in question. See 15 U.S.C. § 1691e(f). In 1998 Congress eliminated that restriction on ECOA claims against the USDA, creating a new statute of limitations for complaints alleging ECOA violations in the administration of various farm-related benefit programs. See PUB. L. NO. 105-277, § 741, 112 STAT. 2681, 2681-31 (1998). Such complaints could be brought at any time within two years of Congress' enactment of the new statute of limitations, so long as (1) the allegations underlying those complaints had previously been presented to the USDA before July 1, 1997, and (2) the ECOA violations alleged had occurred between January 1, 1981, and December 31, 1996. Id. § 741(e). Congress' action thus had the effect of opening the courthouse doors to large numbers of old claims, including many subsequently brought in Pigford I.

In light of Congress' 1998 amendments to the statute of limitations applicable to

ECOA claims, this Court ultimately certified a plaintiffs' class in Pigford under Rule 23(b)(3) of

the Federal Rules of Civil Procedure that was composed of

> [a]ll African American farmers who (1) farmed, or attempted to
> farm, between January 1, 1981 and December 31, 1996; (2) applied
> to the (USDA) during that time period for participation in a federal
> farm credit or benefit program and who believed that they were
> discriminated against on the basis of race in USDA's response to
> that application; and (3) filed a discrimination complaint on or
> before July 1, 1997, regarding USDA's treatment of such farm
> credit or benefit application.

Pigford v. Glickman, 185 F.R.D. at 92. Rather than proceeding to trial on the claims of the

plaintiffs' class members, class counsel and the USDA negotiated a settlement, which was

approved by the Court and memorialized in a consent decree filed on April 14, 1999. That

consent decree did not provide for the automatic payment of damages to any plaintiff. Instead, it

established a non-judicial mechanism by which each class member would have an opportunity to

demonstrate that he or she had been the victim of past discrimination by the USDA and therefore

was entitled to compensatory damages. Potential class members were not required to participate

in that alternative claims resolution process, however; those African-American farmers who

wished to pursue their ECOA claims against the USDA in court were permitted to opt out of the

Pigford plaintiffs' class by submitting an opt-out request within 120 days of the entry of the

consent decree. Pigford v. Glickman, Civil Action No. 97-1978, Consent Decree ¶ 5(b)-(f)

(D.D.C. Apr. 14, 1999) ("Consent Decree"); see also Pigford v. Glickman, 185 F.R.D. at 95-96.

For those who did not opt out of the plaintiffs' class, the Pigford consent decree

created a distinctive process for resolving class members' claims against the USDA. First, any

5

individual seeking an award under the consent decree was required to submit to a neutral "Facilitator," the Poorman-Douglas Corporation (now Epiq Systems, Inc.), evidence that he or she was in fact a member of the class. See Consent Decree ¶ 2(b). Next, if the Facilitator determined that a given claimant was a member of the class, the claimant was permitted, at his or her election, to proceed along one of two "tracks" for determining the merits of the claim. Id. ¶ 5(f). "Track A" allowed a claimant to prevail by presenting "substantial evidence" of discrimination to a neutral, third-party "Adjudicator." Id. ¶ 9. The requirement of "substantial evidence" — defined as "such relevant evidence as . . . a reasonable person might accept as adequate to support a conclusion after taking into account other evidence . . . that fairly detracts from that conclusion," id. ¶ 1(l) — represents a less stringent evidentiary standard than the more common preponderance of the evidence standard. Still, prevailing on a Track A claim in Pigford was not easy, largely because the claimant was required to demonstrate that he or she had made a request for USDA program benefits that yielded a less favorable result than a request or requests made by "specifically identified, similarly situated white farmers." Id. ¶ 9(a)(i)(C); see Pigford v. Glickman, 127 F. Supp. 2d 35, 39 (D.D.C. 2001) (discussing the difficulty of satisfying this requirement). Nevertheless, because claimants proceeding along this track were not required to prove their claims by a preponderance of the evidence, their potential recovery was limited: with respect to monetary compensation, a successful Track A claimant was entitled only to liquidated damages in the amount of $50,000, plus forgiveness of certain types of debt owed to the USDA and a payment to offset federal taxes owed on other portions of the award. See Pigford v. Glickman, 185 F.R.D. at 97.

The second form of claim resolution created by the consent decree, known as

"Track B," also involved a streamlined process of dispute resolution. Track B claims were to be

heard by another third-party neutral, the "Arbitrator," who could receive written testimony and

documentation as evidence but would conduct only a one-day mini-trial of each plaintiff's

claims. See Pigford v. Glickman, 185 F.R.D. at 97. Claimants choosing Track B, unlike those

proceeding along Track A, were required to prove their claims by a preponderance of the

evidence, rather than the more lenient substantial evidence standard, but, if successful, they were

awarded the full amount of damages necessary to compensate them for their losses. Id.

Pigford class members were not given an unlimited amount of time in which to

submit their claims and supporting documentation to the Facilitator. Under the terms of the

consent decree, all claims packages had to be postmarked on or before October 12, 1999.

Consent Decree ¶ 5(c). Paragraph 5(g) of the consent decree provided that if a claims package

was not postmarked within that period of time, the claimant could pursue relief under the decree

only by receiving permission from the Arbitrator. Consent Decree ¶ 5(g).[2] The claimant could

receive such permission, however, only if he or she demonstrated that "his failure to submit a

timely claim was due to extraordinary circumstances beyond his control." Id. Furthermore, there

was also a time limit on the period during which late claimants could submit petitions under

Paragraph 5(g); by order of the Court, those petitions were to be postmarked no later than

---

[2]        The consent decree originally provided that the Court would render decisions on
petitions for permission to submit a late claims package under Paragraph 5(g), but the Court
subsequently delegated that authority to the Arbitrator. See Pigford v. Glickman, Civil Action
No. 97-1978, Order, at 2 (D.D.C. Dec. 20, 1999).

January 30, 2000.  Pigford v. Glickman, Civil Action No. 97-1978, Order, at 2 (D.D.C. Dec. 20, 1999).

      Implementation of all of these provisions of the consent decree was to be overseen by the "Monitor," another independent, neutral third party whose responsibilities were delineated by the decree itself.  See Consent Decree ¶ 12.  The Monitor was responsible for (1) making periodic written reports on the good faith implementation of the consent decree; (2) attempting to resolve any problems that any class member may have with the consent decree; and (3) being available to class members and the public through a toll-free number to provide information about the consent decree and the claims process and to facilitate the lodging of any consent decree complaints and to expedite their resolution.  Id. ¶ 12(b).  While there was no appellate review of the decisions of the Arbitrator, the Adjudicator, and the Facilitator, the Monitor was authorized to examine them for "clear and manifest error" in the screening, adjudication, or arbitration of the claim that has resulted or is likely to result in "a fundamental miscarriage of justice."  Id. ¶ 12(b)(iii).  On a petition for review of a decision granting or denying a claim submitted in Track A, the Monitor was permitted within her discretion to consider new evidence — documentation not previously submitted to the Adjudicator — if she found that "such materials address[ed] a potential flaw or mistake in the claims process that in the Monitor's opinion would result in a fundamental miscarriage of justice if left unaddressed."  Pigford v. Glickman, Civil Action No. 97-1978, Order of Reference ¶ 8(e)(i) (D.D.C. Apr. 4, 2000).

2. Results of the Consent Decree's Claim Resolution Process

As of December 31, 2010, more than 22,700 completed claim packages had been

submitted by individuals eligible to pursue relief under the terms of the consent decree. Pigford

v. Glickman, Civil Action No. 97-1978, Monitor's Report Regarding Implementation of the

Consent Decree for the Period of January 1, 2010, through December 31, 2010, at 7 (D.D.C. May

27, 2011) ("2010 Monitor Report"). Of those eligible claimants, approximately 99% elected to

pursue Track A relief, while 170 claimants proceeded to Track B arbitration. Id. at 10. Over one

billion dollars has been awarded to the approximately 16,000 successful claimants in the form of

direct payments, loan forgiveness, and tax relief. Id. at 10, 19-20.

Although the number of eligible claimants who submitted timely claims under the

consent decree may seem staggering, that figure is dwarfed by the number of individuals who

have sought to submit late claims. As of September 15, 2000, the court-set deadline by which

late claimants were to request permission to file late claims under Paragraph 5(g) of the consent

decree, more than 61,000 individuals had petitioned the Arbitrator for leave to submit untimely

claim packages. 2010 Monitor Report at 5. These "late filers" were later joined by an as-yet

uncertain number of "late-late filers" — individuals who filed Paragraph 5(g) petitions with the

Arbitrator *after* September 15, 2000. See Mot. to Stay at 1-2 (suggesting that the number of

late-late filers may be as high as 25,000).

In light of this Court's order that such petitions should be postmarked by

September 15, 2000, the Arbitrator did not consider any petitions postmarked after that date. See

2010 Monitor Report at 4-5. Instead, in accordance with the dictates of Paragraph 5(g), he

reviewed the 61,252 timely petitions to determine whether each petitioner's failure to file a claim

9

package within the prescribed timeframe resulted from "extraordinary circumstances beyond [the petitioner's] control." Id. Those petitioners who ascribed their failure to submit timely claims to such uncontrollable circumstances as ill health or the ravages of Hurricane Floyd were given permission to complete late-claim packages. Id. at 4. That permission was denied to all those who explained that they had failed to complete timely claim packages because they had only recently learned of the Pigford lawsuit or the consent decree. Id. Ultimately, only 2,585 late filers — 4% of the total number — were permitted to pursue relief under the consent decree. Id. at 5.

### B. The 2008 Farm Bill

In 2008, after extensive hearings on the Pigford case and the consent decree, see, e.g., *"Notice" Provision in the Pigford v. Glickman Consent Decree: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 118th Cong. (2004), Congress resurrected the claims of those who had unsuccessfully petitioned the Arbitrator for permission to submit late claim packages. Under the Food, Conservation, and Energy Act of 2008 ("2008 Farm Bill"), "[a]ny Pigford claimant who has not previously obtained a determination on the merits of a Pigford claim may, in a civil action brought in the United States District Court for the District of Columbia, obtain that determination." PUB. L. 110-234, § 14012(b), 122 STAT. 923, 1448 (2008). A "Pigford claim" is "a discrimination complaint" as defined by the Pigford consent decree, id. § 14012(a)(3):

> a communication from a class member directly to USDA, or to a
> member of Congress, the White House, or a state, local or federal
> official who forwarded the class member's communication to
> USDA, asserting that USDA had discriminated against the class

10

> member on the basis of race in connection with a federal farm
> credit transaction or benefit application.

Consent Decree ¶ 1(h).  To be a "Pigford claim" for the purposes of the statute, such a

discrimination complaint must be "documented under section 5(b) of the consent decree" — the

portion of the decree that lists the required elements of a complete claim package.  2008 Farm

Bill § 14012(a)(3).

    An individual qualifies as a "Pigford claimant" within the meaning of the 2008

Farm Bill only if that person "previously submitted a late-filing request under section 5(g) of the

consent decree."  2008 Farm Bill § 14012(a)(4).  Notably, the statute does not specify the time

during which, to qualify as a "Pigford claimant," an individual must have submitted a 5(g)

late-filing request, although the phrasing of the statute makes clear that the request must have

been made prior to the effective date of the 2008 Farm Bill.  See id. (late-filing request must have

been "previously submitted").

    For those individuals who meet its eligibility requirements, the 2008 Farm Bill

provides for forms of adjudication and relief that are similar, but not identical, to those created by

the Pigford I consent decree.  Claimants under the 2008 Farm Bill may elect to pursue "expedited

resolution" of their claims by means of a process that mirrors Track A.  See PUB. L. 110-234,

§ 14012(f).  If claimants choose to participate in that expedited process, they are entitled to

"liquidated damages of $50,000," loan forgiveness, and tax relief so long as they can prove their

claims by substantial evidence, "as defined in section 1(l) of the consent decree."  Id.  Under the

2008 Farm Bill, however, "the court" is to "decide the case based on a review of documents"

11

submitted by the claimant and the USDA; the statute makes no mention of any third-party neutral that would be analogous to the consent decree's Adjudicator. Id. § 14012(f)(1)(B).

      In addition, the 2008 Farm Bill, like the consent decree, allows claimants to pursue a more complete adjudication of their claims and provides for the payment of "actual damages" to claimants who prevail in such an adjudication by proving their claims by a preponderance of the evidence. PUB. L. 110-234, § 14012(g). But again, the court is authorized to preside over those adjudications, and no mention is made of an Arbitrator. See id. § 14012(b), (g). Furthermore, the 2008 Farm Bill does not streamline those adjudications in the way that the consent decree did for Track B proceedings. While the consent decree limited Track B hearings to one day and permitted only limited discovery, the 2008 Farm Bill contains no such express restrictions.

