**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **In re BLACK FARMERS DISCRIMINATION** ) | |
| **LITIGATION** ) | |
| _____ ) | **Misc. No. 08-mc-0511 (PLF)** |
| ) | |
| **This document relates to** ) | |
| ) | |
| **ALL CASES** ) | |
| _____ ) | |

**REPLY BRIEF IN SUPPORT OF CLASS COUNSEL'S UPDATED
MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

## I.    INTRODUCTION

As this Court has previously recognized, the settlement of this complex action required

"extraordinary efforts" by Class Counsel and others.  *In re Black Farmers Discrimination Litig.*,

856 F. Supp. 2d. 1, 42 (D.D.C. 2011).  But Class Counsel's work did not end or even abate with

the Court's approval of the Settlement last year.  Indeed, the implementation of the Settlement

over the last 12 months has been an even more challenging and difficult undertaking than the

achievement of the Settlement itself and has required an even larger work effort (tens of

thousands of attorney hours and even more paralegal time) than was required in the three years

of litigation leading up to the approval of the Settlement.

The Ombudsman has described the implementation process as "a complicated and

formidable undertaking . . . involv[ing] tens of thousands of possible claimants" and has noted

the "considerable expertise, resources, and commitment" that Class Counsel have brought to the

Settlement implementation process.  Ombudsman Report Regarding the Implementation of the

Settlement Agreement through September 30, 2012 (Nov. 7, 2012) (Docket No. 319)

("Ombudsman Report") at 1-2.  As a result of their expertise, resources, and commitment, Class

Counsel were able to ensure that every Class Member who sought the assistance of counsel

would have access to individual claims assistance from a lawyer trained in the preparation of

claims under this Settlement Agreement at no out-of-pocket cost.

The claims process that Class Counsel developed, implemented, and funded in large

measure was unique in its scale and geographic reach as well as in other respects.  Class Counsel

conducted more than 380 claims preparation meetings in 66 cities across the United States (each

meeting staffed by multiple lawyers and paralegals) and also provided individual telephonic

claims assistance to any Class Members who were unable to attend one of the meetings.  The

careful planning and skilled implementation of this enormously challenging claims assistance

process enabled Class Counsel to provide individual claims assistance to more than 25,000 claimants.  Beyond that, Class Counsel committed substantial resources to ensure that they were in a position to provide similar in-person claims assistance to thousands more Class Members if needed.

Beyond the enormous task of providing individual claims assistance to Class Members, the implementation of the Settlement also required considerable skill and expertise in overseeing the process and working with all stakeholders to ensure the fairness and integrity of the implementation process.  Thus, Class Counsel have devoted thousands of hours over the past year on, among many other things:  working with the Claims Administrator to refine the claims process and to address difficult issues as they arose; interfacing with the Track A and B Neutrals to ensure that the claims adjudication process was proceeding smoothly and on a pace that would result in completion of the process before the end of 2012; working with the Ombudsman and Deputy Ombudsman to address issues and to implement suggestions raised by them; cooperating with the General Accounting Office and the Office of the Inspector General of the U.S. Department of Agriculture as they have implemented their audit responsibilities under the Claims Resolution Act of 2010 ("CRA");[1] responding to questions raised by thousands of non-Class Members who sought to determine their eligibility to participate in the Settlement; coordinating with farm advocacy groups and enlisting their support to disseminate information about the claims process and to combat fraudulent schemes designed to prey on unsuspecting black farmers.  Of course, Class Counsel also have been required to oversee the funding of the Settlement implementation process by reviewing all billings by the Claims Administrator and the Neutrals, filing motions to obtain the funds to pay these Settlement implementation expenses,

---

[1]    Pub. L. No. 111-291, § 201, 124 Stat. 3064, 3070 (2010).

and addressing all related banking issues.  Remarkably, Defendant does not address any of these crucial and time-consuming aspects of Class Counsel's work in its opposition brief.[2]

Defendant also does not challenge Class Counsel's showing in their opening brief that Class Counsel's efforts were instrumental in securing a "substantial amount of money – $1.25 billion – that will benefit a significant number of claimants," Opp. at 4; that Class Counsel exhibited substantial skill in litigating this case, *id.*; that Class Counsel faced a substantial risk of non-payment, *id.*; and that this "case involved 'an enormous, geographically dispersed plaintiffs' class' and a multitude of individual claims predicated upon facts and events that may have occurred as much as 30 years ago."  *Id.* at 5 (quoting *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d at 40).

Instead, Defendant makes essentially two arguments in opposition to Class Counsel's request for a 7.4% fee award.  First, Defendant argues that this case was really not all that complex or difficult, and therefore Class Counsel should receive the minimum fee award under the Settlement Agreement.  Second, Defendant asserts that the Court should award the minimum fees provided for in the Settlement Agreement because the funds paid to counsel will diminish the recovery to successful claimants.  Both of these arguments are without merit.

