UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

——————————————————   )
                                              )
In re BLACK FARMERS DISCRIMINATION   )      Misc. No. 08-0511 (PLF)
LITIGATION                                    )
——————————————————   )
                                              )

## OPINION

This matter is before the Court on class counsel's updated motion for an award of

attorneys' fees and expenses.  The Settlement Agreement that was approved by the Court

following a Fairness Hearing provides that class counsel will receive an award equal to at least

4.1% but no more than 7.4% of the common fund that has been established for the payment of

successful claims in this action.  Class counsel, who have devoted an immense number of hours

to this case while incurring many millions of dollars in unreimbursed out-of-pocket expenses,

have moved for an award set at 7.4% of the fund, or $90,835,000.  Having carefully considered

the matter, and for the reasons explained below, the Court will grant class counsel's motion for

an award of attorneys' fees and expenses set at 7.4% of the common fund.  Pursuant to the

Settlement Agreement, class counsel will receive their fee award at the same time that successful

claimants are paid on their claims.[1]

——————————————

[1]    The papers considered by the Court in connection with this matter include the
following: Updated Motion by Class Counsel for Award of Attorneys' Fees and Expenses
("Mot.") [Dkt. No. 306]; Memorandum of Law in Support of Class Counsel's Updated Motion
for Award of Attorneys' Fees and Expenses ("Mem.") [Dkt. No. 306-1]; Defendant's Response
to Class Counsel's Updated Motion for an Award of Attorneys' Fees and Expenses ("Opp.")
[Dkt. No. 321]; Reply Brief in Support of Class Counsel's Updated Motion for Award of
Attorneys' Fees and Expenses ("Reply") [Dkt. No. 325]; and Supplemental Filing in Support of
Class Counsel's Motion for an Award of Attorneys' Fees and Expenses ("Supp. Filing") [Dkt.
No. 368].

The term "common fund," as used here with reference to the fund established in
this case, refers specifically to the "Fee Base" as defined in the Settlement Agreement, which

## I. BACKGROUND

On April 14, 1999, this Court entered a Consent Decree in Pigford v. Glickman, Civil Action No. 97-1978, establishing a non-judicial claims resolution process for a class of African American farmers who alleged that they had been discriminated against on the basis of their race by the United States Department of Agriculture ("USDA") in the provision of farm loans and subsidies and other federal agricultural benefits, and who further alleged that complaints they lodged about this discrimination were ignored by the USDA. See Pigford v. Glickman, 185 F.R.D. 82 (D.D.C. 1999); see also In re Black Farmers Discr. Litig., 856 F. Supp. 2d 1, 7-11 (D.D.C. 2011) (recounting history of the Pigford litigation).

The Pigford Consent Decree represented an important step toward ameliorating a long legacy of discrimination acknowledged by the USDA itself. But tens of thousands of prospective claimants were not permitted to participate in the claims resolution process that was set in motion by the Consent Decree because their claim forms were not timely filed. Under the terms of the Consent Decree, any claim form that was not postmarked within 180 days of the entry of the Consent Decree could not be considered on the merits unless the claimant petitioned for permission to file a late claim and demonstrated that "his failure to submit a timely claim was due to extraordinary circumstances beyond his control." Pigford v. Glickman, Civil Action No. 97-1978, Consent Decree ¶ 5(g) (D.D.C. Apr. 14, 1999). More than 61,000 individuals petitioned to submit untimely claim packages. Ultimately, only 4% of these "late filers" were deemed to have shown "extraordinary circumstances" beyond the individual's control and had their claims considered on the merits. The remaining "late filers" — over 58,000 in all — were

---

comprises the $1.25 billion appropriated by Congress for this litigation minus $22.5 million in implementation costs. See Settlement Agreement (Revised and Executed as of May 13, 2011) § II.O [Dkt. No. 170-2].

unable to pursue relief under the Pigford Consent Decree. See In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 11. Moreover, thousands of additional would-be claimants (the so-called "late-late filers") submitted petitions to file untimely claims *after* the deadline for such petitions, and they, too, were denied the opportunity to have their claims adjudicated under the Pigford Consent Decree. Id.

In 2008, after years of lobbying and publicity efforts by advocates for late-filing Pigford claimants, Congress enacted Section 14012 of the Food, Conservation, and Energy Act of 2008 (the "Farm Bill"), which provided that "[a]ny Pigford claimant who has not previously obtained a determination on the merits of a Pigford claim may, in a civil action brought in the United States District Court for the District of Columbia, obtain that determination." Pub. L. No. 110-246, § 14012(b), 122 Stat. 1651 (2008). Section 14012 authorized forms of adjudication that were "similar, but not identical," to the two-track adjudication system established under the Pigford Consent Decree. In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 12. Among the most noteworthy differences, Section 14012 made no provision for a non-judicial claims resolution process but instead directed that "the court shall decide the case" of each individual claimant. Farm Bill § 14012(f)(1)(B).[2] In addition, the Farm Bill appropriated only $100 million for the payment of successful claims, id. § 14012(c)(2) — far too little to satisfy the number of successful claims that could reasonably be anticipated, although the statute contemplated the possibility of future additional appropriations. See id. § 14012(i)(2), (j).

After the enactment of the 2008 Farm Bill, numerous complaints were filed in this Court under Section 14012 on behalf of thousands of plaintiffs. All of the Section 14012 actions

---

[2]      Certain paragraphs in Section 14012 of the Farm Bill were renumbered by subsequent legislation. Citations in this Opinion refer to the original numbering used in the 2008 statute.

were consolidated in August of 2008 into this miscellaneous case.  The case was then stayed to

enable settlement negotiations to proceed, except for the limited purpose of allowing the parties

to brief the question of whether the case should be certified as a class action.  See Order (Aug. 8,

2008); Minute Order (Oct. 1, 2008); Order (Dec. 23, 2008).  While briefing on class certification

was underway, the parties continued their settlement discussions.  In February 2010, they

reached a settlement agreement that delineated a comprehensive, non-judicial claims resolution

process for plaintiffs seeking recovery under Section 14012 of the Farm Bill.  See Defendant's

Unopposed Motion to Withdraw His Motion to Certify a Rule 23(b)(1) Class, ¶ 3 [Dkt. No. 137].

 In late 2010, Congress appropriated an additional $1.15 billion to carry out the

terms of the Settlement Agreement, but conditioned this appropriation of additional funds on the

Court's approval of that agreement, including any modifications agreed to by the parties and

accepted by the Court.  In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 13, 39.  This

conditional commitment is found in Section 201 of the Claims Resolution Act ("CRA").  See

PUB. L. NO. 111-291, § 201(b), 124 Stat. 3064 (2010).  To promote the integrity of the claims

process it endorsed in the CRA, Congress imposed additional requirements on the attorneys and

the prospective appointed neutrals as they carried out the terms of the Settlement Agreement; it

also mandated certain government audits and oversight reports.  Id. §§ 201(g), (h).