      In contrast to the consent decree, which did not set a cap on the amount of damages recoverable by the Pigford class, the Farm Bill originally provided that "[t]he total amount of payments and debt relief pursuant to actions commenced under [this section] shall not exceed $100,000,000." 2008 Farm Bill § 14012(c)(2). When 75% of that $100 million had been "depleted," the Secretary of the USDA was to notify the House and Senate Judiciary Committees. Id. § 14012(j)(2). The Secretary was also directed to report on the "status of available funds" under the statute every six months. Id. § 14012(j)(1).

      The Farm Bill does not purport to create an open-ended right for individuals to bring late Pigford claims. The right to file a complaint under the statute "terminate[d]" two years after the law's enactment, on June 18, 2010. PUB. L. 110-234, § 14012(k). All complaints based on Section 14012 of the Farm Bill were to be filed in this Court. See id. § 14012(b).

### C.  The Current Lawsuit and the Claims Resolution Act of 2010

Approximately 40,000 individuals have filed complaints in this Court pursuant to

Section 14012 of the 2008 Farm Bill. Mot. for Prelim. Approval at 48. They did not file

individual complaints. Instead, plaintiffs brought suit in groups, with large numbers of

individuals aggregating their claims and summarizing them all in a single complaint. See, e.g.,

Agee v. Schafer, Civil Action No. 08-0882, Complaint at 1-24 (D.D.C. May 23, 2008) (listing

plaintiffs). Twenty-three such complaints alleging claims under the 2008 Farm Bill (hereinafter

"Pigford II" actions or cases), most of them aggregating large numbers of plaintiffs in the manner

described, were filed in this Court between May of 2008 and June of 2010 by plaintiffs

represented by a wide array of counsel. Recognizing the substantial case management difficulties

posed by the Pigford II actions, the Court stayed each individual lawsuit and consolidated all 23

actions into one miscellaneous case in order to permit the various parties, their counsel, and the

Court to determine the best way to proceed in this matter. See, e.g., In re Black Farmers

Discrimination Litig., Misc. No. 08-0511, Order (D.D.C. Aug. 8, 2008) (consolidating the first

eight cases brought pursuant to Section 14012).

Beginning in the spring of 2009, counsel for the plaintiffs named in several

Pigford II complaints initiated settlement negotiations with counsel for the USDA and the United

States Department of Justice. See Mot. for Prelim. Approval, Ex. 13 (Declaration of Andrew H.

Marks) ("Marks Decl.") ¶ 2. In February 2010, after extensive negotiations, the defendant and

certain plaintiffs executed the first version of a settlement agreement that has since been signed

by counsel for every plaintiff named in a pending Pigford II complaint except for those in five

cases, Civil Action Nos. 09-1019, 10-0465, 10-0737, 10-0801, and 10-0839.  See Mot. for

Prelim. Approval, Ex. 2 (Settlement Agreement) ("SA") ¶ II.HH.  Secretary of Agriculture

Thomas Vilsack and Attorney General Eric Holder announced the settlement on February 18,

2010.  See Press Release, USDA, USDA and Department of Justice Announce Historic

Settlement in Lawsuit by Black Farmers Claiming Discrimination by USDA (Feb. 18, 2010),

*available at* http://www.usda.gov/wps/portal/usda/usdahome?contentidonly=

true&contentid=2010/02/0072.xml.  As the Attorney General explained, the settlement provided

that a total of $1.25 billion would be made available for the resolution of claims brought pursuant

to Section 14012 of the 2008 Farm Bill — but at the time the settlement was executed, the only

funds appropriated by Congress for that purpose were the $100 million set aside by the Farm Bill

itself.  See id.  The settlement's continuing validity was contingent upon the appropriation by

Congress of an additional $1.15 billion.  Id.

   Beginning in March of 2010, members of Congress introduced legislation

intended to fund the settlement agreement reached by the USDA and the Moving Plaintiffs.  See

S. Amend. 3407 to H.R. 4213, 111th Cong. (2010) (failed proposed amendment that would have

appropriated $1.15 billion "to the Department of Agriculture . . . to carry out the terms of a

Settlement Agreement . . . executed in In re Black Farmers Discrimination Litigation"), *reprinted

in* 156 Cong. Rec. S1189 (daily ed. Mar. 4, 2010).  Several such attempts to fund the settlement

agreement were defeated in the Senate during the spring, summer, and fall of 2010.  See

TADLOCK COWAN AND JODY FEDER, CONG. RESEARCH SERV., RS 20430, THE PIGFORD CASES:

USDA SETTLEMENT OF DISCRIMINATION SUITS BY BLACK FARMERS 12 (2011).

On November 30, 2010, Congress passed the Claims Resolution Act of 2010, which was signed into law by President Barack Obama on December 8, 2010. See PUB. L. 111-291, 124 STAT. 3064. The Act "appropriated to the Secretary of Agriculture $1,150,000,000, to remain available until expended, to carry out the terms of the Settlement Agreement [in In re Black Farmers Discrimination Litigation ] if the Settlement Agreement is approved by a court order that is or becomes final and nonappealable[.]" Claims Resolution Act § 201(b). "Settlement Agreement" is specifically defined by the statute to refer to "the settlement agreement dated February 18, 2010 (including any modifications agreed to by the parties and approved by the court under that agreement) between certain plaintiffs . . . and the [USDA] . . . in In re Black Farmers Discrimination Litigation, Misc. No. 08-mc-0511." Id. § 201(a)(1).

In addition to funding the settlement agreement reached by the defendant and the Moving Plaintiffs, the Claims Resolution Act amended Section 14012 of the 2008 Farm Bill. Those amendments included the removal of two provisions of Section 14012 that would have required the USDA to (1) supply each Pigford II plaintiff with reports on USDA loans and other benefits awarded in the plaintiff's county of residence, and (2) make progress reports to Congress regarding the depletion of the $100 million made available by Section 14012 for the payment of awards in Pigford II.  See Claims Resolution Act § 201(f)(2), (5) (striking subsections 14012(e) and (j) of the 2008 Farm Bill).  It also makes clear that the claims under the settlement agreement should be resolved by a Neutral Adjudicator rather than by the Court itself.  See Claims Resolution Act § 201(b), (g)(1).

On March 30, 2011, the Moving Plaintiffs requested preliminary certification of a plaintiffs' class and approval of the settlement agreement first executed on February 18, 2010.

15

See Mot. for Prelim. Approval.  On April 25, 2011, the Court sent counsel for the Moving

Plaintiffs a letter in which it communicated several questions and concerns raised by the

proposed settlement agreement.  See Docket No. 168.  Those questions and concerns were

addressed by the Moving Plaintiffs in a written response dated May 11, 2011.  See Docket No.

171-1.  The Court granted preliminary class certification and preliminary approval of the

settlement on May 13, 2011, set a deadline for the filing of written objections to the settlement,

and scheduled a Fairness Hearing for September 1, 2011.

        After preliminary approval of the settlement agreement, the Moving Plaintiffs

initiated a comprehensive program intended to provide notice of the proposed settlement to

putative class members.  See Mot. for Final Approval, Ex. A (Declaration of Katherine Kinsella).

Kinsella Media, LLC, the firm engaged by the Moving Plaintiffs to effect notice, arranged for the

mailing of packets describing the settlement agreement in detail directly to all individuals who,

according to the records of the Pigford I Facilitator, made any written request to participate in the

Pigford I claims resolution process between October of 1999 and June 18, 2008.  See id. ¶ 7.

Notice was also broadly disseminated through radio, television, print, and online advertising.  A

60-second advertisement announcing the proposed settlement aired on two national radio stations

with large African-American audiences and 52 local radio stations located in areas with high

concentrations of African-American farmers.  See id. ¶ 13.  Written announcements appeared

once in American Profile, a newspaper supplement available in many rural counties; once in Jet

magazine; once in 46 daily newspapers that circulate in areas where high concentrations of

putative class members reside; twice in numerous newspapers targeting African-Americans; once

or twice in almost 200 community newspapers; and at least once in 20 trade publications geared

toward farmers and ranchers. See id. ¶¶ 17, 23-24. Online announcements appeared on a variety of websites with large numbers of African-American visitors, see id. ¶ 22, and directed Internet users to a website, www.blackfarmercase.com, providing detailed information about this case and the proposed settlement. See id. ¶ 21. Press releases announcing details of the settlement were circulated and widely reported on by various media outlets. See id. ¶¶ 27-29.

After that notice program was implemented, as of August 5, 2011, interested persons had made more than 62,000 requests for the claim packages that must be completed by any individual wishing to participate in the claims resolution process that would be created by the proposed settlement agreement. Mot. for Final Approval, Ex. A ¶ 32. Nearly 150,000 calls had been placed to a toll-free telephone number established to provide information about the settlement agreement. Id. Almost 70,000 visitors have viewed the website announcing the settlement. Id. In spite of the overwhelming degree of interest indicated by these numbers, however, the Court received only a handful of written objections from parties who may be members of the putative plaintiffs' class. The Court also received several written comments or objections from organizations or individuals that either do not appear to be or to represent potential class members, or have made no attempt to establish that they are class members. See In re Black Farmers Discrimination Litig., Misc. No. 08-0511, Memorandum Opinion and Order Regarding Fairness Hearing (D.D.C. Aug. 26, 2011) (listing objections).

The Court held an all-day Fairness Hearing on September 1, 2011. Because so few objections by putative class members had been received, and because the Court is aware that this litigation is a subject of intense interest among many African-American farmers and farming organizations, the Court allowed any individual who had experience with or an established

17

interest in Pigford I or communities of African-American farmers to offer comments at the

hearing. Although few of those who spoke demonstrated that they are putative plaintiffs' class

members and so have standing to object to the settlement agreement, the Court appreciates and

has considered their comments.

## II. CLASS CERTIFICATION

The Moving Plaintiffs seek final certification of a settlement class consisting of:

> All individuals: (1) who submitted Late-Filing Requests under
> Section 5(g) of the Pigford v. Glickman Consent Decree on or after
> October 13, 1999, and on or before June 18, 2008; but (2) who
> have not obtained a determination on the merits of their
> discrimination complaints, as defined by Section 1(h) of the
> Consent Decree.

SA ¶ III.A. A "Late-Filing Request" is defined as "a written request to the Court, the Pigford

Facilitator, the Pigford Monitor, the Pigford Adjudicator, or the Pigford Arbitrator seeking to

participate in the claims resolution processes in the Pigford Consent Decree." Id. ¶ II.T. The

dates specified in the class definition — October 13, 1999, and June 18, 2008 — correspond,

respectively, to (1) the day after the deadline for the filing of a timely claim under the Pigford I

consent decree, and (2) the effective date of the 2008 Farm Bill. The remainder of the class

definition tracks the language of Section 14012. See 2008 Farm Bill § 14012(a)-(b).

As the parties seeking class certification, the Moving Plaintiffs bear the burden of

demonstrating that the proposed class meets the requirements of Rule 23 of the Federal Rules of

Civil Procedure. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997). The parties must

show that all four prerequisites of Rule 23(a) have been met and that the proposed class falls

within at least one of the three categories delineated by Rule 23(b). See FED. R. CIV. P. 23(b);

Richards v. Delta Air Lines, Inc., 453 F.3d 525, 529 (D.C. Cir. 2006). If the Moving Plaintiffs are able to satisfy those requirements, then the Court may decide, in its discretion, whether a class should be certified. See Garcia v. Johanns, 444 F.3d 625, 631 (D.C. Cir. 2006) (citing McCarthy v. Kleindienst, 741 F.2d 1406, 1410 (D.C. Cir. 1984)).

The Moving Plaintiffs' request for class certification is supported by the defendant. See Def.'s Certification Resp. The only real opposition to the request comes from a group of ten potential class members represented by attorney Precious Martin ("the Martin Objectors"). See Martin Obj. at 1-2. According to those plaintiffs, the assets available for the payment of awards in this case do not truly qualify as a "limited fund," and therefore certification of a class pursuant to Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure is improper. Id. at 14-17. Furthermore, the Martin Objectors assert that the class proposed by the Moving Plaintiffs does not meet the commonality requirement of Rule 23(a)(2). See Martin Reply at 2-3. Because the matters in dispute all relate to Rule 23(b)(1)(B) and Rule 23(a)(2), the Court first addresses those provisions together before moving on to consider the requirements of Rule 23(a)(1), (3), and (4).