This class action has presented a unique array of geographic, cultural, historic, administrative, and legal challenges that Class Counsel have successfully met by negotiating a comprehensive class Settlement and then developing and implementing a claims process characterized by fairness, efficiency, and integrity.  In doing so, Class Counsel have provided to Class Members the ability to obtain a meaningful recovery for the discrimination they suffered at the hands of the U.S. Government – a recovery that has eluded them, in some cases, for more

---

[2]      Defendant's Response to Class Counsel's Updated Motion for an Award of Attorneys' Fees and Expenses (Nov. 9, 2012) (Docket No. 321) is referred to herein as "Opp."

than three decades.  For these exceptional efforts and for the enormous benefits that Class

Counsel have obtained for the Class, Class Counsel respectfully submit that a 7.4% fee award is

fully justified.

## II.    ARGUMENT

Defendant does not dispute that a percentage-of-the-fund method for determining fees in

this case is appropriate, and that in determining the amount of the Fee Award the Court should

weigh the seven factors addressed in Class Counsel's opening brief.  *See* Memorandum of Law

in Support of Class Counsel's Updated Motion for Award of Attorneys' Fees and Expenses

(Sept. 24, 2012) (Docket No. 306) ("Mem.") at 20-23, Opp. at 3.[3]  Defendant's opposition

addresses only two of these factors:  (1) the complexity and duration of the litigation, and (2) the

amount of time devoted by Class Counsel to the case.  Significantly, Defendant does not

challenge Class Counsel's showing that the two most important factors in the consideration of

the amount of a fee award – the benefit obtained for the Class and the risk assumed by Class

Counsel – support a 7.4% Fee Award in this case.

### A.    The Majority of the Factors Supporting a 7.4% Fee Award for Class Counsel – Including Those Warranting the Most Weight – Are Not in Dispute.

#### 1.    Class Counsel Secured Enormous Benefits for the Class.

The value of the benefit to the Class obtained by Class Counsel is the most important

factor in evaluating a fee request in a common fund case.  *See Basile v. Merrill Lynch, Pierce,*

---

[3]       The seven factors are:  (1) the size of the fund created and the number of persons benefitted;
(2) the skill and efficiency of the attorneys involved; (3) the complexity and duration of the litigation;
(4) the risk of nonpayment; (5) the amount of time devoted to the case by plaintiffs' counsel; (6) the
awards in similar cases; and (7) the presence or absence of substantial objections by members of the class
to the settlement terms and/or to the attorneys' fees requested.  *See* Mem. at 22-23 (citing *Trombly v.
Nat'l City Bank*, 826 F. Supp. 2d 179, 204 (D.D.C. 2011), and other cases); Opp. at 3 (citing *In re Black
Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 39 (D.D.C. 2011)).  In making its determination, the
Court should "consider[] and weigh[] these factors and the record as a whole."  *Trombley*, 826 F. Supp.
2d at 207.

*Fenner & Smith, Inc.*, 640 F. Supp. 697, 700 (S.D. Ohio 1986) (value of benefit rendered is the

first factor listed because it is the most important one); *In re UnitedHealth Group Inc. PSLRA*

*Litig.*, 643 F. Supp. 2d 1094, 1104 (D. Minn. 2009) ("In considering a fee award, the most

critical factor is the degree of success obtained.") (citations omitted).

As the Court has recognized, the terms of the Settlement Agreement negotiated by Class

Counsel provide "enormous benefits to the class." *In re Black Farmers Discrimination Litig.*,

856 F. Supp. 2d at 39.  Not only were the substantive terms of the Settlement Agreement highly

beneficial to the class – enabling successful Class Members to receive their awards far more

quickly than if their claims were individually adjudicated by the Court, reducing the evidentiary

burden for Class Members, and postponing foreclosures of Class Members' loans – but the very

achievement of the Settlement Agreement was instrumental in the approval by Congress of $1.15

billion of the total $1.25 billion obtained for the payment of Class Members' claims.  *See* Mem.

at 23-26.  Indeed, absent Class Counsel's successful negotiation of a comprehensive Settlement

Agreement, it is likely that only the $100 million appropriated in the 2008 Farm Bill[4] would now

be available to pay successful claimants.  *See id.*; *see also In re Black Farmers Discrimination*

*Litig.*, 856 F. Supp. 2d. at 39 ("the execution of an agreement between class counsel and

defendant's counsel was a necessary catalyst leading to the appropriation of a great deal of

additional funding for this litigation").  Thus, more than 90% of the funding for the payment of

Class Members' claims was a direct result of the work of Class Counsel in successfully

negotiating a comprehensive class settlement of all Section 14012 claims.