 Although the funding provided by the Claims Resolution Act was substantial —

adding up to $1.25 billion when combined with the funds appropriated by the Farm Bill — the

existence of an upper limit on the total funds available for the payment of successful claimants

created a situation markedly different from that in Pigford.  While the Pigford Consent Decree

capped the individual amounts that could be awarded for certain types of successful claims, there

was no limit on the total available funds, and thus no prospect that awards would have to be

divided among successful claimants from a limited common fund. And like the Farm Bill, the
Claims Resolution Act included no fee-shifting provision, meaning that any payment of
attorneys' fees and expenses would inevitably have to be drawn from the same (limited) common
fund.

The Court granted preliminary approval of the Settlement Agreement and
certified a Rule 23(b)(1)(B) settlement class in May 2011. See Order (May 13, 2011); Order
(May 20, 2011). A Fairness Hearing on final approval of the Settlement Agreement was
scheduled, and class counsel undertook the execution of a multifaceted notice program designed
to apprise potential class members of the proposal to certify a class and approve the Settlement
Agreement. The notice program involved direct mailings to tens of thousands of known
potential class members, along with radio, television, print, and online publicity. Written notices
about the proposed settlement informed the class that counsel would be seeking an award of
attorneys' fees equaling as much as 7.4% of the settlement fund, the date of the Fairness
Hearing, and the fact that class members could file written objections to the Settlement
Agreement and potential fee award as well as speak at the Fairness Hearing individually or
through counsel. See Plaintiffs' Motion for Final Approval of Settlement, Ex. A [Dkt. No.
187-3] (detailing notice program); id. at 19 (example of direct notice mailed to known potential
class members). Class counsel also filed a motion for an award of attorneys' fees, seeking an
award set at 7.4% of the common fund — the maximum amount permitted under the Settlement
Agreement. See Class Counsel's Motion for an Award of Attorneys' Fees and Expenses [Dkt.
No. 180].

The Fairness Hearing was held on September 1, 2011, and the Court entered an
Order and Judgment on October 27, 2011, certifying a settlement class, approving the terms of

the settlement, and dismissing the case, while retaining jurisdiction to enforce the Settlement

Agreement and resolve ancillary matters.  See In re Black Farmers Discr. Litig., 856 F. Supp. 2d

1 (D.D.C. 2011) (Opinion); In re Black Farmers Discr. Litig., 820 F. Supp. 2d 78 (D.D.C. 2011)

(Order and Judgment).

   In its Opinion approving the Settlement Agreement, the Court indicated that it

would approve an award of attorneys' fees to class counsel only after the completion of the

claims resolution process.  In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 25.  The lump

sum payment is to be divided among class counsel pursuant to the terms of the Settlement

Agreement and the separate, negotiated Counsel Participation Agreement.  Id.  The Court also

appointed an Ombudsman and Deputy Ombudsman to, among other things, serve as the Court's

eyes and ears during the claims process and offer an independent perspective on the

implementation of that process.  They have communicated extensively with claimants, attorneys,

farmer advocacy organizations, the Court-appointed neutrals, class counsel, and the Court during

the claims process.  See, e.g., Ombudsman Report Regarding the Implementation of the

Settlement Agreement through September 30, 2012 ("Ombudsman Report") [Dkt. No. 319].  The

Ombudsman and Deputy Ombudsman have performed admirably and have helped to ensure that

the process has run both efficiently and fairly.

   In September 2012, class counsel submitted an updated motion for an award of

attorneys' fees and expenses.  The updated motion — still seeking an award set at 7.4% of the

common fund — omits an expert declaration included with the original motion that the

government had moved to strike, and it also reflects class counsel's efforts on behalf of the class

since the approval of the Settlement Agreement and during the claims process.

The government, recognizing that class counsel's fees will be drawn from the public fisc, in the form of the funds appropriated by Congress for this case, and that the government shares an obligation "to ensure that the funds that Congress appropriated . . . are responsibly disbursed to those for whom Congress and the United States Department of Agriculture intended the money," has opposed class counsel's motion in part, arguing that counsel's work in this case merits compensation at a rate of 4.1% of the common fund, at the bottom of the permissible range set forth in the Settlement Agreement. Opp. at 2.

## II.  LEGAL STANDARD

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). "Courts have a duty to ensure that claims for attorneys' fees are reasonable," Trombley v. Nat'l City Bank, 826 F. Supp. 2d 179, 204 (D.D.C. 2011), "in light of the results obtained." In re Dep't of Veterans Affairs (VA) Data Theft Litig., 653 F. Supp. 2d 58, 60 (D.D.C. 2009) (citing Hensley v. Eckerhart, 461 U.S. 424, 440 (1983)). While the commonly used "lodestar" method represents one way of calculating reasonable attorneys' fees, this circuit has indicated that in cases involving a common fund that has been established for the benefit of the plaintiffs, the "percentage of the fund" method "is the appropriate mechanism for determining the attorney fees award." Id. (quoting Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1271 (D.C. Cir. 1993)).

"The common fund doctrine allows an attorney whose efforts created, increased or preserved a fund to recover from the fund the costs of his litigation, including attorneys' fees." In re Baan Co. Sec. Litig., 288 F. Supp. 2d 14, 16 (D.D.C. 2003) (quotations omitted). This percentage-of-the-fund approach "helps to align more closely the interests of the attorneys with the interests of the parties," Democratic Cent. Comm. of Dist. of Columbia v. Washington

Metro. Area Transit Comm'n, 3 F.3d 1568, 1573 (D.C. Cir. 1993), by discouraging inflation of attorney hours and promoting "efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." Trombley v. Nat'l City Bank, 826 F. Supp. 2d at 205 (quoting In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 383 (D.D.C. 2002)); see Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1268-69.

   "Once it is determined that the attorneys are entitled to be paid from the common fund, it is the duty of the court to determine the appropriate amount," based on "reasonableness under the circumstances of a particular case." Democratic Cent. Comm. of Dist. of Columbia v. Washington Metro. Area Transit Comm'n, 3 F.3d at 1573. The Court's independent scrutiny of an award's reasonableness is particularly important in common fund cases, because "the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." Id. (quotation omitted); see Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1265. "[W]here the settlement agreement creates a common fund against which individual plaintiffs may make claims," the Court must "'act as fiduciary for the beneficiaries'" of the fund "'because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set'" and because "'there is no adversary process that can be relied upon in the setting of a reasonable fee.'" In re Dep't of Veterans Affairs (VA) Data Theft Litig., 653 F. Supp. 2d at 60 (quoting COURT AWARDED ATTORNEY FEES: REPORT OF THE THIRD CIRCUIT TASK FORCE, 108 F.R.D. 237, 251 (1985)).

   "While this Circuit has not yet developed a formal list of factors to be considered in evaluating fee requests under the percentage-of-recovery method, other jurisdictions have delineated factors that courts should consider in evaluating fee requests." In re Lorazepam &

Clorazepate Antitrust Litig., Misc. No. 99-276, 2003 WL 22037741, at *8 (D.D.C. June 16,

2003).  Courts typically consider seven factors to guide their inquiries:

> (1) the size of the fund created and the number of persons benefitted, (2) the presence or absence of substantial objections by class members to the settlement terms or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of litigation, (5) the risk of non-payment, (6) the time devoted to the case by plaintiffs' counsel, and (7) awards in similar cases.