### A. Requirements for a Limited Fund Class Action

Under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure, a plaintiffs' class meeting the requirements of Rule 23(a) may be certified if

> prosecuting separate actions by or against individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

19

FED. R. CIV. P. 23(b)(1)(B). The Moving Plaintiffs request certification under Rule 23(b)(1)(B) on the ground that this case involves the aggregation of "'claims . . . made by numerous persons against a fund insufficient to satisfy all claims.'" Ortiz v. Fibreboard Corp., 527 U.S. 815, 834 (1999) (citation omitted). In such a case every award made to one claimant reduces the amount of funds available to other claimants until, in the absence of equitable management of the fund, some claimants are able to obtain full satisfaction of their claims, while others are left with no recovery at all. Thus are "adjudications with respect to individual class members . . . dispositive of the interests of the other members" in such a case. FED. R. CIV. P. 23(b)(1)(B); see generally Ortiz v. Fibreboard Corp., 527 U.S. at 834-37.

To qualify for class certification on such a limited fund rationale, the Moving Plaintiffs must show that the fund and the proposed class in question meet three criteria. See Ortiz v. Fibreboard Corp., 527 U.S. at 838. First, "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." Id. Next, "the whole of the inadequate fund" must be dedicated "to the overwhelming claims." Id. at 839. Finally, all claimants to the fund who are "identified by a common theory of recovery [must be] treated equitably among themselves." Id. All three requirements are met in this case.

### 1. Inadequacy of the Fund

The 2008 Farm Bill initially limited the amount of money available for the payment of damages to Pigford II plaintiffs to $100 million. PUB. L. 110-234, § 14012(c)(2). The Claims Resolution Act of 2010 increased that pool of assets by $1.15 billion, to a total of

$1.25 billion, on the condition that the proposed settlement agreement be approved. See PUB. L. 111-291, § 201(b). Taken out of context, that fund might seem vast. When considered in light of the Pigford I proceedings, however, it appears woefully insufficient to fund the judgments or to satisfy the meritorious claims likely to result from this litigation. Of the roughly 22,700 individuals who pursued claims under the Consent Decree, 99% elected to proceed along Track A and receive liquidated damages if they prevailed on their claims. 2010 Monitor Report at 10. Roughly 69% of those Track A claimants, or 15,645, succeeded in proving their entitlement to relief. Id. Even though each of those successful Track A claimants was entitled only to $50,000 plus debt and tax relief (amounting to $12,500), the aggregate amount of damages paid to those claimants amounted to more than $1 billion. Id. at 19.

More than 40,000 plaintiffs have already filed complaints in this case. Tens of thousands more may be entitled to participate in the litigation. See supra at 17. The $1.25 billion appropriated by Congress in the 2008 Farm Bill and the Claims Resolution Act would cover Track A cash damages and tax relief — a payment amounting to $62,500, see Pub. L. No. 110-234, § 14012(e), as amended by Pub. L. 111-291, § 201(f) ("Am. 2008 Farm Bill") — for only 20,000 successful claimants. That simple calculation does not take into account the facts that some claimants will also win debt relief, that others will pursue the more generous monetary relief afforded upon success in Track B, and that the costs of administering the claims resolution process will inevitably run into the tens of millions of dollars, further reducing the funds available for awards. Even if Pigford II class members prevail on their claims at far lower rates than their Pigford I predecessors — and there is no reason to believe that they would — it is

21

apparent that the available $1.25 billion fund is inadequate to pay for the awards of all successful claimants.

No party to this litigation — and none of those who filed objections or spoke at the Fairness Hearing — disputes that the funds made available by Congress in the 2008 Farm Bill and the Claims Resolution Act are insufficient to compensate the Pigford II plaintiffs.  Instead, the Martin Objectors contend that the fund established by the 2008 Farm Bill and the Claims Resolution Act is not "set definitely at [its] maximum."  See Martin Obj. at 14-17; Martin Reply at 6-7.  All of the arguments marshaled by the Martin Objectors in support of this assertion, however, are unpersuasive.

The Martin Objectors claim first that no limited fund can exist in this case because the defendant has engineered the limitation on the fund, in contravention of the Supreme Court's ruling in Ortiz that a fund does not qualify as "limited" for the purposes of a Rule 23(b)(1)(B) analysis if it is capped only "by the agreement of the parties."  Ortiz v. Fibreboard Corp., 527 U.S. at 848.  This argument lacks merit for two reasons.  First, the defendant in this case is the USDA.  As the text of the 2008 Farm Bill and the Claims Resolution Act makes clear, the USDA did not impose the limitation on the fund at issue here — Congress did.  Second, even if one were to ignore the fact that the USDA is a separate juridical entity from Congress, and so to imagine that the defendant here is simply equivalent to the United States government, the Martin Objectors ignore the fact that the government is that unique defendant which has the legal authority to define the extent of its own liability, unlike the private defendants in Ortiz.  See id. at 850 (limited fund would comprise defendant corporation's entire equity and insurance assets).  There is nothing improper or illegal about Congress' limitation of the plaintiffs' possible

22

recovery in this case to $1.25 billion, if the proposed settlement is approved, or to $100 million, if it is not.

Next, the Martin Objectors contend that there is no limited fund in this case because the Claims Resolution Act is unconstitutional, or because it "does not apply retroactively." Martin Reply at 6-8. While creative, these arguments are bizarre and frivolous. According to the Martin Objectors, the Claims Resolution Act violates the separation of powers between branches of government because it represents an attempt by Congress "to coerce the class and the Court into accepting th[e] proposed settlement." Id. at 6. Congress has not overstepped its bounds with respect to this case. Although Congress may lack authority to direct a court to reach a particular result in a given case without amending substantive law, see Robertson v. Seattle Audubon Soc'y, 503 U.S. 429, 436, 441 (1992), Congress certainly has not done so here. Indeed, the Claims Resolution Act makes clear that Congress has funded the proposed settlement agreement only if this Court approves the settlement in a final order. But nothing in the statute presumes to instruct the Court how or whether to decide if the settlement should be approved.

Nor is the Claims Resolution Act impermissibly retroactive. The Martin Objectors contend that the Act "is a conditional attempt to limit the funds of this case retroactively, contingent upon the class and this Court's acceptance of the settlement." Martin Reply at 213. That contention is silly. There is nothing retroactive about the limitation on funds in this case; the 2008 Farm Bill limited the available funds first, and it did so to a much lower number, $100 million, than the Claims Resolution Act. Furthermore, contrary to the conclusory assertions of the Martin Objectors, the Claims Resolution Act did not "'attach[] new legal

consequences to events completed before its enactment.'" Id. at 8 (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 270 (1994)).  The Act is a valid statute, one that makes available for the payment of claims in this case limited funds that may be combined with the even more limited funds appropriated by the 2008 Farm Bill.  Since there is no reason to believe that any further funds are or will be available for the payment of Pigford II claims, and since the available funds are inadequate to pay all claims fully, the first Ortiz requirement is satisfied.

### 2.  Dedication of the Fund to Class Claims

To qualify as a limited fund justifying the certification of a plaintiffs' class, "the whole of the inadequate fund" available for the payment of judgments must be dedicated "to the overwhelming claims."  Ortiz v. Fibreboard Corp., 527 U.S. at 839.  That criterion is easily met in this case.  The 2008 Farm Bill and the Claims Resolution Act appropriate the total of $1.25 billion specifically for use in the resolution and payment of Pigford II claims.  See Claims Resolution Act § 201(b); Am. 2008 Farm Bill § 201(f).

### 3.  Equitable Distribution of the Fund

In order for a class to be certified on a limited fund theory, "the class [must] comprise everyone who might state a claim on a single or repeated set of facts, invoking a common theory of recovery, to be satisfied from the limited fund as the source of payment." Ortiz v. Fibreboard Corp., 527 U.S. at 839.  Every plaintiff in this case proceeds on the theory of recovery spelled out in the 2008 Farm Bill, and every prevailing plaintiff will be paid out of the limited fund created by Congress.  Furthermore, the proposed class would include every person who could potentially be eligible for relief under Section 14012, encompassing every individual

who unsuccessfully petitioned for leave to file a late Pigford claim under Paragraph 5(g) of the consent decree. With all potential plaintiffs gathered into one class, the Court will be able to ensure that, even given an available fund insufficient to pay the full amount of all judgments, similarly situated plaintiffs will ultimately receive the same awards, thus satisfying the requirement that all claimants to the fund who are "identified by a common theory of recovery [will be] treated equitably among themselves." Ortiz v. Fibreboard Corp., 527 U.S. at 839. As explained below, see infra at 48-49, the proposed settlement agreement provides for an equitable division of the common fund among members of the plaintiffs' class.

### 4. Commonality

As the foregoing analysis indicates, the proposed plaintiffs' class meets the requirements identified in Ortiz as prerequisites for the formation of a Rule 23(b)(1)(B) class. For similar reasons, the proposed class also meets the requirement of Rule 23(a) of the Federal Rules of Civil Procedure that there be "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). "'What matters to class certification,'" however, "'is not the raising of common "questions" — even in droves — but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)) (emphasis in original). In other words, the determination of a disputed question or questions that are common to the various class members will "resolve an issue that is central to the validity of each one of the claims in one stroke." Id.

"Implicit in a finding that an action satisfies the requirements of Rule 23(b)(1) is the decision that there are questions of law or fact shared by the persons affected." 1 WILLIAM B. RUBENSTEIN, ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 3:10 (4th ed. 2002). The logic of that principle is evident upon a brief examination of the factual questions that must be answered before the common fund may be divided equitably among similarly situated plaintiffs: How many plaintiffs will prevail? What amount of damages will each prevailing class member be entitled to recover? And how, in the likely event that total recoverable damages exceed available funds, will each award be reduced? These questions are "central to the validity" of every single claim that could be brought in this matter because they will determine the extent to which any prevailing claimant is entitled to relief.

The Martin Objectors dismiss these common questions as "related solely to the issue of how potential class members, and consequently, class counsel, might get paid." Martin Reply at 3. But they fail to explain why that distinction matters. The sole function of the 2008 Farm Bill is to allow those farmers who were the subject of discrimination by the USDA and who meet other eligibility requirements to "get paid" — *i.e.*, be compensated for their injuries. Determining the amount of compensation that a given plaintiff may receive is central to the claims made in this lawsuit, and that determination cannot be made without answering the "common questions" identified above. The Martin Objectors have identified no way in which those questions could be answered in the absence of a Rule 23(b)(1)(B) class. Certification of a class to permit the proper determination of common questions is thus not only appropriate, but necessary in this case.

26

### B. Other Requirements of Rule 23(a)

In addition to the commonality requirement, Rule 23(a) conditions class

certification upon a showing that the proposed class "is so numerous that joinder of all members

is impracticable," FED. R. CIV. P. 23(a)(1); that "the claims . . . of the representative parties are

typical of the claims . . . of the class," id. 23(a)(3); and that the named plaintiffs "will fairly and

adequately protect the interests of the class." Id. 23(a)(4). No party or objector has claimed that

the proposed class fails to meet any of those three requirements, and the Court finds that each is

satisfied here.

### 1. Numerosity

"Courts in this District have generally found that the numerosity requirement is

satisfied and that joinder is impracticable where a proposed class has at least forty members."

Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd., 246 F.R.D. 349, 357 (D.D.C. 2007)

(listing cases); see also Cohen v. Chilcott, 522 F. Supp. 2d 105, 114 (D.D.C. 2007) (same).

Roughly 40,000 plaintiffs have filed claims at this point in the Pigford II litigation, and thousands

more may follow. Those thousands of plaintiffs and potential class members are scattered

throughout the country. See 2010 Monitor Report, App. 5 (showing the successful Pigford I

claimants came from more than forty states). Joining such a vast number of dispersed parties is

not practicable. See Pigford v. Glickman, 182 F.R.D. 341, 347-48 (D.D.C. 1998). The

numerosity requirement is satisfied.

2.  Typicality

The remaining requirements of Rule 23(a) identify "the desired qualifications of the representative parties" to a class action, FED. R. CIV. P. 23, advisory committee's note (1966 amendment), that the "claims or defenses" of the representative parties be "typical" of the claims of the class, and that the representative parties "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(3)-(4).  The typicality requirement "is 'intended to assess whether the action can be efficiently maintained as a class action and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented.'"  Pigford v. Glickman, 182 F.R.D. at 349 (quoting Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994)).  In other words, "[t]he typicality prerequisite assures that the class representative[s] share[] the issues common to other class members."  1 RUBENSTEIN, CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS § 3:13.

The three named plaintiffs proposed by the Moving Plaintiffs all share the classwide need for and interest in an equitable distribution of the limited fund available for damage awards.  Taken together, the allegations advanced by these plaintiffs are appropriately representative of the fact patterns underlying the claims of other putative class members. Proposed named plaintiffs James Copeland and Marshallene McNeil both allege that they were denied USDA program benefits between January 1, 1981, and December 31, 1996, as a result of racial discrimination.  See Am. Compl. ¶ 22 (alleging that "[b]etween 1990 and 1992, Mr. Copeland attempted to apply to USDA for an operating loan, but was told repeatedly that the USDA office had lost his applications"); id. ¶ 26 (claiming that "[i]n 1982, Ms. McNeil went to the [Farmers Home Administration] office in Camden, Alabama to request an operating loan, but

. . . her loan application was denied" based on racial discrimination).  The third named plaintiff proposed by the Moving Plaintiffs, Earl Moorer, proceeds not on his own behalf, but, like numerous other plaintiffs, as the heir of a family member — in his case, his father, John Moorer — who applied for and was denied USDA loan benefits repeatedly between 1981 and 1984 even as local white farmers received the benefits he was denied.  See id. ¶ 24.