Moreover, as this Court has recognized, absent the Settlement Agreement, there would

have been no non-judicial claims process.  That means that but for the Settlement, "the members

---

[4]      "2008 Farm Bill" refers to the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246,
122 Stat. 1651, 2209 (2008).

of the plaintiffs' class would not be in a position to divide up $1.25 billion (less implementation costs); [rather,] they would be engaged in a chaotic struggle to win a portion of the $100 million appropriated by the 2008 Farm Bill before those funds ran out." *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d. at 38-39.  As this Court explained, "Class Counsel's intensive efforts over nearly two years" were needed to avert this "disastrous outcome[]." *Id.* at 39.

Of course, obtaining the funding and creating a non-judicial claims process was only the first part of the substantial benefit that Class Counsel have provided to Class Members.  Class Counsel have also provided an enormous benefit to the Class by developing and implementing a claims process that was a model of fairness, efficiency, and integrity and by providing the opportunity for all Class Members to receive individual claims assistance from a trained legal team.  More than 25,000 Class Members availed themselves of the opportunity to obtain this assistance from Class Counsel.

As this Court has previously recognized, "without the services of class counsel, . . . there would be no recovery for most class members." *Id.*  This factor therefore strongly supports a 7.4% Fee Award for Class Counsel.

## 2.  Class Counsel Assumed a Substantial Risk of Non-Payment.

The second factor to which courts typically give heavy weight in assessing a fee request is the risk that Class Counsel faced of non-payment when the case began.  *See Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988) ("the amount involved and the results obtained [] may be given greater weight when, as in this case, the trial judge determines that the recovery was highly contingent"); *Stanley v. U.S. Steel Co.*, No. 04-74654, 2009 WL 4646647, at *3 (E.D. Mich. Dec. 8, 2009) ("the contingent fee risk is an important factor in determining the fee award").  As this Court has previously found:

> When they became involved in this litigation, class counsel also assumed a
> substantial risk that their efforts would never yield much in the way of fees.
> There has never been any guarantee that Congress would appropriate additional
> funding for the adjudication and payment of Section 14012 claims.  Even after the
> settlement agreement was executed and legislation to fund it was introduced in
> Congress, the path to passage and approval of the funding required by the
> settlement was not easy. . . .  If available funding had remained capped at $100
> million, the more than forty attorneys now acting as class counsel would have
> been left to scramble for any fees that could be eked out of a fund vastly
> insufficient to pay all claims against it, and the payment of any fees that were
> forthcoming may have been delayed for years.  This litigation was no sure bet for
> plaintiffs' lawyers.

*In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d at 41.  Indeed, Defendant concedes

that "Class Counsel faced a risk of nonpayment when they agreed to represent class members in

this litigation."  Opp. at 4.[5]

But it is not just that Class Counsel faced a substantial risk of receiving no payment for

their efforts on behalf of the Class.  Because of the duration of this case (more than four years

and counting) and because of the vast size of the class and its unique geographic and cultural

attributes, Class Counsel have been compelled to go out-of-pocket literally millions of dollars to

maintain this litigation and implement the extensive claims process that the Ombudsman has

accurately characterized as both "complicated and formidable."  Ombudsman Report at 1; Mem.

at 19-20.  Over this entire period, Class Counsel have received not a penny in fees or cost

reimbursement.  Indeed, Class Counsel specifically agreed not to seek any fees until all

successful claimants received their awards under the Settlement Agreement.  *See* Mem. at 20 &

n.21.  Virtually all of the firms comprising Class Counsel are small firms for which the lack of

any compensation for the tens of thousands of attorney and paralegal hours, plus the carrying of

millions of dollars in out-of-pocket outlays, have been a serious hardship.  The attached

---

[5]      There was also the very real risk that, if Congress did not appropriate substantially more funds
than the $100 million authorized by the 2008 Farm Bill, counsel would be very substantially
undercompensated for their efforts regardless of how successful they were in the litigation.

Declaration of James S. Farrin attests to the fact that his small firm has paid or incurred obligations in excess of $10 million in connection with this case and the personal stress and even "specter of personal ruin" that this case has caused him. *See* Exhibit A ¶¶ 4, 9, 10.

The risk factor therefore strongly supports a 7.4% Fee Award to Class Counsel.

### 3.   The Skill of Class Counsel Supports a 7.4% Fee Award.

Defendant does not dispute that Class Counsel have brought tremendous skill and expertise to this litigation and to the implementation of the claims process. Opp. at 4 ("Nor is there any dispute regarding Class Counsel's skill . . . ."). Likewise, this Court has already recognized that Class Counsel "collectively offer class members highly relevant legal skill and experience" and that the "skill of the many attorneys working on behalf of the plaintiffs' class . . . justif[ies] the approval of a substantial fee award in this case." *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d at 22, 40. The Court made these findings even before Class Counsel successfully implemented the claims process in this case.

The absence of any significant administrative difficulties or delays in the claims process attests to the detailed and skillful work performed by Class Counsel throughout all phases of this case. There was nothing "easy" about this process. Class Counsel respectfully submit that their performance in the implementation of the Settlement Agreement confirms that the skill factor strongly supports a 7.4% Fee Award.