Trombley v. Nat'l City Bank, 826 F. Supp. 2d at 204; see also Wells v. Allstate Ins. Co., 557

F. Supp. 2d 1, 6 (D.D.C. 2008); In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 17.


### III.  DISCUSSION

With respect to the seven factors cited above, the government does not question

the skill and efficiency of class counsel or the fact that class counsel faced the risk of non-

payment when they agreed to represent class members in this litigation.  See Opp. at 4.  It does

argue, however, that class counsel is not entitled to a 7.4% fee award in light of the amount of

time they devoted to this case and because this litigation was neither long in duration nor

particularly complex.  Id. at 4-8.  The government also maintains that the fee awards in similar

common fund cases do not provide an apt comparison on which the Court can base a 7.4% fee

award.  Id. at 8-10.  Finally, the government notes that because there are likely to be insufficient

funds to pay the awards of all potentially successful claimants, "every dollar that is awarded to

Class Counsel in fees is one less dollar that is available to pay successful class members."  Id.

at 1; see also id. at 7-8.[3]  For these reasons, the government urges the Court to exercise its

discretion to limit the award to class counsel to 4.1% of the common fund.  See id. at 11-12.

---

[3]        This final argument advanced by the government has since lost all force: the status report filed by class counsel on July 8, 2013 demonstrates that even after the payment of

In approving the Settlement Agreement, the Court explained why consideration of the seven factors may justify, as fair and reasonable, an award of attorneys' fees and expenses equaling as much as 7.4% of the common fund. In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 38-41. Many of the observations made then support the Court's conclusion today regarding the specific percentage of the fund at which, in its discretion, the Court has concluded the award should be set. In addition, the Court now is in a position to assess, in view of the government's arguments, the effectiveness of class counsel's performance over the course of more than twenty months since the settlement was approved, including counsel's implementation of the claims process and the other tasks associated with the performance of their responsibilities under the Settlement Agreement.

### A. Percentage-of-the-Fund Analysis

1. The Size of the Fund and the Number of Persons Benefitted

As the Court already has observed: "In the absence of the services of class counsel, the members of the plaintiffs' class would not be in a position to divide up $1.25 billion (less implementation costs); they would be engaged in a chaotic struggle to win a portion of the $100 million appropriated by the 2008 Farm Bill before those funds ran out." In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 38-39. Class counsel do not attempt to take all the credit for the appropriation by Congress of an additional $1.15 billion to fund successful claims in this action, as that credit must be shared with other groups and individuals who advocated before Congress and the public about the cause of Pigford late-filers and the critical need for

---

attorneys' fees in the full amount requested and of all implementation costs, there will be sufficient settlement funds to pay all prevailing class members the full amount of the award authorized by the Settlement Agreement and the Farm Bill. See Status Report Regarding Projected Timeline for Completion of Claims Process ("Status Report") [Dkt. No. 367]; infra at 29-30.

additional funding.[4] Yet "[a]s the Claims Resolution Act's specific references to the settlement agreement make clear, the execution of an agreement between class counsel and defendant's counsel was a necessary catalyst leading to the appropriation of a great deal of additional funding for this litigation." In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 39 (citing CRA §§ 201(a), (b)). By reaching a comprehensive settlement with the government that encouraged confidence within the legislative and executive branches about the wisdom of supplying additional funding, class counsel's efforts undoubtedly "increased" and "preserved" the common fund benefitting the plaintiffs in this action. In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 16. As the Court has recognized, "[w]ithout the services of class counsel, there would be no recovery for most class members." In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 39.

Beyond helping to secure additional funding through the Claims Resolution Act, class counsel's success in negotiating the Settlement Agreement has increased the number of persons benefitted by this case in other ways. The Settlement Agreement enables plaintiffs to pursue their claims in an expedited, non-judicial forum — a development that, as a matter of practical reality, is essential to making the adjudication of claims and the payment of successful plaintiffs attainable. By contrast, if each of the tens of thousands of individual plaintiffs were required to present his or her case directly to the Court for a decision, as the Farm Bill originally specified, see § 14012(f)(1)(B), given the unprecedented amount of judicial resources that would have been required, recovery for most class members would have been postponed into the far

---

[4]     See Mem. at 3 n.6 (noting that "the National Black Farmers Association (spearheaded by John Boyd), the Federation of Southern Cooperatives, and other farm advocacy groups played key roles in advocating for . . . passage of the 2010 Claims Resolution Act"); id. at 23 (stating that it was as a result of "the intense and sustained efforts of Class Counsel in this action over the duration of the case and of Class Counsel's effective advocacy that, *together with the efforts of others*, led to the $1.15 billion in additional funding for this Settlement provided by the Claims Resolution Act") (emphasis added).

distant future — even assuming that sufficient funds were available to pay all successful claims. For a class that includes many elderly individuals seeking redress for acts of discrimination that in some instances stretch back to the 1980s, the establishment of a streamlined claims resolution process is an achievement that confers significant benefit on the plaintiffs.  In addition, their prospects for success were enhanced by class counsel's negotiated elimination of the imposing evidentiary requirement that a claimant identify two specific and "similarly situated white farmers" who obtained more favorable results from the USDA, In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 9 (quoting Consent Decree ¶ 9(a)(i)(C)) — a legacy of the Pigford claims resolution process that was replicated in the Farm Bill.

  The Settlement Agreement negotiated by class counsel also has benefitted plaintiffs by imposing a categorical prohibition on the acceleration or foreclosure of any USDA loans that form the basis of a plaintiff's claim, during the pendency of that claim.  Settlement Agreement § VII.A.  In contrast, the Farm Bill required plaintiffs seeking such deferral to make "a prima facie case in an appropriate administrative proceeding that the acceleration or foreclosure is related to a Pigford claim."  Farm Bill § 14012(h)(2).

  All told, class counsel's adept negotiation of the Settlement Agreement dramatically benefitted the class by ensuring that a greater number of plaintiffs likely will prevail on their claims than otherwise, that these claims will be resolved and payments issued in a timely manner, and that adequate funding will exist to provide meaningful compensation to each successful plaintiff.