Mr. Copeland, Ms. McNeil, and John Moorer each complained to the USDA about racial discrimination at least once between January 1, 1981, and July 1, 1997, but their complaints went unanswered.  See Am. Compl. ¶¶ 22, 24, 26.  Mr. Copeland and Earl Moorer, on behalf of the Estate of John Moorer, were both "late filers" in Pigford I; between October 13, 1999, and September 15, 2000, they petitioned under Paragraph 5(g) of the consent decree for the right to submit late claims, but their petitions were denied, and their claims went unadjudicated.  See id. ¶¶ 23, 35.  Ms. McNeil, on the other hand, is a "late-late filer."  She submitted a 5(g) petition prior to the effective date of the 2008 Farm Bill, but after the deadline established by this Court for the timely submission of such petitions.  See id. ¶ 27.

Each of these proposed representative plaintiffs alleges the same core facts as all other potential class members: injury resulting from racial discrimination by the USDA, followed by complaints about that discrimination that went unaddressed, and ultimately an unsuccessful and untimely attempt to join the claim resolution process established in Pigford I.  Since each of these plaintiffs has the same interest in ensuring equitable division of the available limited fund as do other putative class members, the Court finds the typicality requirement satisfied.

29

### 3. Adequacy of Representation

"The final element of Rule 23(a) necessitates an inquiry into the adequacy of representation, including the quality of class counsel, any disparity of interest between class representatives and members of the class, communication between class counsel and the class and the overall context of the litigation." Pigford v. Glickman, 182 F.R.D. at 350 (citing Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997)).  The Court has already found the interests of the representative plaintiffs to be in alignment with those of other putative class members.  It also finds that the representation afforded by class counsel is more than adequate.

Counsel for the proposed plaintiffs' class are 42 attorneys associated with 20 different law firms.  See Mot. for Final Approval, Ex. 2 ([Proposed] Final Approval Order and Judgment) ¶ 10.  These attorneys serve a wide variety of geographical areas in which likely claimants reside, including Alabama, Arkansas, Florida, Mississippi, North Carolina, Pennsylvania, South Carolina, and Virginia.  See id.  Among them are several attorneys — including Henry Sanders, Fayarose Sanders, David Frantz, and Phillip L. Fraas — who were deeply involved in the litigation of class claims in Pigford I and are familiar with the sorts of factual, legal, and administrative issues that may arise in this case.  Several members of class counsel have extensive experience in complex litigation in general and in class action litigation in particular.  See, e.g., Mot. for Prelim. Approval, Ex. 13 at 3 (professional accomplishments of co-lead counsel Andrew H. Marks).  In short, the members of this group of counsel collectively offer class members highly relevant legal skill and experience.

The overall context of this litigation confirms the Court's belief that class counsel will provide adequate representation. Although this case, involving many separate legal complaints and scores of attorneys, could have devolved into an endless series of squabbles between rival attorneys, class counsel, representing the vast majority of plaintiffs who have filed complaints under the 2008 Farm Bill, have managed to band together and to negotiate with the defendant a single comprehensive settlement. Perceiving that late filers and late-late filers might have adverse interests, see infra at 61-62, several class counsel sought to ensure that the two groups were represented by separate and independent attorneys. See Mot. to Withdraw at 3-4. Despite the large number of attorneys designated as class counsel, the responses of counsel to the Orders of this Court have been prompt, efficient, and well-coordinated. Based on the procedural history of this matter, the Court concludes that proposed class counsel will provide more than adequate representation to class members.

### C. The Court's Conclusion on Certification

The Court is satisfied that the requirements of Rule 23 of the Federal Rules of Civil Procedure are fulfilled by the proposed plaintiffs' class. Furthermore, the Court cannot imagine how the claims of the thousands of putative class members could be resolved efficiently and fairly in the absence of class treatment. Accordingly, the Court will certify a plaintiffs' class pursuant to Rule 23(b)(1)(B) of the Federal Rules.

31

### III. PROVISIONS OF PROPOSED SETTLEMENT AGREEMENT

#### A. Overview of the Claim Resolution Process

The proposed settlement agreement maintains the two-track claim resolution process created in Pigford I and replicated in Section 14012 of the 2008 Farm Bill, but modifies some aspects of that process in light of the strictly limited funds available for the resolution and payment of claims. As in Pigford I, the agreement provides for the creation of two alternative forms of claim resolution, designated Track A and Track B. See SA ¶ V. Under Track A, claimants must prove their claims by substantial evidence, the same evidentiary standard that was mandated for Track A claims in the Pigford I consent decree, and the standard that is prescribed by Section 14012 of the 2008 Farm Bill. Id. Those who prevail in Track A on a claim of discrimination in a credit program are entitled to a *maximum* of $50,000 in cash, forgiveness of certain categories of debt to the USDA, and tax relief equal to one-quarter of the combined value of awarded cash and debt relief. Id. ¶¶ II.LL-NN.[3]

Those claimants who proceed along Track B must, as in Pigford I, prove their claims by a preponderance of the evidence. SA ¶ V. If they prevail, those Track B claimants are entitled to a *maximum* of their proven actual damages or $250,000, whichever is less. Id. Claim determinations in both Track A and Track B will be made by a neutral third party, the "Track A Neutral" or the "Track B Neutral," and the determinations of both neutrals are final and not subject to appeal. Id. ¶ V.A.8.

---

[3]     Track A claimants who prevail on a claim of discrimination in a non-credit program are eligible for debt relief, tax relief, and maximum cash payments of $3,000. SA ¶ V.

No award will be paid to any claimant until after determinations have been rendered on all claims — a process expected to last for approximately a year. Once all claims have been resolved, the cash value of awards payable to successful claimants will be compared to the value of available funds, consisting of the appropriated $1.25 billion, less administrative and implementation costs and attorneys' fees. See SA ¶¶ V.E.4-5. If payable awards exceed available funds, awards will be reduced ratably according to a predetermined procedure. First, if the total of Track B awards exceeds $100 million, those awards will be proportionately reduced until their total falls below the $100 million cap. Id. ¶ V.E.5.a. If the total value of Track A and Track B awards still exceeds available funds, then the awards of late-late filers will be reduced, again on a *pro rata* basis, by up to 30% of their value. Id. ¶ V.E.5.b. If the total value of awards still, even after those reductions, exceeds available funds, then all awards will be proportionately reduced until their aggregate value is equal to or less than the amount of available funds. Id. ¶ V.E.5.c. Awards will then be paid out to successful claimants. Id. ¶¶ V.E.8.

## B. Method of Determining Claims

The agreement's provisions become operational only if this Court's final order approving the settlement is either upheld on appeal or ceases to be subject to appeal. SA ¶ II.L. Once either of those two conditions is met, members of the plaintiffs' class will have 180 days — roughly six months — to submit their claims for resolution. Id. ¶ II.D. To do so, each claimant must submit to Epiq Systems, Inc. (the "Claims Administrator") a "Claim Package" that includes, among other documentation, the following: (1) a sworn declaration by the claimant in which he or she states, among other things, whether he or she submitted a late-filing request

33

under Paragraph 5(g) of the Pigford I consent decree during the relevant time period, and whether he or she has received a determination on the merits of a claim in Pigford I, see id., Ex. C at 3; and (2) a sworn declaration by the claimant's counsel that "the claim is supported by existing law and the factual contentions have evidentiary support." Id. ¶ V.A. The claimant must also indicate at that time whether the claim is to be evaluated under Track A or Track B of the claim resolution structure. See id., Ex. C at 4. For those who choose Track A, that choice is final. See id. Class counsel have committed to providing direct assistance to would-be claimants as they prepare their claim packages and decide whether to proceed along Track A or Track B. See Mot. for Prelim. Approval at 21.[4]

Once the claimant has submitted a timely and complete Claim Package to the Claims Administrator, the Claims Administrator will determine whether the claimant has established by a preponderance of the evidence that he or she is a member of the plaintiffs' class. SA ¶ V.B.4. The Claims Administrator's determination regarding class membership is final and not subject to review. Id. ¶ V.B.5. If the Claims Administrator determines that a claimant has established class membership, and that claimant has elected to proceed along Track A, the Claim Package will be forwarded to the Track A Neutral for review and determination of the claim. Id. ¶ V.B.6. The Claims Administrator will retain Track B Claim Packages until the close of the 180-day claim submission period. At that point, the Claims Administrator will notify all claimants who have elected to proceed along Track B of the number of other claimants who have

---

[4]     Exhibit C to the Settlement Agreement was the Claim Form claimants were to submit. Following the Fairness Hearing, the Claim Form was revised and the revised form was submitted to the Court on October 7, 2011. See Notice of Revision of Proposed Claim Form, Docket No. 226. At the request of lead class counsel, with the consent of the defendant, the Court will approve the revised Claim Form in the accompanying Order and Judgment.

chosen to do the same. Id. ¶ V.B.7. At that point, claimants who have selected Track B may opt instead for Track A if they choose to do so and notify the Claims Administrator. Id. If they do not so notify the Claims Administrator within a specified period of time, their selection of Track B becomes final and irrevocable. Id.

To prevail on a Track A claim, a plaintiffs' class member must show by substantial evidence that the class member (1) "is an African-American who farmed, or attempted to farm, between January 1, 1981, and December 31, 1996"; (2) "owned or leased, or attempted to own or lease, farm lands"; (3) "applied, or constructively applied, for a specific farm credit transaction(s) or non-credit benefit(s) at a USDA office between January 1, 1981, and December 31, 1996"; (4) was denied the requested loan or benefits, or was provided a loan or benefits late, on terms less favorable than those requested, or subject to "restrictive condition[s]"; (5) sustained economic damages as a result of USDA's handling of the application for a loan or benefits; and (6) "complained of discrimination to an official of the United States Government on or before July 1, 1997, regarding USDA's treatment of him or her in response to the application." SA ¶ V.C.1. Notably, class members proceeding on Track A under the settlement will not be required, as they would have been under the Pigford I consent decree, to identify a specific "similarly situated white farmer" who received better treatment from the USDA during the relevant time period. The USDA will not participate in the claim determination process, except to provide information about debt owed by the claimant that may be eligible for forgiveness if the claimant prevails. Id. ¶ V.C.3. All documentation before the Track A Neutral, then, will come from materials "submitted by the Class Member." Id.

35

A class member proceeding under Track B must establish, "by a preponderance of the evidence and through independent documentary evidence admissible under the Federal Rules of Evidence," the same elements that a Track A claimant must, with the additional requirement that a Track B claimant must also show that the "treatment of the [claimant's] loan application(s) by [the] USDA was less favorable than that accorded a specifically identified, similarly situated white farmer." SA ¶ V.D.1. As with Track A, the USDA will not participate in the Track B claim determination process, nor are Track B claimants entitled to any discovery from the USDA. Id. ¶¶ V.A.9, 11. Unlike the Track B process created by the Pigford I consent decree, the Track B resolution of claims under the settlement agreement involves only documentary evidence and does not require or allow a "mini-trial." See Mot. for Prelim. Approval at 17.

### C. Ombudsman

At the request of the Court, the Moving Plaintiffs and the defendant have provided in the settlement agreement for the appointment by the Court of a neutral third party, known as the "Ombudsman," to serve as the arm of the Court during the implementation of the claim resolution process. See SA ¶ VI. It will be the responsibility of the Ombudsman to (1) serve as a neutral party to whom complaints or concerns about the claim resolution process may be presented; (2) work with the parties' counsel and, if necessary, the Court to address any serious concerns or problems that arise during the implementation of the settlement agreement; and (3) report in writing to the Court, the defendant, and class counsel regarding "the good faith implementation" of the settlement agreement. See id. Unlike the Monitor appointed under the consent decree in Pigford I, the Ombudsman will not have any power to reexamine the merits of

any claim, nor will he or she have the authority to require the defendant to take any particular actions. Id. ¶ VI.C.

### D. Implementation Costs, Attorneys' Fees, and Legal Representation for Class Members

Of the $1.25 billion made available by the 2008 Farm Bill and the Claims Resolution Act, a maximum of $38.5 million may be allocated for "implementation costs" — "Court-approved administrative costs associated with implementing" the claims resolution process created by the settlement agreement. SA ¶¶ II.I, R. The costs of the Ombudsman, which should be far less than those associated with other aspects of the settlement agreement, are not included in the $38.5 million reserved for implementation costs, and must be drawn from the $100 million appropriated by the 2008 Farm Bill. Id. ¶ II.R, U.