### 4.   The Absence of Objections Favors a 7.4% Fee Award.

The absence of any substantial objections also favors a 7.4% fee request. *See In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003). As demonstrated in Class Counsel's fee petition, only a handful of objections were filed regarding the Settlement Agreement, and many of them were actually petitions to participate in the non-judicial claims

process, and were not objections at all.  Mem. at 35-36.  Defendant does not contest this

showing.

**5.   The Awards in Similar Cases Support a 7.4% Fee Award.**

As demonstrated in Class Counsel's opening brief, a comparison of the 7.4% fee

requested here to the fees awarded in other common fund cases demonstrates that Class

Counsel's request for a 7.4% fee is reasonable.  *See* Mem. at 37-38; *In re Black Farmers*

*Discrimination Litig.*, 856 F. Supp. 2d at 40 ("even in cases where, as here, the common fund is

over one billion dollars," a 7.4% fee "is unexceptional").  In fact, courts, including in the District

of Columbia, have commonly awarded considerably higher percentages in other cases with large

common funds, reasoning that "it is not fair to penalize counsel for obtaining fine results" and

reduce the percentage simply because the settlement fund is large.  *See, e.g., In re Vitamins*

*Antitrust Litig.,* Misc. No. 99-197, 2001 WL 34312839, at *12 (D.D.C. July 16, 2001)

(Hogan, J.) (awarding 33% fee); *see also In re Lorazepam*, MDL No. 1290, 2003 WL 22037741,

at *7 (D.D.C. June 16, 2003) (citing *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942,

989 (E.D. Tex. 2000) (surveying cases)); *see also Silverman v. Motorola, Inc.*, No. 07-C-4507,

2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012) (27.5% fee award from settlement fund of $200

million); *In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403, 443-48 (S.D. Tex. 1999) (25% fee

award from fund of more than $190 million)*; In re NASDAQ Market-Makers Antitrust Litig*.,

187 F.R.D. 465, 470 (S.D.N.Y. 1998) (14% fee award from fund of $1 billion); *In re*

*Combustion, Inc.*, 968 F. Supp. 1116, 1136-40 (W.D. La. 1997) (36% fee award from fund of

$127 million); *In re Enron Corp. Sec., Derivative, and ERISA Litig.*, 586 F. Supp. 2d 732, 740,

828 (S.D. Tex. 2008) (approving award equal to 9.52% of $7.2 billion fund).

Notably, Defendant fails to cite a single common fund case in which a percentage fee of

less than 7.4% has been awarded to class counsel.  In fact, the one case Defendant does cite

recognizes that "courts commonly award attorneys' fees 'in the range of 6% to 10%'" even in megafund cases.  *See* Opp. at 10 (quoting *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 351 (N.D. Ga. 1993)).  A Fee Award of 7.4% falls squarely within this range.

The only other case comparison asserted by Defendant is to *Keepseagle v. Vilsack*, Case No. 99-cv-03119 (D.D.C.), the parallel case to *In re Black Farmers* dealing with USDA's discrimination against Native American farmers.  A comparison of this case to *Keepseagle* in fact strongly supports an award of 7.4% in this case.  First, Judge Sullivan awarded an 8% fee to Class Counsel in *Keepseagle* – the top of the fee range provided in the settlement agreement in that case – over similar objections by the Defendant to those being asserted here.  *See* Order on Pls.' Mot. For Final Approval of Settlement, ¶ 8, *Keepseagle v. Vilsack*, No. 99-cv-03119 (D.D.C. Apr. 28, 2011) (Docket No. 606) ("*Keepseagle* Final Approval Order").  Second, the fact that the parties took "approximately 100 depositions across 13 states" or that various motions were litigated in *Keepseagle* hardly suggests that *Keepseagle* was a more complex case or required more effort (or greater skill) by the lawyers involved.  With all due respect to the lawyers in *Keepseagle*, there is nothing to indicate that the depositions that were taken were particularly complex or that they involved more than 1,500 hours of total work (even assuming a generous 15 hours for preparing and taking each deposition).  Indeed, the extent of the briefing and litigation cited by Defendant as significant in *Keepseagle* – specifically, motions for class certification, appeals, and negotiation of a Settlement Agreement – were all present in the present case.  Opp. at 9.

This case had its own unique challenges.  As reflected in the attached Declaration of Stephen M. Coe, the preparation of claims on behalf of thousands of farmers, many elderly and lacking in full literacy, required no less skill (and much more compassion and sensitivity) than

asking questions of a deponent.  *See generally* Exhibit B.  It is simply wrong for Defendant to ignore this effort and to contend that adversary litigation work should be more highly valued than the claims assistance provided by Class Counsel.

Moreover, the claims process in *Keepseagle* resulted in less than 4,000 claims filed by Class Counsel, as compared to the more than 25,000 claimants who have received individual claims assistance from Class Counsel in *In re Black Farmers*.  Thus, even if *Keepseagle* had more traditional litigation activities (so-called "actual litigation," as Defendant defines it, *see* Opp. at 8) prior to settlement, the amount of overall work actually performed by Class Counsel for the benefit of the class in the present case during the post-settlement claims process was of an immensely larger magnitude than in *Keepseagle*.