  By the same token, Congress' appropriation of the additional $1.15 billion that forms the bulk of the common fund was a legislative decision, informed in part by policy considerations independent of class counsel's efforts.  Moreover, the precise amount

appropriated by Congress bears no direct relationship to those efforts, instead seemingly

reflecting a choice to fix a sum that approximates the total funds paid out by the government in

the Pigford case.  Therefore, although the negotiation of the Settlement Agreement by class

counsel clearly was a "necessary catalyst" without which additional funding for this action may

well not have materialized, In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 39, the

relationship between the amount of the common fund and counsel's efforts may be more

attenuated than in some common fund cases, and the credit for the expansion of the fund does

not rest entirely with class counsel.[5]

> ## 2. The Presence or Absence of Substantial Objections by Class Members to the Settlement Terms or Fees Requested by Counsel

Objections by class members to the award of attorneys' fees sought by class

counsel have been few in number.  Indeed, the Court emphasized "the lack of substantial

objections to the fee range set by the settlement agreement" in concluding at the settlement stage

that a fee award between 4.1% and 7.4% of the common fund was fair and reasonable.  The

Court further observed that even the few objections that were voiced generally lacked substance:

> Although numerous individuals have objected to the prospect of a
> $90 million award of attorneys' fees, at the high end of the
> proposed range, none of those individuals has proposed a
> reasonable alternative measure of fees. Nor have they provided
> specific reasons that the proposed range is unfair or unreasonable,
> aside from the fact that the fee award will inevitably reduce the
> fund available for payments to the class — a necessary and
> unavoidable result.

---

[5]      In addition, the government apparently was as desirous as the plaintiffs of
securing an expedited, non-judicial claims resolution process requiring minimal participation by
government lawyers, and with avoiding the administrative burdens on the USDA contemplated
by the 2008 Farm Bill, which required the agency to supply each claimant with certain loan data
from the claimant's county — a requirement clearly aimed at helping claimants satisfy the
"similarly situated white farmer" requirement for successful claims.  See Farm Bill § 14012(e).

In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 41; but see supra note 3; infra at 29-30.

Out of a class comprising tens of thousands of plaintiffs — each holding a potential stake of $50,000 or more in this litigation (that being the minimum payment to which successful Pigford plaintiffs were entitled) — only 25 individuals filed objections to the proposed Settlement Agreement (including its range of 4.1% to 7.4% in attorneys' fees) or to class counsel's request for a 7.4% fee award.  And among this relatively small group, many of the ostensible objections actually expressed no real disagreement with the terms of the Settlement Agreement (including the attorneys' fees provision), while others were submitted by individuals who were not class members and therefore had no right to object to either the Settlement Agreement or class counsel's motion for a fee award.  See FED. R. CIV. P. 23(e)(5) (providing that only a "class member" may object to a proposed class action settlement); FED. R. CIV. P. 23(h)(2) (providing that only a "class member, or a party from whom payment is sought" may object to a motion for attorneys' fees by class counsel).  As noted, some individuals who spoke at the Fairness Hearing expressed the view that the attorneys' fees sought by class counsel were excessive, but none of those who balked at the 7.4% rate presented a tangible basis for the objection, aside from the sheer size of the award and the assumption, now proven unfounded, that it would reduce plaintiffs' recovery.

### 3.  The Skill and Efficiency of the Attorneys Involved

There is little question about the skill and efficiency demonstrated by class counsel in this action.  Indeed, even as they challenge other aspects of the fee motion, the exemplary team of lawyers from the Department of Justice and the USDA involved in this case for the government state that there is not "any dispute regarding Class Counsel's skill."  Opp. at 4.

14

The prosecution of this case entailed a diverse array of challenges. Surmounting these difficulties called for a host of skills by class counsel, including the ability to craft a complex settlement agreement delineating a process for the expedited resolution of plaintiffs' claims, to successfully negotiate with the government concerning the terms of this agreement and later secure the Court's approval, to orchestrate a vast claims resolution process that maximized counsel's assistance to an enormous class of plaintiffs spread across the country, to supervise the efforts of a large team of lawyers providing assistance to these plaintiffs and ensure that they be sufficiently versed in the governmental credit programs underlying the plaintiffs' claims to provide useful assistance in completing and submitting claim forms, and to resolve bedeviling logistical glitches that arose with respect to particular groups of plaintiffs during the claims process.

Successfully coordinating the efforts of over twenty law firms, class counsel have demonstrated the sophistication necessary to effectively brief complex class certification issues before this Court and to defend the Settlement Agreement on appeal before the D.C. Circuit, the skill to negotiate with the government's experienced legal team and obtain advantageous terms for the plaintiffs, and the logistical wherewithal to help implement the massive claims process — a task that demanded making myriad strategic adjustments as the process unfolded in response to a host of pragmatic difficulties.

"The sign-up period of the settlement, in which tens of thousands of class members needed to submit complete claim packages, required significant expertise and commitment." Ombudsman Report at 31. While there were indications that some meetings held by class counsel to assist claimants may have been insufficiently staffed at the very beginning of the claims process, and that some claimants had to travel significant distances to attend meetings,

15

class counsel promptly responded to these concerns by adding meetings in areas of the country where there had been significant turnouts. The problem of staffing and organization at meetings appears to have been resolved quickly. Id. at 26; see Reply, Ex. C ¶¶ 4-7 (describing the challenge of organizing meetings and improvements made by class counsel during the process). Furthermore, while some individuals reported that it was difficult to arrange to talk directly with class counsel by telephone, perhaps as a result of the call-back system that class counsel utilized, ultimately people "who continued to try to speak with Class Counsel . . . were able to do so." Ombudsman Report at 26. In sum: "Although there were some logistical difficulties in the process, a reasonably diligent person had ample opportunity to receive assistance from Class Counsel in filing a claim." Id. at 30.

With respect to the overall design and implementation of the claims resolution process, class counsel rightly contend that "the absence of any significant administrative difficulties or delays in the claims process attests to the detailed and skillful work performed by Class Counsel throughout all phases of this case." Reply at 8. While some limited delay was caused by class counsel's failure to anticipate certain logistical problems in the processing of claims — requiring class counsel to submit a motion to provide particular classes of claimants more time to return their claims packages, see Motion to Modify Final Order and Judgment [Dkt. No. 300] — the delay was not unreasonable given the number of potential claimants and the logistical challenges presented, and class counsel worked hard to correct the problems they identified as promptly as possible. In view of the complexity and intricacy of the situation with which they were faced, there is no doubt that class counsel's skill and efficiency resulted in a claims resolution process that, now proceeding apace, is on track to provide full remedial awards to successful claimants that have eluded these African American farmers for so many years.

16

4. The Complexity and Duration of the Litigation

This action posed unique challenges for class counsel, many of which the Court

already has acknowledged:

> Although civil rights litigation is not typically considered as
> complex as, for example, sprawling commercial class actions, this
> case involves a wide range of complicating factors: an enormous,
> geographically dispersed plaintiffs' class that may number more
> than 60,000; a multitude of individual claims predicated at least in
> part upon unique facts and upon events that may have occurred as
> much as 30 years ago; an authorizing statute never interpreted by a
> court; a dizzying array of relevant statutory and regulatory
> provisions affecting the validity of claims as to both liability and
> damages; a large number of potential class members who are
> highly suspicious of both attorneys and the government; and
> intense scrutiny by Congress, the executive branch, and the press.
> The prospect of such litigation is daunting, and many attorneys
> would not have undertaken it.