The amount of attorneys' fees payable to class counsel is to be determined as a percentage of $1.25 billion minus $22.5 million ($1,227,500,000) — a calculation presumably intended to remove expected implementation costs from the fund, the size of which determines class counsel's fees. After the completion of the claims resolution process, the Court will approve a lump-sum fee for class counsel that will not exceed 7.4% of $1,227,500,000 ($90,835,000) or be less than 4.1% of $1,227,500,000 ($50,327,500). SA ¶ II.O. That fee will be divided among class counsel pursuant to the terms of the settlement agreement and a separate contract executed between and among class counsel. See id. ¶ X.E; Mot. for Fees, Ex. A.

As required by the settlement agreement, class counsel will represent any Track A claimant during the claims resolution process without seeking or receiving any additional fee from the claimant. SA ¶ VIII.A.2. Or if they choose, Track A claimants may retain non-class

37

counsel to represent them; such counsel may seek a fee of up to 2% of any award ultimately

made to a Track A claimant that he or she represents. Id. ¶ X.A. Track B claimants, regardless

of whether they are represented by class counsel or another attorney, may be required to pay up to

8% of any award they receive in exchange for legal representation. Id. No class counsel

designated by the accompanying Order and Judgment may seek to enforce the terms of any

existing contingency fee agreements with class members.

### E. Provisions Required by the Claims Resolution Act

The Court notes that the funds appropriated by the Claims Resolution Act become

available to finance the settlement only upon a finding by the Court that "the Settlement

Agreement [has been] modified to incorporate the additional terms contained in subsection (g)"

of the statute. Claims Resolution Act § 201(b). The Court finds that this requirement of the

statute has been satisfied. In particular, the settlement agreement has been modified to provide

that (1) the Track A and B neutrals will be approved by the Court, the USDA, and the United

States Attorney General, see SA ¶¶ II.JJ, RR; (2) all Track A and B neutrals must take an oath

administered by this Court that "he or she will determine each claim faithfully, fairly, and to the

best of his or her ability," see id.; (3) counsel representing any claimant in the claims resolution

process must produce a sworn statement to the effect that "to the best of the attorney's

knowledge, information, and belief formed after an inquiry reasonable under the circumstances,

the claim is supported by existing law and the factual contentions have evidentiary support," id.

¶ V.A.1.c.; (4) any Track A or Track B neutral may request more documentation or evidence

from a claimant "if, in the [neutral's] judgment, additional documentation and evidence would be

38

necessary or helpful in deciding the merits of a particular claim, or if the [neutral] suspects fraud regarding a particular claim," id. ¶¶ V.C.4, D.4; and (5) the Claims Administrator will prepare and provide to the USDA, the USDA's Inspector General, the Attorney General, and lead class counsel a report accounting for the use of all funds disbursed pursuant to the settlement agreement. See id. ¶ V.F.

## IV. FAIRNESS OF PROPOSED SETTLEMENT AGREEMENT

Under Rule 23 of the Federal Rules of Civil Procedure, no class action may be dismissed, settled, or compromised without the approval of the Court. FED. R. CIV. P. 23(e). Before giving its approval, the Court must direct the provision of adequate notice to all members of the class, id., conduct a "fairness hearing," and find, after notice and a hearing, that the "settlement is fair, adequate and reasonable and is not the product of collusion between the parties." Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998). In performing this task, the Court must protect the interests of those unnamed class members whose rights may be affected by the settlement of the action.

In this circuit there is "no obligatory test" that the Court must use to determine whether a settlement is fair, adequate, and reasonable. Osher v. SCA Realty I, Inc., 945 F. Supp. 298, 303-04 (D.D.C.1996); see also Radosti v. Envision EMI, LLC, 717 F. Supp. 2d 37, 54 (D.D.C. 2010). Instead, the Court must consider the facts and circumstances of the case, ascertain what factors are most relevant in the circumstances, and exercise its discretion in deciding whether approval of the proposed settlement is fair. By far the most important factor is a comparison of the terms of the compromise or settlement with the likely recovery that plaintiffs

would realize if the case went to trial.  See Pigford v. Glickman, 185 F.R.D. at 98 (collecting

cases).  In addition, courts frequently find the following factors relevant in assessing the fairness

of a proposed settlement: (1) "whether the settlement is the result of arm's-length negotiations";

(2) "the status of the litigation at the time of the settlement"; (3) "the reaction of the class"; and

(4) "the opinion of experienced counsel."  Radosti v. Envision EMI, LLC, 717 F. Supp. 2d at 55.

Having carefully considered all of the objections that have been filed with the Court or expressed

at the Fairness Hearing, the Court concludes that the settlement is fair, adequate, and reasonable.[5]

---

[5]  The following individuals and/or organizations submitted written or oral comments or objections: the Martin Objectors (Larry Morgan, M.C. Moore, Willie Parker, Sr., Vernon Ross, Sr., Blanche Ross, Lewis Walker, Thomas Walker, Inez Washington, Steven Bailey, and O.C. Anthony); Thomas Burrell, President of the Black Farmers and Agriculturalists Association;  Ralph Paige, Executive Director of the Federation of Southern Cooperatives Land Assistance Fund; Dr. Dewayne L. Goldmon, Chairman of the National Black Agricultural Alliance; Tracy Lloyd McCurty, representing the Rural Coalition; John Zippert, representing the Federation of Southern Cooperatives; John W. Boyd, Jr., President of the National Black Farmers Association; Bernice Atchison, President of the Black Farmers of Chilton County, Alabama; Justin and Willa Fouts; Booker T. Woodard; Diahann C. Stevens; Errol Von Hart; Eddie Lee Gray; Muhommad Rabbalaa and Henry Burris; Karla K. Adams and Terrie L., Theodore B., Brad E., Kerry F., and Ava L. Bates; Lillie M. Wingard; Robert E. Walker; M. Murline Price; Joyce A. Smith; Doris Gray; James Coleman; William Paramore; Gloria Davis Gilmore; Carl Ulyssess Eggleston; Jonathan Grant; Melvin Bishop; Obie Beal; and Pauline and Johnny Hughes.

Although the Court instructed potential objectors in its Preliminary Approval Order that they must include in their objections a "statement explaining the basis for the objector's belief that he or she is a Class Member," most objectors failed to do so.  In re: Black Farmers Discrimination Litig., Misc. No. 08-0511, Order Granting Preliminary Approval of Settlement Agreement ¶ 28(a) (D.D.C. May 13, 2011).  Based on the record before the Court, it appears that only the following individuals may have standing to make objections: Bernice Atchison, Larry Morgan, Blanche Ross, Thomas Walker, Inez Washington, Errol Von Hart, Eddie Lee Gray, Doris Gray, William V. Paramore, Lille M. Wingard, M. Murline Price, Karla K. Bates, Terrie L. Bates, Brad E. Bates, and Kerry F. Bates.  See Pigford v. Glickman, 185 F.R.D. at 103 n.17 (citing Mayfield v. Barr, 985 F.2d 1090 (D.C. Cir. 1993)) (in general, only putative class members have standing to object to proposed settlement agreement).  Nevertheless, the Court has carefully considered all comments or objections submitted, and discusses them where appropriate.

*A. The Process of Settlement and Context of the Litigation*

1. Timing and Negotiation of Settlement

The Court has received very few substantive objections concerning the manner and context in which the settlement was negotiated — an unsurprising state of affairs given the nature of this litigation and of most of the counsel involved with it. As the text of Section 14012 of the 2008 Farm Bill makes clear, that statute is intended to provide certain African-American farmers who were unable to pursue relief under the Pigford I consent decree a second chance of sorts, an opportunity to gain relief similar to that afforded by the consent decree by engaging in a dispute resolution process similar to the one created by the decree. See Am. 2008 Farm Bill § 14012(d)-(f). As a result, when counsel in this case initiated settlement negotiations, they already had a template for their efforts, one that had been field-tested for roughly ten years: the Pigford I consent decree. Unlike in many class actions, here both plaintiffs' counsel, among whom are a number of attorneys who participated in Pigford I, and defendant's counsel, at least one of whom participated in Pigford I, were in a position from the outset of this case to gauge the defendant's liability, the sort of proof that would be required to establish plaintiffs' claims, the types of legal and factual questions that might arise during the adjudication process, and the range of problems that would arise in the management of the litigation. Class counsel and defendant's counsel thus were ideally situated to assess the strength of their litigating positions and to negotiate accordingly.

At the same time, despite the wealth of knowledge made available to counsel in this matter by the litigation in Pigford I, there was no rush to settlement in this case. Class counsel, led by Andrew H. Marks of Crowell & Moring, and defendant's counsel, led by Michael

41

Sitcov of the Department of Justice, negotiated the terms of the agreement currently before the Court for almost two years, exchanging more than 20 drafts of the settlement during the process. Mot. for Prelim. Approval, Ex. 13 ¶¶ 2, 5; Sept. 1 Tr. at 26 (statement of Mr. Marks). From all accounts, the negotiations were "vigorous" and at "arm's length." Id. There is no hint in the record, and no suggestion by any objector, that the attorneys who negotiated the terms of the proposed agreement were anything other than professional and zealous in the defense of their respective clients' interests during the negotiation process.

The Martin Objectors have suggested, in a conclusory manner, that plaintiffs' counsel failed to engage in sufficient discovery before accepting the settlement agreement that has been proposed. According to the Martin Objectors, "[t]here is no evidence, absent discovery, to determine the strength of the Plaintiffs' cases, or, therefore, what a proper settlement amount might be." Martin Obj. at 5. While insufficient discovery is a charge frequently raised by those objecting to a proposed class settlement, the claim that class counsel were not sufficiently familiar with the factual underpinnings of this case is simply not credible. This case rests upon the same factual predicates as Pigford I, in which "'a literal mountain of discovery [was] provided and reviewed.'" Pigford v. Glickman, 185 F.R.D. at 99 (citation omitted). USDA's liability for widespread discrimination against African-American farmers in the relevant time period is not in dispute. See supra at 4. In addition, the 12 years of proceedings that have taken place under the Pigford I consent decree have provided counsel in this case with a huge amount of data — including the detailed annual Monitor's Reports — from which to extrapolate the likely success rate of Pigford II plaintiffs. Against this backdrop, the assertion that "[t]here is no

42

evidence" from which class counsel might estimate the strength of the plaintiffs' case is profoundly unpersuasive.

As the foregoing analysis indicates, the proposed settlement agreement was the result of arm's-length negotiations by experienced counsel who had extensive knowledge about the factual basis of the case. As a result, the settlement is entitled to "[a] presumption of fairness, adequacy, and reasonableness." Radosti v. Envision EMI, LLC., 717 F. Supp. 2d at 56.

### 2.  Adequacy of Notice

"When a class is certified and a settlement is proposed, the parties are required to provide class members with the 'best notice practicable under the circumstances.'" Pigford v. Glickman, 185 F.R.D. at 101 (quoting FED. R. CIV. P. 23(c)(2)).  In this case, class members have received more than adequate notice and have had sufficient opportunity to be heard on the fairness of the proposed settlement.

Notice of the proposed settlement was provided promptly, allowing potential class members ample time to lodge objections, and was disseminated in a manner calculated to reach as many of those putative class members as was practicable.  The best possible source of the names and addresses of potential class members, the Pigford I Facilitator's list of 5(g) petitioners, was put to good use; postcard notice of the proposed settlement was mailed directly to almost 90,000 possible class members on June 3, 2011, some ten weeks before the deadline for filing a written objection.  See Mot. for Final Approval, Ex. B ¶ 6.  Class counsel also retained a firm specializing in the provision of class action notice, which developed and

implemented a comprehensive scheme for reaching a vast array of potential class members by use of radio, television, print, and Internet campaigns. See supra at 16-17.

Although the content of the notice provided by class counsel varied somewhat depending on the format in which it was presented, every form of notice was carefully designed to give any potential class member easy access to detailed information regarding "'the terms of the proposed settlement and . . . the options that are open to [class members] in connection with [the] proceedings'" in this Court. Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1078 (2d Cir. 1995) (citation omitted). And, unlike in some class action cases, despite the complexity of the case, the notices were written in easy-to-understand plain English.

Short-form notices gave possible class members an overview of the subject matter of this litigation, the major forms of relief that might be available to them under the proposed settlement, and their right to submit objections. See, e.g., Mot. for Prelim. Approval, Ex. 5, Attach. 3, App. 4 (postcard notice). Those short-form notices also directed potential class members to both a toll-free telephone number and a website through which an individual could obtain long-form notice. See id. Long-form notices provided detailed but accessible summaries of the nature of this litigation, the requirements for class membership, the terms of the proposed settlement, the date, location, and purpose of the Fairness Hearing, and the manner in which objections could be submitted. See id., App. 5 (long-form notice). Putative class members were also instructed on how to file a claim in the event that the settlement is approved. See id. at 8. The notice provided a toll-free number that could be used to contact class counsel. See id. at 9. In short, class counsel's notice program was exceptionally well-designed by Kinsella Media,

44

LLC to reach as many potential class members as was practicable and to provide in a comprehensible way exactly the information that such class members might want and need.