Finally, Defendant ignores the fact that it was only after Class Counsel negotiated the Settlement in this case that the Defendant finally settled *Keepseagle*.  Indeed, the *Keepseagle* Settlement Agreement in substantial measure tracks the Settlement Agreement negotiated by Class Counsel in this case.  Thus, if *Keepseagle* is Defendant's model for what "unique, novel, or complex" litigation looks like (Opp. at 11), *Keepseagle*'s reliance on Class Counsel's work in *In re Black Farmers* further supports Class Counsel's request for a 7.4% award in this case.

The fee awards granted in similar cases therefore strongly support a 7.4% Fee Award in this case.

**B.  Defendant's Arguments Against a 7.4% Fee Award Are Without Merit.**

Defendant essentially makes two arguments against Class Counsel's request for a 7.4% Fee Award: (1) that the litigation in this case was not all that complex and that the more than 80,000 attorney hours and more than 160,000 paralegal hours expended by Class Counsel were not necessary; and (2) that the Court should treat this fee petition differently from other common

fund cases because the funds for attorneys' fees will reduce the funds available to claimants, and come from the public fisc.  Both of these arguments are unavailing.

### 1. This Case Presented Uniquely Complex Challenges that Have Required Immense Skill and an Investment of Tens of Thousands of Hours of Work Over More Than Four Years by Class Counsel.

Defendant's primary argument in opposition to Class Counsel's fee request is that this case was not "particularly unique, novel, or complex," and that "there was very little original work to perform in this case."  Opp. at 7, 11.  Based on this flawed characterization of this case and its manifold challenges, Defendant glibly suggests that the hours reported by Class Counsel must be "inflated."  *Id.* at 7.  Defendant's argument reflects a fundamental misunderstanding regarding the logistical, legislative, and litigation challenges this case has presented from the beginning of this litigation right through the present time.  This case has been uniquely difficult and complex in myriad respects and has presented (and continues to present) Class Counsel with a never-ending series of difficult and sophisticated issues and challenges that have demanded every bit of Class Counsel's skill, experience, and commitment throughout the more than four years of litigation.  It matters not that the demands and complexity of this case may not have taken the form of traditional discovery or motions practice.  As described by the Court in its Final Approval Opinion:

> Although civil rights litigation is not typically considered as complex as, for example, sprawling commercial class actions, this case involves a wide range of complicating factors:  an enormous, geographically dispersed plaintiffs' class that may number more than 60,000; a multitude of individual claims predicated at least in part upon unique facts and upon events that may have occurred as much as 30 years ago; an authorizing statute never interpreted by a court; a dizzying array of relevant statutory and regulatory provisions affecting the validity of claims as to both liability and damages; a large number of potential class members who are highly suspicious of both attorneys and the government; and intense scrutiny by Congress, the executive branch, and the press.  The prospect of such litigation is daunting, and many attorneys would not have undertaken it.

*In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d at 40.  Class Counsel not only took

on this case despite its challenges; they have met and successfully overcome these challenges at

great risk of receiving little or no compensation for their efforts.  In the process, Class Counsel

have achieved for the Class Members a $1.25 billion Settlement and provided them with a fair

and efficient process for determining who is entitled to an award and for distributing the

Settlement funds.

 *First*, Defendant asserts that "the parties reached a settlement agreement in this case in

less than two years from the commencement of plaintiffs' lawsuit," suggesting that the "short"

duration of the negotiations supports its claim that this was not a complex case and thus justifies

a minimal Fee Award.  Opp. at 2, 4, 6, 11.  However, Defendant does not and cannot dispute that

negotiation of the Settlement Agreement was a difficult and protracted process that was certainly

not assured of success.  Nor does Defendant dispute that in order to finally reach agreement, the

parties exchanged over 20 comprehensive settlement drafts, engaged in many extended face-to-

face negotiation sessions, and participated in numerous conference calls to reach a final outcome

acceptable to all Plaintiffs' counsel, the Defendant, the Court, and Congress.  *See* Opp. at 5; *In re*

*Black Farmers Discrimination Litig.*, 856 F. Supp. 2d at 13 (recognizing that the Settlement was

reached "after extensive negotiations").  The result was a 48-page Settlement Agreement (plus

numerous appendices and exhibits) that prescribed standards for determining what constituted a

late-filing request in *Pigford*, elements to determine whether a claimant had actually suffered

discrimination, a mechanism to fairly distribute limited funds among "late" filers and "late-late"

filers, requirements to ensure timely and fair processing of claims by qualified and experienced

neutrals, and a means to ensure that the geographically diverse class of tens of thousands of

potential claimants were able to receive meaningful claims assistance and have their claims fairly

and efficiently processed and adjudicated.  The complexity of the Settlement Agreement that is evident on its face belies Defendant's assertion that this was a simple piece of litigation.