In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 40.  On the other hand, as the government

points out, the case involved no discovery or dispositive motions, no pretrial preparation, and no

trial.  The proceedings were stayed for the purpose of settlement negotiations almost

immediately after the first complaints were filed.  In less than two years a settlement agreement

was reached that, like the claims resolution process it established, was modeled in large part on

the Consent Decree in Pigford v. Glickman.  Briefing of legal issues was largely confined to the

matters surrounding class certification and approval of the Settlement Agreement.  And none of

the parties who appealed the Settlement Agreement to the D.C. Circuit had standing to do so,

enabling class counsel to obtain dismissal of the appeals in a short per curiam order.

Emphasizing these points, the government maintains that this case "was not

particularly complex" and that "it did not require the parties to engage in original research, nor

did it require them to reinvent the wheel to devise the non-judicial claims process by which all

the class members' claims will be resolved." Opp. at 1-2.  The government also portrays the parties' negotiation of the settlement agreement as characterized by "intermittent settlement discussions," during which "there was virtually no actual litigation." Opp. at 4.  These considerations arguably may warrant some reduction of class counsel's fee in comparison with awards granted in more complex cases involving common funds of a comparable size.  But in light of the genuine challenges faced by class counsel in this action, they surely would not justify lowering the award to 4.1% of the common fund or anywhere near the low end of the agreed-upon range.

It is true that the prosecution of this action lacked many of the typical hallmarks of complex litigation, and that the work of crafting the settlement agreement was greatly facilitated by the template established in the Pigford case.  See Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1272 (where counsel's efforts ride "piggyback" on those from an earlier case, courts are within their discretion to reduce the fee award accordingly).  But a side-by-side comparison of the Settlement Agreement with the Pigford Consent Decree belies the claim that little original work was required here on behalf of the plaintiffs.  "Although the duration of litigation was relatively short," and "there were no dispositive motions filed," "the issues to be resolved in this case were complex." Trombley v. Nat'l City Bank, 826 F. Supp. 2d at 205; see Radosti v. Envision EMI, LLC, 760 F. Supp. 2d 73, 78 (D.D.C. 2011) ("While there was no lengthy litigation, counsel should not be penalized for achieving an effective and efficient settlement." (quoting In re Vitamins Antitrust Litig., Misc. No. 99-197, 2001 WL 34312839, at *11 (D.D.C. July 16, 2001))).

Among many other novel challenges they faced, class counsel had to devise a fair and efficacious manner of resolving a potentially very large number of claims with funds drawn

from a limited pool. At least twenty drafts of the Settlement Agreement were exchanged between the parties in an effort to achieve this shared goal.

  While the government depicts this negotiation process as merely "fine-tuning the agreement in principle reached early on in the litigation," Opp. at 5, in a case of such magnitude and complexity it is precisely this process of "fine-tuning" that leads to the creation of an effective non-judicial claims forum rather than one that might become bogged down in unforeseen hitches or unintended omissions, resulting in adverse consequences for claimants. Indeed, this attention to precision and detail may ultimately spell the difference between success or failure for thousands of claimants. Furthermore, even after reaching an accord with the government on a proposed settlement, class counsel were required to further revise this agreement in response to concerns expressed by the Court, see Dkt. Nos. 168, 170, 171, and requirements imposed by Congress under the Claims Resolution Act.

  An exclusive focus on the lack of discovery, merits briefing, and trial gives short shrift to the unenviable logistical challenges that confronted class counsel in designing and implementing the claims resolution process in this case — "a complicated and formidable undertaking" that "called for the evaluation and sign-up of tens of thousands of claimants." Ombudsman Report at 1. Given the intricate requirements for class membership and the often dated information available about the individuals who unsuccessfully sought to participate in Pigford, even the initial process of properly identifying and communicating with class members was no easy task. Class counsel, working together with the Claims Administrator, "devoted considerable effort, expertise, and resources to the task of distributing Claim Forms to potential claimants," and as a result of their efforts over 96,000 claim forms were sent to potential class members. Id. at 18-19.

This was only the tip of the iceberg for class counsel, who committed to providing assistance to all class members in the completion and submission of their claim forms. Carrying out this task entailed developing a systematic program of meetings held across the country, a program that strategically located and scheduled meetings to maximize counsel's efforts and reach the largest possible number of claimants. Class counsel report that during the claims period they held 384 group meetings in 66 cities and 23 states and in Washington, D.C., which allowed counsel to assist nearly 22,000 potential claimants in person. Ombudsman Report at 26. These group meetings were staffed by multiple attorneys and paralegals to assure that putative class members had access to in-person assistance from legal professionals. And the in-person meetings were supplemented by a system of toll-free telephone assistance, through which class counsel spoke with over 3,600 claimants. Id. at 25.

Providing these services demanded that the meetings be designed with sufficient care to run smoothly and ensure that all potential claimants received attention. It also required that the attorneys assisting these thousands of claimants be sufficiently knowledgeable about the underlying USDA farm loan programs to offer effective assistance. Making such assistance available to this large and disparate class was indeed an arduous undertaking. See generally Reply, Ex. B (Declaration of Stephen M. Coe); id., Ex. C (Declaration of Eric J. Sanchez) (recounting diverse challenges of designing and implementing strategy for claimant assistance meetings).

In addition, as class counsel have accurately explained on their own behalf, they have devoted thousands of hours over the past year and a half to, among other things, "working with the Claims Administrator to refine the claims process and to address difficult issues as they arose," "interfacing with the Track A and B Neutrals to ensure that the claims adjudication

process was proceeding smoothly," "working with the Ombudsman and Deputy Ombudsman to address issues and to implement suggestions raised by them," "cooperating with the General Accounting Office and the Office of the Inspector General of the U.S. Department of Agriculture as they have implemented their audit responsibilities under the Claims Resolution Act of 2010," "responding to questions raised by thousands of non-Class Members who sought to determine their eligibility to participate in the Settlement," and "coordinating with farm advocacy groups and enlisting their support to disseminate information about the claims process and to combat fraudulent schemes designed to prey on unsuspecting black farmers." Reply at 2.

Although this case required less in the way of discovery, motions practice, and in-court activity than many class actions, therefore, and although class counsel benefitted from the work performed in <u>Pigford</u>, the manifold complications inherent in crafting and negotiating the Settlement Agreement, and in implementing the enormous claims resolution process, undermine the government's assertion that an ostensible lack of complexity in this case warrants setting counsel's fee award at the very bottom of the range negotiated by the parties.

### 5. The Risk of Nonpayment

The risk of nonpayment is a factor that weighs heavily in favor of a considerable award in this case. Some of the lawyers now denominated as class counsel originally brought Section 14012 complaints to this Court on a contingency fee basis, with no guarantee that their clients' cases would be certified as part of a class action and successfully resolved through settlement or that this result would be achieved at all expeditiously. Counsel instead faced the real prospect of presenting the claims of individual plaintiffs to the Court for determination on a case-by-case basis (probably over many years, given the judicial resources that would be required), as contemplated by the Farm Bill. Given the difficulty of determining with certainty

whether particular individuals truly qualified for relief under Section 14012, counsel also ran the risk that many of their clients would be found ineligible even before their claims were adjudicated on the merits.