### 3.  Responses of Class Members

Potential class members were given a lengthy period in which to file objections to the settlement, and the Court has given careful consideration to all objections, even those that were filed late, that did not meet the substantive or procedural requirements outlined in the Court's Preliminary Approval Order, or that were submitted by individuals who did not attempt or otherwise failed to establish that they are members of the proposed settlement class.  As the Court has already discussed, see supra at 17, the proposed plaintiffs' class in this matter could encompass tens of thousands of individuals.  In light of that fact, it is significant that only approximately 15 likely class members have made objections to the settlement.  See Pigford v. Glickman, 185 F.R.D. at 102 (noting as a factor weighing in favor of settlement approval that "there are relatively few objections to the settlement in comparison with the size of the class").  By contrast, there is powerful evidence that the vast majority of possible class members are enthusiastic about the settlement and welcome the opportunity to pursue relief under its provisions.  According to the Claims Administrator, 62,715 individuals have already requested a Claims Package so that they may participate in the claim resolution process once the settlement is approved and implemented.  Mot. for Final Approval, Ex. B ¶ 13.  Given the overwhelming indications of support for and interest in the settlement and the comparatively minuscule number of objections to it, the Court easily concludes that the mere fact that some potential class

members dislike aspects of the settlement is not sufficient to demonstrate that the settlement is not fair and adequate.  See Pigford v. Glickman, 185 F.R.D. at 102.

### B. Substantive Fairness of the Settlement

As our court of appeals has said, in considering a proposed class action settlement, the Court first must compare the benefits afforded to class members under the settlement with the likely recovery that plaintiffs would have realized if they pursued the resolution of their claims through litigation in court.  See Thomas v. Albright, 139 F.3d at 231. The Court must look at the settlement as a whole and should not reject a settlement merely because individual class members claim that they would have received more by litigating rather than settling.  The Court should scrutinize the terms of the settlement carefully, but the discretion of the Court to reject a settlement is restrained by the "principle of preference" that encourages settlements.  See Durrett v. Hous. Auth. of City of Providence, 896 F.2d 600, 604 (1st Cir. 1990); Radosti v. Envison EMI, LLC, 717 F. Supp. 2d at 51; In re Vitamins Antitrust Litig., 305 F. Supp. 2d 100, 103 (D.D.C. 2004); Pigford v. Glickman, 185 F.R.D. at 103.  Furthermore, "the Court [should not] make the proponents of the agreement justify each term of settlement against a hypothetical measure of what concessions might have been gained." Stewart v. Rubin, 948 F. Supp. 1077, 1087 (D.D.C. 1996).  The relevant question is whether the structure of the settlement and the substantive relief, including the amount of money provided, are fair and reasonable when compared with the recovery that plaintiffs likely would have realized if their claims were decided through the judicial process.  In this case, the benefits offered to plaintiffs by the settlement agreement are so substantial, and the likely outcome of this case to individual plaintiffs if it were

to proceed to a final resolution in court is so dismal, that the Court is firmly convinced that the settlement is fair, adequate, and reasonable.

### 1. Likely Results of Settlement Contrasted with In-Court Adjudication

In the absence of the proposed settlement, the plaintiffs' prospects for recovery are sobering. The $1.15 billion appropriated by Congress in the Claims Resolution Act is specifically earmarked for the funding of the proposed settlement agreement and its availability is contingent on the approval of a settlement. Indeed, the statute precisely identifies the agreement funded as the one executed by class counsel and the defendant on February 18, 2010, as subsequently revised, if at all, by agreement of the parties. See Claims Resolution Act § 201(a)(1). Without that additional $1.15 billion — *i.e.*, in the absence of an approved settlement agreement — the only funds available for prevailing plaintiffs in this matter are the $100 million appropriated by Section 14012 of the 2008 Farm Bill. See Am. 2008 Farm Bill § 14012(c)(2). Although the Farm Bill originally suggested that more funds might be available for the payment of claims in this case as the initial $100 million fund was depleted, see 2008 Farm Bill § 14012(i)(2), j(2), the Claims Resolution Act amended the Farm Bill to remove that possibility and explicitly provided: "If the Settlement Agreement is not approved as provided in this subsection, the $100,000,000 of funds . . . made available by section 14012(i) of the [2008 Farm Bill] shall be the *sole funding available* for Pigford claims." Claims Resolution Act § 201(b) (emphasis added). At $50,000 per claim, see supra at 32, that $100 million would cover Track A *cash* damages — excluding damages paid in the form of loan forgiveness and tax relief — for only 2,000 of the tens of thousands of plaintiffs in this case.

If the plaintiffs were to pursue relief solely through litigation in this Court and not through the claim determination process created by the settlement agreement, the formidable obstacles to a reasonable recovery for prevailing plaintiffs would derive not only from the grossly insufficient funds available for the payment of claims, but also from staggering, perhaps insurmountable, case management problems. The 23 complaints filed in this Court under Section 14012 of the 2008 Farm Bill name 40,000 individual plaintiffs. Section 14012 provides that the claim of every plaintiff should be determined by this Court. See Am. 2008 Farm Bill § 14012(b), (e)(1)(B). Adjudication of individual claims on such a massive scale would take decades. See Pigford v. Glickman, 185 F.R.D. at 94. Indeed, any judicial adjudication of the claims authorized by Section 14012 would be so "unmanageable," id., that it is almost impossible not to conclude that Congress expected and intended this matter to be resolved by a class action settlement.

Furthermore, in the absence of settlement, it is unclear that the severely limited fund available for the payment of awards could be distributed equitably among prevailing plaintiffs. Under the proposed settlement, the equitable division of available funds is ensured because individual adjudications will occur swiftly, in approximately a year, and payments from the fund will be made to prevailing claimants only once the amount of all awards is determined. In contrast, in the absence of the settlement and the certification of a Rule 23(b)(1)(B) limited fund class, it might not be possible for the Court to delay the payment of awards pending the adjudication of all claims — meaning that available funds would be exhausted by payments to prevailing claimants long before all claims were decided. Even if payments could be delayed, adjudication of all claims would be so time-consuming that payments to claimants might not be

48

made for many years.  Such a result is undesirable in a case where the injuries to be redressed are already decades old and many of those likely entitled to relief are elderly or already deceased.  It is also contrary to the intent of Congress, which expressed its wish in the 2008 Farm Bill that the claims of plaintiffs in this case "be resolved in an expeditious and just manner."  Am. 2008 Farm Bill § 14011.

        Some of the individuals who have objected to the proposed settlement appear to be proceeding under the misapprehension that African-American farmers who were unable to present their claims in Pigford I may obtain resolution of those claims by filing a complaint under a statute other than Section 14012 of the 2008 Farm Bill.  For example, Mr. Thomas Burrell, president of the Black Farmers and Agriculturalists Association, asserted at the fairness hearing and in a written submission, see Burrell Notice ¶¶ 27-28, that "the 66,000 or so[] claimants who were denied entry into Pigford I" may still file complaints in court under Section 741 of Public Law No. 105-277, the 1998 statute that revived certain stale ECOA claims by permitting them to be filed at any time within two years of the statute's enactment.  See PUB. L. NO. 105-277, § 741; supra at 4.  Mr. Burrell is simply wrong.  The Pigford I consent decree by its terms extinguished the ECOA claims against the USDA of all members of the Pigford I plaintiffs' class who did not opt out of the consent decree by August 30, 1999.  See Consent Decree ¶ 18; Pigford v. Veneman, 208 F.R.D. 21, 23 (D.D.C. 2002).  Thus, *no* Pigford claimant who did not opt out of the class by August 30, 1999, could pursue his or her Pigford claim in court, whether under Section 741 or otherwise.

        Those individuals who fit the definition of the plaintiffs' class in Pigford *and* who filed a timely opt-out notice were permitted to pursue their claims under ECOA and Section 741

49

in court rather than under the consent decree; but to do so, they had to file in court a complaint

setting out their claims prior to the end of the statute of limitations period established by Section

741 — that is, on or before October 21, 2000.  Thus, *none* of the "66,000 or so[] claimants," by

Mr. Burrell's calculation, "who were denied entry into Pigford I" can, at this late date, pursue

their Pigford claims under Section 741 and/or ECOA.  Their only avenue of relief is Section

14012 of the 2008 Farm Bill.

      As the Court has made clear, those with claims under Section 14012 are faced

with two drastically different possibilities for resolution of those claims: a decades-long process

of in-court adjudication that may end by providing little or no recovery for most claimants, or the

alternative, out-of-court claims process created by the proposed settlement agreement, which

would provide claimants with a much larger potential recovery and permit the payment of awards

in one to two years.  The merits of these options are not similar; the settlement agreement affords

the far better result.  Furthermore, in light of various statutory and financial constraints, the

settlement agreement strikes a fair, reasonable, and adequate balance between the competing

concerns of all affected parties.

### 2.  Breadth of Plaintiffs' Class

      Various objectors have complained that the plaintiffs' class contemplated by the

settlement agreement is either too narrow or too broad.  A number of objectors, most prominently

those represented by attorney Precious Martin, argue that the class is too broad because it does

not permit any individual falling within its definition to opt out of the class and, by extension, out

of the settlement agreement. See Martin Obj. at 12-13. Indeed, the Martin Objectors assert that

any class settlement that does not permit opt-outs is unconstitutional. See id. The Court is aware

of no authority establishing such a rule. On the contrary, "courts should not permit opt-outs

when doing so would undermine the policies behind (b)(1) . . . certification[.]" Eubanks v.

Billington, 110 F.3d 87, 94-95 (D.C. Cir. 1997); see also Keepseagle v. Johanns, 236 F.R.D. 1,

3-4 (D.D.C. 2006) (same).

   In this case, permitting opt-outs would destroy the fairness of the proposed

settlement and defeat the purpose of certification of a Rule 23(b)(1)(B) class. The settlement

agreement addresses the problem of insufficient available funding by providing for delayed

payment of awards and, if necessary, the *pro rata* reduction of awards to ensure that similarly

situated claimants receive the same recovery. See supra at 33. If class members were permitted

to opt out of the claim resolution process created by the settlement agreement, they could pursue

their claims in court and avoid both delayed payment of awards and any equitable reductions in

the amount of their recovery, destroying the safeguards intended to provide for the fair

distribution of limited funds. Furthermore, if presented with the opportunity to escape from the

restrictions imposed by the settlement agreement, plaintiffs would likely opt out in large

numbers, rendering the agreement a dead letter. Opt-outs are thus contrary to the interests of the

plaintiffs' class as a whole and cannot be permitted.

   Other objectors have suggested that the proposed plaintiffs' class is too exclusive.

They argue that this litigation should afford relief to "the large number of active farmers who

were outright denied or denied proper debt relief in the first Pigford settlement," NBAA Letter

at 5, or individuals who filed late or incomplete claim packages or petitions for Monitor review

51

in Pigford I. See Federation Letter at 2. The definition of the plaintiffs' class contained within

the settlement agreement, however, tracks the language of the 2008 Farm Bill, see supra at 18,

and encompasses every individual authorized by the statute to pursue relief under its provisions.

Pigford I claimants whose claims under the consent decree were presented to and denied by the

Adjudicator or the Arbitrator are not eligible for any relief under the statute. See Am. 2008 Farm

Bill § 14012(b). The settlement agreement cannot provide relief to those with no legal

entitlement to it.

### 3. Adjudication Process

Perhaps the most difficult problem confronted by the negotiators of the settlement

agreement was the need to balance, on one side, the interests of all parties and the United States

itself in the accurate determination of claims, and on the other, the practical reality that most

class members, because of the passage of time and the failure of the USDA to investigate civil

rights complaints during the relevant time period, cannot meet the stringent evidentiary standards

required in traditional litigation to prove their claims. It was widely felt by all parties in Pigford I

that drastic remedial action was required in light of the USDA's history of discrimination, and

that "class members' lack of documentation [of their claims] [was] at least in part attributable to

the passage of time which ha[d] been exacerbated by the USDA's failure to timely process

complaints of discrimination." Pigford v. Glickman, 185 F.R.D. at 94. Therefore, Track A, with

its lowered burden of proof, was designed to provide 'virtually automatic" relief to those who

had "little or no documentary evidence." Id. at 95. Yet, because of the similarly situated white

farmer requirement, that turned out not to be the case; only 69% of Track A claimants prevailed,

even after Monitor review of the Adjudicator's claim decisions. See 2010 Monitor Report at 10. In light of that fact, some commenters have suggested that the Track A adjudication process should be less rigorous than the settlement agreement proposes. See, e.g., NBAA Letter at 5 ("[O]nce a Black farmer proves that he is an eligible party, the evidence of discrimination should include information that could easily be provided by the complainant or USDA.").