*Second*, Defendant asserts that "there was not a substantial amount of original work Class Counsel had to perform in this case . . . [because] the [S]ettlement [A]greement reached by the parties substantially mirrors the terms of the *Pigford I* Consent Decree."  Opp. at 6.  This assertion is simply wrong.  While the Settlement Agreement necessarily embodies the claim elements contained in Section 14012 of the 2008 Farm Bill and adopted two tracks to adjudicate such claims as was done in *Pigford*, the similarities between the two cases in many ways ended there.  For one, the Settlement Agreement in this case required Class Counsel to devise a means to fairly and efficiently distribute a limited pot of money to meritorious claimants.  In *Pigford*, by contrast, all claims were paid through the Judgment Fund, and hence awards were unlimited.  In addition, Class Counsel here needed to derive a fair and equitable way to determine who filed a late-filing request in *Pigford*, and therefore was eligible to participate in the non-judicial claims process.  In *Pigford*, by contrast, claimants needed only to demonstrate that they were discriminated against in order to recover.  Moreover, Class Counsel in *In re Black Farmers* needed to figure out a mechanism to ensure that only meritorious claimants would receive an award without the traditional check of government opposition.  In fact, a precondition of settlement insisted upon by Defendant was that the government have *no involvement whatsoever* in the claims process.  As demonstrated by the attached Declaration of Eric J. Sanchez, while Class Counsel certainly sought to leverage the experiences and lessons learned in *Pigford* to make the claims process as fair and efficient as possible, this case presented unique and novel challenges wholly separate from *Pigford*.  *See generally* Exhibit C.  Defendant's claim that there was "not a substantial amount of original work" in this case (Opp. at 5) is thus demonstrably

14

untrue.  *See Mazola v. May Dept. Stores Co.*, No. 97-cv-10872, 1999 WL 1261312, at *3 (D.

Mass. 1999) (rejecting defendant's "piggybacking" argument and approving counsel's 20% fee

request because even though "the template for this settlement may have derived from the Sears

litigation, the nuts-and-bolts were different").

*Third,* Defendant fails to recognize the critical value created by the Settlement

Agreement and Class Counsel's efforts (along with others) to secure $1.15 billion in additional

funding beyond the limited $100 million provided for in the 2008 Farm Bill.  These advocacy

efforts by Class Counsel involved more than 1,000 hours of attorney time and included

numerous briefings and discussions over many months with Members of Congress and their

staffs.  As the Court has recognized, "Class counsel's intensive efforts over nearly two years to

arrive at a settlement have thus yielded enormous benefits to the class" and "[w]ithout the

services of class counsel, . . . there would be no recovery for most class members."  *In re Black

Farmers Discrimination Litig.*, 856 F. Supp. 2d at 39.  Indeed, the role of the Settlement

Agreement as a precondition to the additional funding is evident from the Claims Resolution Act

itself, which expressly conditioned appropriation of the additional monies upon Court approval

of the Settlement Agreement in this case.  *See* CRA §§ 201(a), (b).  Accordingly, as a result of

Class Counsel's efforts, the funds available to compensate successful Class Members increased

by over *ten times*, increasing the average expected claim award per claimant by approximately

$50,000, as explained in greater detail below.  These results speak for themselves.  *See Hensley

v. Eckerhart*, 461 U.S. 424, 435 (1983) ("Where a plaintiff has obtained excellent results, his

attorney should recover a fully compensatory fee. . . .  The result is what matters.").

*Fourth*, as noted above, Defendant inexplicably disregards the massive efforts Class

Counsel have made to manage and implement the claims process during the 12 months since the

Court approved the Settlement.  Perhaps that is because the Defendant chose to play no role in

the Settlement implementation process and therefore has no appreciation of how complex and

demanding the process has been.  As described in Class Counsel's fee petition, Class Counsel

provided in-person and/or telephone claims assistance to more than 25,000 Class Members, and

signed Claim Forms for more than 13,000 of these claimants.  *See* Mem. at 16-17, Ombudsman

Report at 29-30; *see also* Coe Declaration (Exhibit B) (describing the claims process); Sanchez

Declaration (Exhibit C) (same).  To achieve that result, Class Counsel "held 384 group meetings

in sixty-six cities and twenty-three states and in Washington, D.C.," and provided in-office

assistance in Jackson, Mississippi; Birmingham and Selma, Alabama; Durham, North Carolina;

and Columbia, South Carolina.  Ombudsman Report at 26.  Class Counsel also established a toll-

free line that enabled any Class Members who were unable to attend the in-person meetings to

obtain claims assistance by telephone.  All of these efforts came on top of the tens of thousands

of hours spent communicating with Class Members and other potential claimants and answering

their questions both before and after the Settlement.  As a result of Class Counsel's efforts and

design of the claims process, more than 38,000 Class Members were able to submit claims under

the Settlement Agreement.  *Id.* at 30 n.33.  The coordination of this effort – from the scheduling

and publication of claims meetings, to the staffing of these meetings, to the training of attorneys

and paralegals, to the coordination with farm advocacy groups, to the conduct of the meetings

themselves – was extremely complex and challenging, and required an immense amount of

logistical and management skill.  The considerable time and expense spent on this case to ensure

that the Settlement was implemented fairly and completely supports Class Counsel's request for

a fee of 7.4%.[6]