As for those prospective merits-based adjudications, the litigation contemplated by Section 14012 of the Farm Bill itself promised uncertain results. And even if counsel's clients were to prevail, it was unlikely that enough money would be available to pay the successful litigants (and their attorneys), as the Farm Bill appropriated only $100 million for Section 14012 claims. Finally, even after a Settlement Agreement was reached to resolve the plaintiffs' claims in a non-judicial forum, had funding remained capped at $100 million, "class counsel would have been left to scramble for any fees that could be eked out of a fund vastly insufficient to pay all claims against it, and the payment of any fees that were forthcoming may have been delayed for years." In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 41.

Moreover, during the course of this litigation, as class counsel have faced the uncertainty of not knowing what amount of compensation they ultimately will receive, they have also incurred significant out-of-pocket expenses, largely associated with pre-settlement outreach and advocacy efforts and with assisting claimants during the extensive post-settlement claims process. Class counsel have reported that, by September of last year, the outlays incurred by one firm alone exceeded ten million dollars. See Reply at 7-8; id., Ex. A (Declaration of James S. Farrin) (describing firm's payments and obligations as exceeding $10 million, leading to maxed-out credit lines, the laying off of staff members, and the necessity of signing personal guarantees on loans). And as of earlier this week, two firms — the Law Offices of James Scott Farrin and Morgan & Morgan, P.A. — reported that they have collectively incurred in excess of $18 million in out-of-pocket expenses and obligations in connection with this case. See Supp. Filing at 1.

To date, the Farrin firm has incurred over $13 million in expenses for client communications, legislative activities, public relations efforts, legal fees for outside counsel not working on a contingent basis, expenses related to the claims administration process, and finance charges. See id., Ex. 1 (Supplemental Declaration of James S. Farrin). Morgan & Morgan has incurred over $5 million in out-of-pocket expenses with respect to similar activities. See id., Ex. 2 (Declaration of Gregorio A. Francis). Other firms have also advanced significant costs throughout the life of this case. Id. at 2.

Yet, to date, these law firms have received no reimbursement for these out-of-pocket expenses which, as characterized by Mr. Farrin, have "been carried at risk for over five years." Supp. Farrin Decl. ¶ 2; see also Francis Decl. ¶ 2 (same characterization, "for over four years"). Absent the settlement of this case, they might never have been reimbursed for many of these costs and expenses. And under the terms of the Settlement Agreement, the law firms involved in this litigation agreed that they would not be reimbursed for any of their out-of-pocket expenses or paid any attorneys' fees until the same time that successful claimants receive their award payments, after the claims process has run its course. See Settlement Agreement §§ V.E.8, V.E.10. In light of these considerations, the Court's previous observation that this litigation "was no sure bet for plaintiffs' lawyers" was, if anything, an understatement. In re Black Farmers Discr. Litig., 856 F. Supp. 2d at 41.

6. The Amount of Time Devoted to the Case by Plaintiffs' Counsel

Class counsel have reported spending an immense amount of time on this action. They say they have assisted over 25,000 class members during the claims process and have submitted approximately 13,000 claim forms, see Mem. at 16 — each of which required counsel to attest under penalty of perjury that, to the best of counsel's knowledge, the claim was

supported by the law and the evidence.  See CRA § 201(g)(5).  More specifically, according to

the updated fee motion, the firms appointed as class counsel have reported to lead class counsel

in excess of 40,000 attorney hours and 60,000 paralegal hours spent during the period preceding

the Court's approval of the Settlement Agreement and, as the claims process has unfolded, more

than 40,000 additional attorney hours and over 100,000 additional paralegal hours between

approval of the Settlement Agreement and the submission of class counsel's motion.  Mem.

at 19.[6]

      Class counsel's work is ongoing: since the filing of their fee motion they have,

among other things, worked with the Claims Administrator and the Ombudsman to ensure that

the various steps involved in the final stages of the claims process can proceed smoothly, helped

to resolve logistical problems regarding the processing of certain categories of claims,

cooperated with auditors from the General Accounting Office and the USDA conducting the

oversight investigations mandated by the Claims Resolution Act, and coordinated with various

parties to finalize preparations for the notification of plaintiffs about the results of their claims

and the payment of successful claims.  See Mem. at 18-19.  Furthermore, class counsel profess

themselves "committed to devoting whatever additional time and effort is necessary going

forward to bring the claims and payment process to a successful conclusion."  Id. at 37.  Indeed,

class counsel "will continue to incur expenses in connection with this case, and will continue to

devote substantial time on behalf of the Class, until all of the Settlement Funds have been

distributed in accordance with this Court's orders."  Supp. Filing at 1.

      The government acknowledges that class counsel "have devoted substantial time

and effort to implement the non-judicial claims process established under the Settlement

---

[6]    See infra note 8 for a discussion regarding documentation for the hours class
counsel have reported expending.

Agreement, and to provide legal advice and assistance to class members." Opp. at 6-7. But, the government suggests, class counsel's reported hours must be "grossly inflated, given that there was very little original work to perform in this case." Id. at 7. As the Court already has indicated, it does not agree that this case involved little original work, see supra at 14-21, and it accepts the representations of class counsel as to the number of hours spent by attorneys and paralegals in this case. It believes that the large number of hours expended by class counsel is a product of the complexity of the tasks they undertook and their adherence to the professional obligations owed to the class — not to mention their likely expectation that the Court would base its fee determination in part on an assessment of how good a job they did for their clients.

### 7. Awards in Similar Cases

To award the full fee requested by class counsel — 7.4% of the common fund — would be consistent with the awards approved in comparable common fund cases, if anything falling at the low end of the range for such awards.

As a general matter, "a majority of common fund class action fee awards fall between twenty and thirty percent." In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 17 (quoting Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1272); see Democratic Cent. Comm. of Dist. of Columbia v. Washington Metro. Area Transit Comm'n, 3 F.3d at 1575 (finding that 23.3% fee "falls well within the range usually awarded in common fund cases"); see also Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 n.4 (9th Cir. 2002) (describing survey of fee awards in 34 common fund settlements from 1996 to 2001 and finding a majority clustered in the 20% to 30% range). Fees awarded in this circuit "mirror the nationwide numbers." In re Dep't of Veterans Affairs (VA) Data Theft Litig., 653 F. Supp. 2d at 61; see Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1272 (approving 20% award); Trombley v. Nat'l City Bank, 826 F. Supp. 2d at

206 (approving 22% to 25% award); <u>In re Baan Co. Sec. Litig.</u>, 288 F. Supp. 2d at 17 (approving

28% award); <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 2003 WL 22037741, at *8-9

(approving 30% award). "In some cases, the percentage has been even greater." <u>Trombley v.</u>

<u>Nat'l City Bank</u>, 826 F. Supp. 2d at 206; <u>see</u> <u>Radosti v. Envision EMI, LLC</u>, 760 F. Supp. 2d at

78 (approving 33% award); <u>In re Vitamins Antitrust Litig.</u>, 2001 WL 34312839, at *10

(approving 34% award); <u>Wells v. Allstate Ins. Co.</u>, 557 F. Supp. 2d at 7 (approving 45% award

in "unique" case).