Set against any impulse to ease the requirements of the Track A adjudication process is the need to ensure that relief goes to those who truly are entitled to redress — those who were victims of USDA discrimination during the relevant time period. This interest is particularly strong in a limited fund case, where any erroneous award reduces the total pool of money available for plaintiffs with meritorious complaints. At the same time, the existence of a limited fund of available assets that must be used both to pay awards and to cover implementation costs increases the pressure to keep those implementation costs — including the costs of adjudication — low.[6]

Finally, the congressionally established limitation on the liability of the government in this case removes the defendant's financial incentive to contest claims, for the amount that may be paid to claimants, regardless of how many claimants are successful, is fixed, while the government incurs more and more costs every time the Department of Justice or the Department of Agriculture becomes involved in the adjudication process. And in fact, the settlement agreement provides that neither agency will oppose claims made in the adjudication

---

[6]     Furthermore, it would be difficult to imagine a less rigorous standard than the "substantial evidence" burden as defined in the settlement agreement, SA ¶ V.C, in combination with the elimination of the requirement in Track A to show that a similarly situated white farmer was treated more favorably by USDA. Compare SA ¶ V.C, with Consent Decree ¶ 9(a)(i)(C).

process; nor may any claimant obtain discovery from the USDA, with the exception of information about the claimant's own debts. See SA ¶ V.A.9. Those provisions of the agreement will dramatically reduce the defendant's costs and accelerate the rate at which claim determinations may be made; they will also, on balance and in combination with the elimination of the requirement that Track A claimants identify a "similarly situated white farmer," see supra at 35, likely lead to an increase in the number of Track A claimants who are able to prevail on their claims. At the same time, however, the non-participation of the USDA in the adjudication process removes one means of ensuring accurate claim determinations. In the absence of information supplied by the USDA, plaintiffs' claims will succeed or fail based solely on the strength of the claimants' submissions — their level of detail and coherence, their consistency, and their credibility.

It is clear from the filings of class counsel and from the settlement agreement itself that both the Moving Plaintiffs and the defendant are sensitive to the competing concerns at play in the claim determination process and have structured that process accordingly. While the defendant has little if any financial incentive to be concerned about the structure of the adjudication process, it does, as a government agency, have a fiduciary duty to ensure that public funds are disbursed responsibly and with a reasonable likelihood of reaching their intended recipients.[7] In the Court's view, it has fulfilled that duty. Working within the constraints

---

[7]     That fiduciary duty includes the responsibility to investigate any fraudulent claims by claimants, as well as scams on and misrepresentations made to claimants. As was made clear at the Fairness Hearing, there is evidence that such scams and misrepresentations have taken place in the past and continue to be of concern to claimants and their attorneys today. See Sept. 1 Tr. at 160-64 (statement of Ms. Rose Sanders). In addition, class counsel and the neutrals shall promptly bring to the attention of the Inspector General of the Department of Agriculture, to the United States Department of Justice, and to the Ombudsman appointed by the Court pursuant to

imposed by Congress' limitation of available funding, class counsel and defendant's counsel have proposed a system of adjudication that would subject each claim to careful and rigorous review while keeping costs in check.

Track A claims, subject to a lower standard of proof, will each be assessed at least twice, by two separate reviewers. First, one of the attorneys at BrownGreer, "a litigation support and claims management firm devoted to mass claims resolution, litigation management, and claims administration," will review each claim and issue a recommended decision on its merits. Supp. Mem. at 2-3. Then an attorney working for the Track A Neutral, JAMS, with BrownGreer's recommendation in hand, will review the claim *de novo* and render a decision. Id. at 4. If that decision is a denial of the claim, the claim determination will be reviewed again by another JAMS adjudicator, one with experience in the adjudication of Pigford I claims. Id. at 7. This iterative review process will reduce errors in claim determinations and subject each claim to thorough examination.[8]

Because Track A claim determinations will be based largely on the quality of the claimant's submissions, it is essential that the Track A Neutral have established protocols for assessing the credibility of factual assertions and for drawing the line between persuasive and unpersuasive claims. The Court is convinced that class counsel are aware of this necessity and

---

the settlement agreement information that they receive relating to potential scams on claimants and/or misrepresentations being made to claimants relating to the claims process or the relief available to claimants under the settlement agreement.

[8]     BrownGreer thus assists JAMS by, as class counsel puts it, "serv[ing] as an additional quality control check on the process, providing a second set of eyes for each claim, and [providing] an additional review for detecting potential fraud in the process." Supp. Mem. at 4.

have taken appropriate steps to ensure that the necessary protocols are in place. First, the Court

notes that the team from JAMS that will review Track A claims consists of very experienced

attorneys/arbitrators and will be led by Lester Levy and Nancy Warren, both of whom have

extensive knowledge of the types of claims at issue in this case because they adjudicated Track A

claims in Pigford I. See Supp. Mem. at 2, 9. Indeed, 10 of the 16 adjudicators from JAMS were

involved in the determination of claims in Pigford I. Id. at 2.

      Second, Track A neutrals from JAMS, as well as claims reviewers from

BrownGreer, will undergo initial and continuing training on such crucial matters as farm loans,

applicable legal standards, and USDA procedures. See Supp. Mem. at 5-6. The form of

continuing training will be determined by a quality control process whereby random samples of

claim determinations are reviewed by a JAMS team led by Lester Levy. Id. at 7. If that review

of randomly selected claims demonstrates weaknesses or inconsistencies in the claim

determination process, neutrals will be retrained accordingly. See id. BrownGreer will subject

its claims review process to similar quality controls and will also retrain its attorneys as

necessary. Id. at 7.

      Finally, the Track A neutrals have already begun a process intended to generate

specific guidelines for the review and determination of claims presenting various types of factual

allegations. JAMS and BrownGreer are currently testing the Track A adjudication process by

deciding 300 "'mock' claims prepared by Class Counsel after interviewing 300+ putative class

Members and assisting them in completing draft Claim Forms." See Supp. Mem. at 5-6. This

test run will permit the development of consistent approaches to various factual patterns and will

permit training of neutrals to be tailored to clarify concepts and standards that have proven

difficult to apply or understand.  See id. at 6.  The Court is satisfied that this extensive plan for

the preparation and continuing training of Track A neutrals, combined with the iterative claim

determination process described above, will yield fair results for Track A claimants.

      The Track B adjudication process, as in the past, is relatively demanding,

requiring that claimants prove their claims by a preponderance of the evidence and by supplying

"independent documentary evidence."  SA ¶ V.D.1.  The results of Track B claims will be

similarly fair, since those claims will be assessed by Michael Lewis, the Pigford I Arbitrator, who

has immense experience in and knowledge of the factual and legal issues likely to arise in the

claim determination process.  See Supp. Mem. at 6 n.6.

      A number of individuals have objected that the proposed settlement agreement

does not permit claimants to appeal adverse decisions by the Track A or Track B Neutral.  See,

e.g., Federation Letter at 2; Burrell Obj. ¶ 45.  The Court concludes that the absence of such an

appeal option or a court-appointed Monitor (as in Pigford I) does not render the settlement

agreement unfair, unreasonable, or inadequate.  As the Court has explained, class counsel have

set in place numerous safeguards against erroneous claim determinations, including an additional

layer of review for every adverse determination by a JAMS neutral.  See Supp. Mem. at 7.  These

safeguards lessen the benefit to be gained by an appeals process.  Furthermore, under the

settlement agreement — unlike the consent decree in Pigford I — Track A claimants need not

prove they were treated less favorably than a similarly situated white farmer, and no government

counsel will be opposing adequately documented claims.  Therefore, there is much less need for

an appeals process or Monitor review.  Finally, an appeal option would significantly increase the

cost of the claim determination process — reducing the funds available for the payment of

awards — as well as slow that process considerably, delaying the distribution of any awards to successful claimants.  Given the costs and benefits of an appeal process or even a Monitor oversight and review, the Court concludes that the decision of the Moving Plaintiffs and the defendant not to offer such a process under the settlement agreement does not make the agreement or the process it established unfair or unreasonable.

One commenter has suggested that unsuccessful Track B claimants should be allowed subsequently to pursue Track A relief.  See NBAA Letter at 5.  That suggestion is not feasible.  "If there were a fallback mechanism to provide relief for claimants who failed in their Track B claims, every class member would choose Track B and the settlement structure would collapse under its own weight."  Pigford v. Glickman, 185 F.R.D. at 107 (responding to the same suggestion).

As the foregoing analysis indicates, structuring the claim determination process in this matter required the careful balancing of many competing factors.  The balance ultimately reached by the Moving Plaintiffs and the defendant is fair, adequate, and reasonable.

### 4.  180 Days for Submission of Claims

The settlement agreement requires completed Claim Packages to be submitted to the Claims Administrator within 180 days of the date the agreement becomes effective.  See supra at 33.  Any class members who fail to submit a complete Claim Package within that window of time will be unable to receive any relief under the agreement or the 2008 Farm Bill. Some objectors assert that 180 days is an insufficient amount of time for the preparation and submission of claims.  See, e.g., Federation Letter at 2.  None of these objectors, however,

suggests a preferable length of time, or supplies any specific reasons to believe that 180 days will

be insufficient. As the Court has already found, the notice program instituted by class counsel is

more than adequate, see supra at 43-45, and class counsel have represented that after the approval

of the settlement they will continue to provide notice; within the 180-day claim submission

period, postcard reminders will be sent by mail to potential class members on the Facilitator's

5(g) list who have not yet filed a claim. See Mot. for Prelim. App., Ex. 5, Att. 3 at 9. Then, at a

second, later point during the submission period, the Claims Administrator will contact by phone

those potential class members on the Facilitator's list who have not filed a claim. Id. Finally,

once the settlement is approved, class counsel will work with community and trade organizations

to disseminate news of the settlement by word of mouth. Id. at 8. In addition to this extensive

continuing notice program, class counsel will be working during the 180-day window to provide

class members with direct assistance in the preparation of Claim Packages. See Mot. for Prelim.

Approval at 21. In light of this extensive plan for outreach to potential claimants, it is not

unreasonable to require class members to file their claims within a 180-day period.[9]

### 5. Forms of Relief

The forms of relief offered to class members through the settlement agreement are

reasonably chosen and structured in light of the financial constraints imposed by Congress. One

commenter suggested that debt relief should be emphasized in the settlement agreement. See

NBAA Letter at 4. In fact, the settlement agreement has always provided for significant debt

relief. Track A claimants who prevail on a credit claim are entitled to forgiveness of certain

---

[9]      As provided in the accompanying Order and Judgment, the 180-day period will
commence on November 14, 2011 and end on May 11, 2012.

outstanding loans if those loans are related in specified ways to the claim on which the class

member prevailed. See SA ¶ II.MM.  Acknowledging that claims for debt relief are "highly

technical," class counsel have arranged for all such claims to be determined by a group of

neutrals "who have extensive experience reviewing and analyzing USDA debt records and all

relevant communications from the Pigford Monitor's office."  Supp. Mem. at 8.  JAMS will also

secure the services of a debt relief expert to assist in the determination of claims for debt relief.

See id. at 8-9.  Finally, the settlement agreement provides that the USDA will not "accelerat[e] or

foreclos[e] any FSA Farm Loan Program Loan held by a Class Member that originated between

January 1, 1981, and December 31, 1996," unless and until the class member in question is

reported not to be entitled to relief under the settlement.  SA ¶ VII.A.

   One individual has objected to the $250,000 cap imposed on Track B awards by

the settlement agreement.  See Gray Letter at 1.  That cap represents a reasonable compromise

reached by balancing conflicting interests and in light of the restricted funding that is available

for awards to class members.  First, the cap serves the purpose of preventing a small number of

claimants from receiving a highly disproportionate amount of the limited fund.  In Pigford I,

101 Track B claimants — just 0.6% of the claimants who prevailed under the consent decree —

received 4% of total monetary relief awarded.  See 2010 Monitor Report at 10, 12, 20.  Given the

strong possibility that Track B claimants might in this case be awarded a recovery significantly

disproportionate to their numbers and thus divert a disproportionate percentage of the limited

available funds away from other class members, it was not unreasonable to impose a cap on

Track B awards.

Second, the Track B cap is reasonable in light of the fact that the defendant will not oppose any claims made under the settlement agreement. See supra at 53-54. As a result, the risk of failing to prove a Track B claim is reduced. Given the reduced risk faced by Track B claimants under the settlement agreement, it is reasonable that the ultimate recovery permitted should also be reduced.