---

[6]      *See, e.g., Quimby v. U.S.*, No. 02-101C, 2012 WL 5395907, at *6-*7 (Fed. Cl. Nov. 5, 2012)
(finding a fee of 30% of $74 million reasonable where counsel engaged in "complex settlement

*Fifth,* Class Counsel have spent substantial time addressing a wide range of implementation issues apart from the claims preparation and submission process, and they will continue to do so for many months to come.  For example, Class Counsel have actively engaged with Defendant, the Court, the Ombudsman, the GAO, the Inspector General of the USDA, and others to ensure that all issues relating to the claims process have been appropriately handled. Class Counsel will continue to perform this role until all successful claimants are paid and the implementation of the Settlement Agreement is completed.  In addition, Class Counsel continue to work to support the payment process that will come shortly for successful claimants, including coordinating with the Claims Administrator on the logistics of payment, and ensuring that sufficient communications mechanisms are in place so that claimants understand the claim determinations.  Here, too, Defendant fails to acknowledge the ongoing Settlement implementation efforts by Class Counsel.

In sum, the Ombudsman's assessment that "[t]he implementation of the *In re Black Farmers* Settlement Agreement is a complicated and formidable undertaking" is a compelling response to Defendant's contention that this was a simple case and should not have required the effort that Class Counsel expended.  Ombudsman Report at 1.  The difficulty and complexity of this entire litigation cannot seriously be doubted.  These factors strongly support Class Counsel's request for a 7.4% Fee Award.[7]

---

negotiations" and obtained "a result that affords substantial settlement benefits to the class"); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1205-16 (S.D. Fla. 2006) (the fact that "Class Counsel's efforts post-settlement will substantially enhance the recoveries by claimants" is entitled to "very significant weight" and "supports the application of a higher percentage award" of 31.3%); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 461 (D.P.R. 2011) (awarding 23% fee and finding that overseeing claims administration process "points in favor of Lead Counsel's fee request").

[7]     In a footnote, Defendant "questions the accuracy of Class Counsel's lodestar cross-check analysis" and suggests that the Court should review Class Counsel's time records in detail.  Opp. at 7 n.4. Class Counsel indicated in their opening brief that they would provide the Court with such records as the Court may want to review, and Class Counsel reaffirm that offer.  However, a demand for time records is

### 2. The Fact That the Fees Award Will Come from a Common Fund Does Not Weigh Against a 7.4% Fee Award.

Defendant also argues that the Court should award Class Counsel the minimum fee allowed by the Settlement Agreement simply because the fees paid to Class Counsel will reduce the amount of funds available to pay successful claimants and because "the funds at issue are derived solely from the public fisc." Opp. at 10. These arguments are not grounds for making a minimum award to Class Counsel.

Of course, "the fact that the fee award will inevitably reduce the fund available for payments to the class" is "a necessary and unavoidable result." *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d at 41. This factor is present in every common fund case, and thus does not distinguish this case from any other common fund case. Indeed, "the underlying justification for attorney reimbursement from a common fund . . . is that unless the costs of litigation are spread to the beneficiaries of the fund they will be unjustly enriched by the attorneys' efforts." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1983).[8]

---

not supported by applicable case law. Indeed, requiring Class Counsel to submit their voluminous fee records, and further requiring the Court to pore over those records for cross-check purposes, would eliminate the core benefit of the percentage-of-the-fund approach. *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C. Cir. 1983) (one of the major advantages over the lodestar approach is that the percentage method does not make the "'considerable demands upon judicial resources' that the lodestar requires, 'since it can be exceptionally difficult for a court to review attorney billing information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable.'"). Because the lodestar amount calculated for a cross-check is only used as a rough comparator, and not as the basis for the actual fee to be assessed, the "lodestar cross-check calculation need entail neither mathematical precision nor bean-counting," and "may rely on summaries submitted by the attorneys." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005). In fact, courts routinely use an approximation of the lodestar based on summaries submitted by counsel. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 284 (3d Cir. 2009) (summaries of time records sufficient in common fund case because Court used information only to cross-check reasonableness of fee award); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) ("Where the lodestar fee is used as 'a mere cross-check' to the percentage method of determining reasonable attorneys' fees, 'the hours documented by counsel need not be exhaustively scrutinized'").