 "Larger common funds are typically associated with smaller percentage awards,

however, because even a small percentage of a very large fund yields 'a very large fee award.'"

<u>In re Black Farmers Discr. Litig.</u>, 856 F. Supp. 2d at 39 (quoting <u>Wal-Mart Stores, Inc. v. Visa</u>

<u>U.S.A., Inc.</u>, 396 F.3d 96, 122 (2d Cir. 2005)). "Where the common fund is worth many

millions or even billions of dollars — in so-called 'megafund' cases — an appropriate fee may

be considerably less than twenty percent of the fund," <u>id.</u>, and it is here that "courts most

stringently weigh the economics of scale inherent in class actions in fixing an appropriate per

cent recovery for reasonable fees." <u>In re Domestic Air Transp. Antitrust Litig.</u>, 148 F.R.D. 297,

351 (N.D. Ga. 1993); <u>see</u> <u>AT&T Mobility Wireless Data Servs. Sales Tax Litig.</u>, 792 F. Supp. 2d

1028, 1033 (N.D. Ill. 2011) (surveying studies of awards in megafund cases). Still, even in

megafund cases involving recoveries of $100 million or more, "fees of fifteen percent are

common." <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 2003 WL 22037741, at *7; <u>see</u> <u>Shaw</u>

<u>v. Toshiba Am. Info. Sys., Inc.</u>, 91 F. Supp. 2d 942, 989-90 (E.D. Tex. 2000) (surveying cases

decided between 1993 and 1999). And "even in cases where, as here, the common fund is over

one billion dollars," an award of 7.4% would be "unexceptional." <u>In re Black Farmers Discr.</u>

<u>Litig.</u>, 856 F. Supp. 2d at 40. As the Court has explained:

> According to one study, in cases involving common funds "from $500 million to $1 billion" in 2006 and 2007, "the mean and median awards were both 12.9%" of the fund. In re AT&T Mobility Wireless Data Servs. Sales Tax Litig., 792 F. Supp. 2d at 1033 (citing BRIAN T. FITZPATRICK, AN EMPIRICAL STUDY OF CLASS ACTION SETTLEMENTS AND THEIR FEE AWARDS, 7 J. EMPIRICAL LEGAL STUD. 811, 839 (2010)). In other cases, where the class recovery exceed $1 billion, courts have approved awards in the 5 to 10% range. See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d at 122 (approving district court's award of 6.5% of $3 billion fund); In re Enron Corp. Securities, Derivative & "ERISA" Litig., 586 F. Supp. 2d 732, 740, 828 (S.D. Tex. 2008) (approving award equal to 9.52% of $7.2 billion fund).

Id.

The awards approved in similar cases, therefore, do not in themselves suggest that counsel's fee should be reduced below the 7.4% of the common fund that they have requested. Any such reduction must instead be founded on considerations — such as the complexity and duration of the case — that reveal this case to be dissimilar to typical megafund cases, in which, as just discussed, an award of 7.4% clearly would be reasonable.

To that end, class counsel and the government dispute the significance of the fee award granted in perhaps the most similar case available, Keepseagle v. Vilsack, Civil Action No. 99-3119 (D.D.C.). In that case — a class action against the USDA involving discrimination against Native American farmers — Judge Sullivan approved an award equal to 8% of a $760 million common fund. See Order on Plaintiffs' Motion for Final Approval of Settlement, ¶ 8, Keepseagle v. Vilsack, Civil Action No. 99-3119, (D.D.C. Apr. 28, 2011). According to the government, however, Keepseagle does not provide an apt comparison:

> [T]he parties vigorously litigated that case for 10 years, which included producing millions of pages of documents during discovery; taking approximately 100 depositions in 13 states, including those of expert witnesses; and briefing class certification twice, including an appeal of class certification pursuant to Federal Rule of Civil Procedure 23(f), *before* initiating settlement

> negotiations in 2009. In contrast, in this case, the parties, promptly
> and without any discovery, reached a settlement agreement, and
> with briefing only on class certification that required Class
> Counsel to file only one 25-page brief.

Opp. at 7-8 (citation omitted).  Notwithstanding these points, the Court tends to agree with class

counsel that a comparison with the Keepseagle award supports, rather than undermines, the fee

request here.

Although Keepseagle was litigated over a much longer period of time and

involved extensive discovery, unique complications are present in this case that were absent in

Keepseagle, including — to cite just one example — more intricate requirements for entitlement

to relief, predicated in part on an unsuccessful attempt to participate in an earlier lawsuit.  In

addition, only approximately 5,000 claim forms were submitted in Keepseagle, see Status Report

on the Claims Process, at 1, Keepseagle v. Vilsack, Civil Action No. 99-3119 (D.D.C. Mar. 9,

2012), compared with well over 30,000 claim forms that were submitted in this case,

approximately 13,000 of which were prepared and signed by class counsel.  See Ombudsman

Report at 30.  Furthermore, while the government emphasizes the extensive discovery and

briefing that took place in Keepseagle prior to the commencement of settlement negotiations, it

overlooks the fact that the settlement agreement ultimately approved in that case was closely

patterned on the settlement agreement negotiated by class counsel and the government here.  See

Motion for Preliminary Approval of Settlement Agreement, Ex. 1, Keepseagle v. Vilsack, Civil

Action No. 99-3119 (D.D.C. Oct. 22, 2010).  Thus, the Keepseagle precedent supports an award

of the full 7.4% that class counsel are requesting in this case.

It also is worth noting that thousands of plaintiffs who retained the law firms later

appointed as class counsel to represent them in their Section 14012 claims signed traditional

contingency fee agreements entitling the attorneys to be compensated at a rate of 33% of any

recovery. If this serves as any indication of the market value for class counsel's services, it

certainly supports a fee award of up to 7.4% of the common fund. See Swedish Hosp. Corp. v.

Shalala, 1 F.3d at 1269 (noting that "a percentage-of-the-fund approach more accurately reflects

the economics of litigation practice" and suggesting that fee agreements with class members can

indicate the marketplace value of services); Gunter v. Ridgewood Energy Corp., 223 F.3d 190,

198 (3d Cir. 2000) ("'[O]ne purpose of the percentage method' of awarding fees — rather than

the lodestar method, which arguably encourages lawyers to run up their billable hours — 'is to

encourage early settlements by not penalizing efficient counsel.'" (quoting MANUAL FOR

COMPLEX LITIGATION (THIRD) § 24.121, at 207 (1997))).

      Finally, in urging the Court to exercise its discretion to provide class counsel with

only a 4.1% fee award, the government anticipated that there would be insufficient funds to pay

all successful claims in full. On that premise, it noted that "every dollar that is awarded to Class

Counsel in fees is one less dollar that is available to pay successful class members," Opp. at 1,

and that, in such circumstances, it is even more important for the Court "to act as a fiduciary for

the benefit of the class members." Id. at 7. This argument has since completely lost its force, as

it is now at least "highly likely" that in fact there will be sufficient funds to pay all prevailing

class members the full amounts of their awards. See Status Report at 1.