Finally, the aggregate cap on Track B awards of $100 million is reasonable. The aggregate cap serves the purpose of preventing the disproportionate reduction of the limited fund by Track B claimants. Because Track B claimants will be given the opportunity to switch to Track A once they are notified of the total number of class members pursuing Track B claims, they will not be unfairly surprised if aggregate Track B awards exceed the $100 million cap and have to be reduced on a *pro rata* basis. The limits on Track B awards thus reflect a careful and reasonable balancing of the interests of all class members.

Some individuals have objected that late-late filers are subject to a greater reduction of their awards than are late filers. See Bates Obj. ¶ 6; see also supra at 33. But late filers and late-late filers are differently situated. The 2008 Farm Bill does not specify whether, to qualify for relief under the statute, a plaintiff must have submitted a *timely* 5(g) request. See supra at 11. The statute could be reasonably construed both to grant relief to late-late filers and to deny it. In light of that fact, both sets of plaintiffs would run the risk of an unfavorable determination if the Court were forced to identify the correct interpretation of the statute. Instead of running that risk, the late filers and late-late filers among the Moving Plaintiffs, represented by separate and independent counsel, see supra at 31, reached a fair and reasonable compromise of their competing interests by agreeing that late-late filers would be permitted to pursue relief

under the settlement agreement, but would be forced to accept a greater reduction in their awards if the available fund proved too limited to pay all awards in full.

Finally, some have objected to the lack of injunctive relief afforded by the settlement. See, e.g., Burrell Obj. at 25-26. The answer to this complaint is simple: Section 14012 does not authorize injunctive relief. The defendant cannot be expected to agree to any settlement that would involve the granting of a form of relief that could not be awarded if the case were to proceed in court.

The relief available under the settlement agreement is carefully calibrated in light of the limited funds available and the sometimes competing interests of different groups of class members. It is fair, reasonable, and adequate.

### 6. Attorneys' Fees

The only major objection remaining to be addressed is perhaps the most frequently voiced: attorneys' fees are too large. See, e.g., Price Obj. at 3; Burrell Obj. at 27. As the Court has already explained, the settlement agreement provides that the Court will choose an appropriate aggregate award of attorneys' fees for class counsel that is between 4.1 and 7.4% of $1,227,500,000, i.e., between $50,327,500 and $90,835,000. SA ¶ II.O. Because Congress has appropriated a fixed sum of money for the payment of all expenses and awards associated with claims under Section 14012 of the 2008 Farm Bill, and because Section 14012, unlike ECOA, contains no fee-shifting provision, attorneys' fees must be drawn from the $1.25 billion appropriated by the 2008 Farm Bill and the Claims Resolution Act. Of necessity, this means that a larger award of attorneys' fees leads to a smaller available fund for the payment of awards. But

to permit only a minimal award of attorneys' fees, as some objectors have proposed, is not a realistic or desirable response to that problem.

      In the absence of the services of class counsel, the members of the plaintiffs' class would not be in a position to divide up $1.25 billion (less implementation costs); they would be engaged in a chaotic struggle to win a portion of the $100 million appropriated by the 2008 Farm Bill before those funds ran out.  As the Claims Resolution Act's specific references to the settlement agreement make clear, the execution of an agreement between class counsel and defendant's counsel was a necessary catalyst leading to the appropriation of a great deal of additional funding for this litigation.  See Claims Resolution Act § 201(a), (b).  Just as importantly, the settlement agreement negotiated by class counsel makes the funding appropriated by Congress far more accessible to class members than it otherwise would have been.  As has already been explained, litigation of the claims of the plaintiffs in this or any court would have resulted in likely disastrous outcomes: the full compensation of some prevailing plaintiffs at the cost of depriving others of any recovery and/or a years-long delay in the resolution of claims.  Class counsel's intensive efforts over nearly two years to arrive at a settlement have thus yielded enormous benefits to the class already.

      Without the services of class counsel, then, there would be no recovery for most class members.  In such a situation, where class counsel's efforts have "create[d], preserve[d], or increase[d] the value of a fund" whose proceeds will be distributed to class members, "[i]t is . . . well established that . . . [counsel] is entitled to a reasonable attorney's fee from the fund as a whole."  Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1265 (D.C. Cir. 1993).  If the rule were

otherwise, "the beneficiaries of the fund [would] be unjustly enriched by the attorney's efforts." Id.

In this circuit, courts typically determine the appropriate amount of fees to be apportioned to attorneys in a "common fund" case such as this one by approving a specified percentage of the fund that will be earmarked for attorneys' fees. See Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1266, 1271.

> Courts have looked to several factors in assessing the reasonableness of a fee request, including: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

In re Baan Co. Securities Litig., 288 F. Supp. 2d 14, 17 (D.D.C. 2003). To set a benchmark against which the reasonableness of class counsel's fee request may be measured, the Court will address first the last of those factors, awards in similar cases.

In "a majority of common fund class action[s]," attorneys' fee "awards fall between twenty and thirty percent" of the fund. Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1272; see also In re Dep't of Veterans Affairs (VA) Data Theft Litig., 653 F. Supp. 2d 58, 61 (D.D.C. 2009) ("The majority of fee awards nationally appear to fall in a range of 20 percent to 30 percent of the common fund."); 4 RUBENSTEIN, CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS § 14:6. Larger common funds are typically associated with smaller percentage awards, however, because even a small percentage of a very large fund yields "a very large fee award." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 122 (2d Cir. 2005). Where the common fund is

worth many millions or even billions of dollars — in so-called "megafund" cases — an appropriate fee may be considerably less than twenty percent of the fund. See id.; In re AT&T Mobility Wireless Data Servs. Sales Tax Litig., No. 10-2278, 2011 WL 2173746, at *3-*4 (N.D. Ill. June 2, 2011) (surveying studies of awards in megafund cases).

        Nevertheless, even in cases where, as here, the common fund is over one billion dollars, the range of percentages permitted by the settlement agreement in this case — 4.1 to 7.4% — is unexceptional. According to one study, in cases involving common funds "from $500 million to $1 billion" in 2006 and 2007, "the mean and median awards were both 12.9%" of the fund. In re AT&T Mobility Wireless Data Servs. Sales Tax Litig., 2011 WL 2173746, at *4 (citing Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 839 (2010)). In other cases, where the class recovery exceed $1 billion, courts have approved awards in the 5 to 10% range. See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d at 122 (approving district court's award of 6.5% of $3 billion fund); In re Enron Corp. Securities, Derivative & "ERISA" Litig., 586 F. Supp. 2d 732, 740, 828 (S.D. Tex. 2008) (approving award equal to 9.52% of $7.2 billion fund). The Court also notes that in Keepseagle v. Vilsack, another class action involving allegations of discrimination by the defendant USDA, Judge Emmet G. Sullivan approved a fee award equal to 8% of a $760 million fund. See Keepseagle v. Vilsack, Civil Action No. 99-3119, Order on Plaintiffs' Motion for Final Approval of Settlement ¶ 8 (D.D.C. Apr. 28, 2011). In this context, an award in the range of 4.1 to 7.4% of the $1.25 billion fund in this case would be a reasonable one, neither unusually high nor extremely low.

The complexity of this action, the time already devoted by class counsel to this case, and the skill of the many attorneys working on behalf of the plaintiffs' class also justify the approval of a substantial fee award in this case.  Although civil rights litigation is not typically considered as complex as, for example, sprawling commercial class actions, this case involves a wide range of complicating factors: an enormous, geographically dispersed plaintiffs' class that may number more than 60,000; a multitude of individual claims predicated at least in part upon unique facts and upon events that may have occurred as much as 30 years ago; an authorizing statute never interpreted by a court; a dizzying array of relevant statutory and regulatory provisions affecting the validity of claims as to both liability and damages; a large number of potential class members who are highly suspicious of both attorneys and the government; and intense scrutiny by Congress, the executive branch, and the press.  The prospect of such litigation is daunting, and many attorneys would not have undertaken it.

Class counsel, however, have embraced the challenges associated with the litigation of this matter, and assert that they already have devoted more than "40,000 attorney hours and 60,000 paralegal hours to this case."  Mot. for Fees at 30.  The considerable labor already devoted by counsel to the litigation of this matter, and the skill brought to the cases by class counsel, are evident in the comprehensive settlement and case management plan that they have presented to the Court.  In attempting to settle this case, class counsel confronted the task not only of securing a much larger amount of funding for distribution to successful plaintiffs, but also of developing and implementing an efficient, reliable, and cost-effective claim determination process.  As the Court's analysis throughout this Opinion should make clear, class counsel, along with counsel for the United States, have succeeded admirably at that task.

The time and effort invested by class counsel will increase exponentially in the weeks and months to come.  After the approval of the settlement agreement, class counsel will be responsible for overseeing the implementation of the claim determination process and for guiding tens of thousands of claimants through that process.  To fulfill those responsibilities, counsel will have to engage in extensive communication with class members, planning and holding "scores of meetings throughout the country" with potential claimants.  Mot. for Fees at 29.  They will offer legal representation during the claim determination process, *for no additional fee*, to any Track A claimant who requests it.  SA ¶ V.A.2.  They will coordinate the efforts of the neutrals and respond to any problems that arise during the resolution of claims.  And they will respond to any inquiries from the Ombudsman or the Court.  All of these activities will require great skill and effort, as well as substantial time.

When they became involved in this litigation, class counsel also assumed a substantial risk that their efforts would never yield much in the way of fees.  There has never been any guarantee that Congress would appropriate additional funding for the adjudication and payment of Section 14012 claims.  Even after the settlement agreement was executed and legislation to fund it was introduced in Congress, the path to passage and approval of the funding required by the settlement was not easy.  See supra at 14.  If available funding had remained capped at $100 million, the more than forty attorneys now acting as class counsel would have been left to scramble for any fees that could be eked out of a fund vastly insufficient to pay all claims against it, and the payment of any fees that were forthcoming may have been delayed for years.  This litigation was no sure bet for plaintiffs' lawyers.

In light of the skill and dedication exhibited by class counsel, the enormous amount of time that they have devoted and will continue to devote to this case, the complexity of this litigation, the risks assumed by counsel, and the very substantial benefits secured by counsel for the class, the Court concludes that a fee within the range of 4.1 to 7.4% of the common fund is fair and reasonable. This conclusion is reinforced by the lack of substantial objections to the fee range set by the settlement agreement. Although numerous individuals have objected to the prospect of a $90 million award of attorneys' fees, at the high end of the proposed range, none of those individuals has proposed a reasonable alternative measure of fees. Nor have they provided specific reasons that the proposed range is unfair or unreasonable, aside from the fact that the fee award will inevitably reduce the fund available for payments to the class — a necessary and unavoidable result. All of these considerations lead the Court to conclude that the proposed fee range should be approved.

The Court also approves the very modest contingency fees authorized for non-class counsel who, at a claimant's request, will represent class members in Track A, and for all attorneys who represent claimants in Track B. See SA ¶ X.A. Set at 2% and 8% of the claimant's recovery, respectively, these fees are modest and reflect the necessary balance between compensating attorneys for the services they provide and preserving awards for class members to the extent feasible.

## V.  CONCLUSION

Forty acres and a mule.  That was the promise made by the government to those former slaves who wanted to farm land in the South after the Civil War.  As detailed in this Court's opinion in Pigford I, for most African-Americans the promise of forty acres and a mule was never kept, and the United States Department of Agriculture and the county commissioners to whom it delegated so much power bear much of the responsibility for the broken promise to those African-American farmers and their descendants.  Pigford v. Glickman, 185 F.R.D. at 85. In the early 1900's, there were 925,000 African-American farmers in the United States farming 16 million acres of farmland.  By the time the Court approved the Pigford I consent decree, there were fewer than 18,000 African-American farms in the United States and African-American farmers owned less than three million acres of land.  Id.  As the Court said 12 years ago in approving the consent decree,"[n]othing can completely undo the discrimination of the past or restore lost land or lost opportunities" to the many African-American farmers who were part of the Pigford I class.  Id. at 112.  Historical discrimination cannot be undone, but the Pigford I consent decree was a significant first step, a step that had been a long time coming.  And, as described earlier in this Opinion, supra at 9, nearly 16,000 African-American farmers received a total of more than $1 billion through the claims process created by the settlement of that historic case.

Today, because of a Congress that was willing to once again waive the statute of limitations and to appropriate $1.25 billion to help further redress the historic discrimination against African-American farmers, the Court is pleased to approve the settlement agreement proposed by the Moving Plaintiffs, and endorsed by the United States, as fair, reasonable, and

adequate.  It will also approve the appointment of the neutrals who will participate in the implementation of the agreement.  This settlement is the product of extraordinary efforts by private litigants and their counsel, by the Congress, and by the Executive Branch.  The Court joins all of those parties in hoping that it will bring class members the relief to which they are entitled.

An Order and Judgment consistent with this Opinion shall issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 10/27/11