[8]    The fact that the funds for attorneys' fees will reduce the overall recovery of these very sympathetic Class Members is already reflected in the agreement between Class Counsel and Defendant to limit fees to a maximum of 7.4% of the Settlement Fund, and the Court's approval of that range. This

But what this argument ignores is that the net effect of Class Counsel's work has been to enable successful Class Members to obtain an average award more than $50,000 greater than they could have obtained if Class Counsel had not successfully negotiated and obtained Court approval of the Settlement Agreement, and successfully defended that Court approval on appeal. Based on the preliminary information received from the Claims Administrator, it appears that between 19,000 and 20,000 Class claims will be approved by the Neutrals.  Assuming that the settlement implementation costs are $30,000,000, and with a 7.4% Fee Award, approximately $1,130,000,000 will be paid to Class Members.  Assuming further that the Neutrals approve the claims of 19,500 Class Members, each of these prevailing Class Members on average will receive a gross award of approximately $58,000 (inclusive of tax payments on their behalf). After deducting a 7.4% Fee Award, amounting to under $4,300 per prevailing claimant, claimants would still receive a net award of over $53,000.  In contrast, if Class Counsel had not expanded the fund as described above, each of these claimants would have received a gross award of less than $3,600, and a net award of even less.  Given that Class Counsel have increased Class Members' average recovery by more than $54,000, a 7.4% Fee Award (less than $4,300 per claimant) is not at all unreasonable.  To put it another way, allowing Class Members to retain 92.6% of their gross recoveries cannot be viewed as unjust, and is consistent with the teaching of *Swedish Hospital* and other leading common fund cases that litigants ought not get a free ride when counsel provide them with exceptional and dedicated legal services on a wholly contingent basis over many years.

Finally, the "public nature of the funds" (Opp. at 10) here does not justify a reduction of the Fee Award.  As the D.C. Circuit has held, there is no reason why a "common fund case such

---

percentage is lower – indeed, substantially lower – than what other courts have generally awarded in common fund cases.  Mem. at 37-38.

as this one should be treated differently than other common fund cases simply because it successfully challenged illegal *government* action." *Swedish Hospital*, 1 F.3d at 1270 (emphasis in original).  Indeed, courts routinely award percentage fee awards in excess of 7.4% in common fund cases involving a government defendant.  *See, e.g., In re Dept. of Veterans Affairs Data Theft Litig.*, 653 F. Supp. 2d 58, 60 (D.D.C. 2009) (attorneys' fee award "of $3.6 million – about two times the lodestar and about 18 percent of the common fund" in a case against the government alleging Privacy Act violations).  The Court need look no further than Judge Sullivan's award of an 8% common fund fee in *Keepseagle* for this proposition.  A Fee Award of 7.4% is therefore certainly appropriate here.

## III.    CONCLUSION

As a result of the intense and sustained efforts and the skill and tenacity of Class Counsel over a period of more than four years, Class Counsel have negotiated and implemented a Settlement Agreement with the government that will allow tens of thousands of black farmers to receive the determination on the merits of their discrimination claim they have been denied, in some cases, for more than 30 years.  This Settlement Agreement was the express predicate for the 2010 appropriation by Congress that expanded funding for black farmers by $1.15 billion (more than ten times the original appropriation), and in doing so, gave meritorious claimants a real chance for meaningful relief.  Class Counsel also designed and managed a non-judicial claims process that provided individual claims assistance to more than 25,000 claimants to ensure that they understood the claims process and had the benefit of attorney assistance in submitting their claims.

To date, Class Counsel have received no payment whatsoever for their efforts.  As a result, the firms comprising Class Counsel have taken enormous risk and incurred significant financial hardship.  Now that the claims process has been successfully implemented, and for the

reasons set forth in Class Counsel's opening brief and in this reply brief, Class Counsel

respectfully seek a Fee Award of 7.4% of the Settlement Fund, to be divided among the 20 law

firms designated as Class Counsel after the payment of outstanding expenses.  This sum is below

the fee awards in comparable cases and is clearly justified by the highly successful results Class

Counsel have achieved for the Class.

Respectfully submitted,

/s/ Henry Sanders          
Henry Sanders
CHESTNUT, SANDERS, SANDERS,
PETTAWAY & CAMPBELL, L.L.C.
One Union Street
Selma, AL  36701
Tel:  (334) 875-9264
Fax:  (334) 875-9853

/s/ Gregorio A. Francis      
Gregorio A. Francis
MORGAN & MORGAN, P.A.
20 North Orange Avenue, Suite 1600
Orlando, FL  32801
Tel:  (407) 420-1414

Dated:  November 26, 2012

/s/ Andrew H. Marks      
Andrew H. Marks
 D.C. Bar No. 932269
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel:  (202) 624-2920
Fax:  (202) 628-5116

## CERTIFICATE OF SERVICE

I certify that on November 26, 2012, I served the above Reply on all counsel of record by filing a copy via the ECF system.

/s/ Michael W. Lieberman
Michael W. Lieberman