      The Claims Administrator has advised class counsel that a total of 17,525

claimants have had their Track A claims provisionally approved for payment of the full Track A

liquidated award of $50,000 plus a corresponding tax award of $12,500. Status Report at 2.

This is the full amount permitted by the Settlement Agreement and the Farm Bill. See

Settlement Agreement §§ II.KK-NN; Farm Bill § 14012(f)(1). Furthermore, according to the

Claims Administrator, an additional 369 Track A liquidated award payments and tax awards

have been provisionally approved in the full amounts, which will be shared among 800 claimants

engaged with others in single farming operations.  See Status Report at 2.  It is anticipated that

no Track B awards will be made.  Id. at 3.  Based on these and other determinations reported by

the Claims Administrator, class counsel project that the total amount of Track A liquidated

awards, Track A loan awards, and Track A tax awards for prevailing class members will not

exceed $1,120,425,000.  See id.  Thus, even if the full $35 million authorized by the Settlement

Agreement for implementation costs is utilized, the Ombudsman is paid no more than the

amount now anticipated, and the Court were to grant the full 7.4% requested in attorneys' fees

and costs, there still would be sufficient settlement funds to pay all prevailing class members the

full amounts of the award authorized by the Settlement Agreement — with money remaining

from the $1.25 billion appropriated by Congress.  See id. at 3-4.  Therefore, it no longer can be

said that every dollar awarded to class counsel in attorneys' fees is "one less dollar that is

available to pay successful class members."[7]

---

[7]      Apart from the seven factors discussed above, a number of courts have concluded that the benefit to the public conferred by class counsel's efforts "is also worth serious consideration," even though "the public interest is not always named as a separate factor in the fee-award determination."  Wells v. Allstate Ins. Co., 557 F. Supp. 2d at 8; cf. Burka v. U.S. Dep't of Health and Human Servs., 142 F.3d 1286, 1292 (D.C. Cir. 1998) (Wald, J., concurring) (noting that courts evaluate the public benefit under fee-shifting statutes "all the time").  Class counsel's success in resolving the Pigford claims that were brought back to life by Congress in the Farm Bill has served the public interest in at least two significant ways.  First, it allowed tens of thousands of African American farmers who failed to timely file claims in Pigford to have their grievances adjudicated on the merits, providing long-sought redress with as little further delay as possible.  Second, by resolving these pending claims comprehensively, through a relatively swift claims process, the Settlement Agreement allows the government to finally turn the page on this particular chapter in the USDA's history, avoiding the prospect of another decade or more spent litigating against individual plaintiffs' claims of discrimination.  In sum, class counsel's efforts have garnered a substantial measure of justice for a group to which it has long been denied, in a manner that will allow the government to refocus its limited legal resources elsewhere.

### B.  Lodestar Cross-Check

Some circuits that employ the "percentage of the fund" method to calculate

attorneys' fees in common fund class actions have suggested that district courts cross-check the

percentage award at which they arrive against the results of the "lodestar" award method, "to

determine whether the percentage award roughly reflects the time and expertise the attorneys

invested in the case." In re Dep't of Veterans Affairs (VA) Data Theft Litig., 653 F. Supp. 2d at

61 (citing Gunter v. Ridgewood Energy Corp., 223 F.3d at 195 n.1).  In this circuit, such a

lodestar cross-check is not required, Trombley v. Nat'l City Bank, 826 F. Supp. 2d at 205 (citing

Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1266-67), although district courts are free to employ

such a cross-check at their discretion to confirm the reasonableness of an award.  See, e.g., Wells

v. Allstate Ins. Co., 557 F. Supp. 2d at 7; In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 19-20.

Class counsel report that a lodestar calculation of the hours they expended as of

the date they submitted their updated fee motion in September 2012, using rates from the "Laffey

Matrix," yields an amount of approximately $50 million.  Mem. at 39.[8]  This figure does not

include the considerable hours spent by class counsel since the filing of the updated fee motion

---

[8]      The government questions the accuracy of class counsel's lodestar analysis,
pointing out that class counsel have not provided time records or affidavits delineating the hours
they have expended or the specific tasks for which they seek payment, nor have they identified
the billing rates they applied or each attorney's years of experience.  Opp. at 7-8 n.4.  Requiring
the Court to examine and evaluate the detailed submissions that the government contemplates,
however, would defeat one of the primary benefits of the "percentage of the fund" method.
Indeed, the advantage of this method over the lodestar approach is that the latter "makes
considerable demands upon judicial resources since it can be exceptionally difficult for a court to
review attorney billing information over the life of a complex litigation and make a
determination about whether the time devoted to the litigation was necessary or reasonable."
Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1269-70.  In the context of a large class action
involving tens of thousands of attorney hours, particularly one — as here — where the awards to
the successful claimants cannot be calculated or distributed until the amount designated for
attorneys' fees has been set, such an undertaking would likely result "in a substantial delay in
distribution of the common fund to the class."  Id.

last September, or the additional hours they will have to devote on behalf of the class "until all of

the Settlement Funds have been distributed in accordance with this Court's orders." Supp. Filing

at 1. It also does not take into account class counsel's out-of-pocket expenditures, which they

now report to be over $18 million. Id.

    A fee award set at 7.4% of the common fund (*i.e.*, $90,835,000) would come to

less than twice the $50 million lodestar figure supplied by class counsel — a figure that itself is

incomplete because it does not include any of class counsel's work over the past nine months.

Such a multiplier — less than two times the lodestar — is unremarkable in common fund cases.

In fact, "multiples ranging up to 'four are frequently awarded in common fund cases when the

lodestar method is applied.'" Lorazepam & Clorazepate Antitrust Litig., 2003 WL 22037741, at

*9 (quoting In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 341 (3d Cir.

1998)); see In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 19-20 (reviewing counsel's reported

lodestar and finding "that a multiplier of 2.0 or less falls well within a range that is fair and

reasonable"); see also Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1263, 1272 (approving fee

award approximately 3.3 times the lodestar amount). Applying a lodestar cross-check, therefore,

confirms that the award sought by class counsel is neither unusual nor unreasonable, in light of

the considerable time and expertise devoted to this case by class counsel.


## IV.  CONCLUSION

    Class counsel have undertaken the immense challenge presented by this action

with the utmost professionalism and integrity, exhibiting skill, diligence, and efficiency in all

aspects of their duties. As noted earlier, they also have committed themselves to devoting

"whatever additional time and effort is necessary going forward to bring the claims and payment

process to a successful conclusion." Mem. at 37; see also Supp. Filing at 1 (noting that class

counsel "will continue to devote substantial time on behalf of the Class, until all of the

Settlement Funds have been distributed in accordance with this Court's orders").  For the reasons

stated above, class counsel's updated motion for an award of attorneys' fees and expenses will be

granted in the full amount requested.  An Order consistent with this Opinion will issue this same

day.

> SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 7|11|13