**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| In re BLACK FARMERS DISCRIMINATION LITIGATION | ) ) ) ) | |
| This document relates to: | ) ) ) | Misc. No. 08-mc-0511 (PLF) |
| ALL CASES | ) ) ) | |

---

**DEFENDANT'S MEMORANDUM IN RESPONSE TO COURT'S ORDER**

### INTRODUCTION

Over five years ago, the parties negotiated a comprehensive class action

settlement in this matter.  The Court approved the parties' agreement after extensive

notice to the class and a lengthy fairness hearing.  At that time, class members agreed to

extinguish their claims without any finding or admission of liability by the Government

in exchange for valuable consideration: the claims process, debt relief, and other

measures established in the agreement.  As part of the settlement, the parties agreed that

if any settlement funds remained after all class members had received the full

compensation to which they were entitled, those unclaimed funds would be distributed to

*cy pres* beneficiaries proposed by class counsel and approved by the Court.  In the 2010

legislation appropriating funds to the Settlement Agreement, Congress sanctioned the

parties' compromise and explicitly prohibited the use of excess funds for "any purpose"

not contemplated by the agreement.  Moreover, it required that any excess funds not used

to carry out the agreement must revert to the United States Department of Treasury.  No

parties objected to the agreement's *cy pres* provision — either before the agreement was approved or on appeal — nor does any party now contend that the provision should not be enforced according to its terms.

The claims process is now closed and approximately $1.088 billion has been paid to claimants and to the Internal Revenue Service ("IRS") on behalf of claimants.  All class members have received the full compensation and other benefits to which they are entitled under both the Settlement Agreement and the Food, Conservation, and Energy Act of 2008 ("2008 Act"), which created the cause of action under which this case was brought.  *See* 2008 Act, Pub. L. 110-234, § 14012(f), 122 Stat. 923, 1448 (2008).  Approximately $9.5 million remains of the $1.25 billion Congress appropriated to fund the settlement.  On September 3, 2015, the Court issued a Memorandum Opinion and Order, explaining that, in light of recent case law criticizing the use of *cy pres* provisions in settlement agreements, it "should determine whether a *cy pres* distribution should be made in this action or whether, instead, some or all of the unclaimed settlement funds should be distributed to Class Members."  Order, ECF No. 430.  For the reasons explained below, the Court should not — and cannot — unilaterally re-write the terms of the parties' bargained-for agreement.  Instead, it should adhere to the *cy pres* provision set forth in the Settlement Agreement that was approved by this Court.

Well-established principles of law provide that a district court has no authority to unilaterally modify the substantive provisions of a final settlement agreement in order to conform it to the court's views of what might satisfy the purposes of the litigation.  Instead, any orders regarding the rights, obligations, or scope of an agreement must be based on its plain and unambiguous language.  These principles apply with special force

here, where Congress sanctioned the parties' agreement, including its *cy pres* provision, when appropriating funds for the settlement and where Congress explicitly prohibited the use of excess funds for any purpose not contemplated by the agreement.  Specifically, the Claims Resolution Act of 2010 requires that "the use of the funds appropriated . . . shall be subject to the *express terms* of the Settlement Agreement."  Pub. L. 111-291, § 201(c), 124 Stat. 3064 (emphasis added).  It further instructs that "[i]f any of the funds appropriated . . . are not obligated and expended to carry out the Settlement Agreement, the Secretary of Agriculture shall return the unused funds to the Treasury and may not make the unused funds available for any purpose related to [the 2008 Act], for any other settlement agreement executed in *In re Black Farmers Discrimination Litigation*, No. 08-511 (D.D.C.), or for any other purpose."  *Id.* at § 201(d).  In light of this unambiguous statutory command, this Court cannot modify the parties' agreement to provide for the distribution of unused funds to class members without running afoul of congressional intent.  Moreover, any such modification would conflict with Congress' decision to provide late-filing *Pigford* claimants who chose to resolve their claims through an expedited process with a maximum recovery of $50,000 in liquidated damages.  *See* 2008 Act § 14012(f) (providing that claimants who choose to participate in the expedited claims process are entitled to "liquidated damages of $50,000," loan forgiveness, and tax relief so long as they can prove their claims by substantial evidence).

Finally, as discussed below, absent agreement of the parties, the Court does not have authority under the Settlement Agreement, Rule 60 of the Federal Rules of Civil Procedure, or otherwise to provide for the distribution of unclaimed settlement funds to class members, rather than to *cy pres* beneficiaries.  Rather, the Court should enforce the

terms of the Settlement Agreement, and permit class counsel to follow the process

outlined in Section V.E.13 of the Settlement Agreement.


### BACKGROUND

Several of this Court's opinions set forth the complete background of this case.

*See, e.g.*, *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1 (D.D.C. 2011); *In*

*re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82 (D.D.C. 2013).  On April 14,

1999, this Court approved a consent decree in settlement of a class action brought on

behalf of African-American farmers against the United States Department of Agriculture

("USDA").  *See* Consent Decree, *Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999),

*aff'd*, 206 F.3d 1212 (D.C. Cir. 2000) ("*Pigford I*").  In that action, class members alleged

that the USDA had discriminated against them on the basis of race in the administration

of USDA credit and other benefit programs.  *Id.*  The *Pigford I* consent decree

established an administrative claims process "by which each class member would have an

opportunity to demonstrate that he or she had been the victim of past discrimination by

the USDA and therefore was entitled to compensatory damages."  *In re Black Farmers*,

856 F. Supp. 2d at 9.

The *Pigford I* consent decree imposed a deadline for farmers to submit their

claims for adjudication and many farmers tried, unsuccessfully, to file claim packages

after the deadline had expired.  *Id.* at 11.  To address this problem, "Congress resurrected

the claims of those who had unsuccessfully petitioned the Arbitrator for permission to

submit late claim packages" with a provision in the 2008 Act, which provides that "[a]ny

*Pigford* claimant who has not previously obtained a determination on the merits of a

*Pigford* claim may, in a civil action brought in the United States District Court for the District of Columbia, obtain that determination." *Id.* After this provision became effective, thousands of farmers filed suit, and these cases were consolidated before this Court as *In re Black Farmers Discrimination Litigation*. *Id.* at 13.

The 2008 Act, like the *Pigford I* consent decree, allowed claimants to pursue "expedited resolution" of their claims. *See* 2008 Act § 14012(f). If claimants chose to participate in that expedited process, they were entitled to "liquidated damages of $50,000," loan forgiveness, and tax relief so long as they could prove their claims by substantial evidence. *Id.* Claimants could also pursue a more complete adjudication of their claims and receive "actual damages" if they proved their claims by a preponderance of the evidence. *Id.* § 14012(g).

After nearly a year of "extensive negotiations," the parties reached a class-wide Settlement Agreement on February 18, 2010. *In re Black Farmers*, 856 F. Supp. 2d at 14. As in *Pigford I*, the agreement provided for the creation of two alternative forms of claim resolution, designated Track A and Track B. Consistent with the 2008 Act, claimants who elected to pursue their claims under Track A were required to prove their claims of discrimination by substantial evidence, and those who prevailed were entitled to $50,000 in cash, loan forgiveness, and tax relief. *Id.* at 22. Those claimants who proceeded along Track B were required to prove their claims by a preponderance of the evidence and through independent documentary evidence, and if they prevailed, they were entitled to a maximum of their proven actual damages up to but not to exceed

$250,000.[1]  *Id.* at 23.  Claim determinations in both Track A and Track B were made by a

court-appointed third party, known as the "Track A Neutral" or the "Track B Neutral."

*Id.*  The agreement specified that the neutrals' determinations were final and not subject

to appeal.  *Id.*

The Settlement Agreement also provided for the distribution of any unclaimed

settlement funds to *cy pres* beneficiaries proposed by class counsel and approved by the

Court.  Specifically, the agreement, Section V.E.13 reads in part:

> In the event there is a balance remaining in the Designated Account after
> the last check has been cashed, the last check has been invalidated due to
> passage of time, and after the passage of time set forth in Section V.E.12,
> Class Counsel may then move the Court to designate "Cy Pres
> Beneficiaries" and propose an allocation of the available cy pres funds
> among such proposed Cy Pres Beneficiaries.  A Cy Pres Beneficiary must
> be either (a) a law school that has a low-income taxpayer clinic or
> program that provides tax advice or assistance to Class Members who
> have received an award under the Settlement Agreement and that has been
> approved by the Court or (b) a tax-exempt non-profit organization, other
> than a law firm, legal services entity, or educational institution, that is
> providing agricultural, business assistance, or advocacy services, including
> assistance under Pigford and the Consolidated Case, to African American
> farmers.  If a Subparagraph (a) Cy Pres Beneficiary is approved by the
> Court, then the Court shall determine the reasonable payment to be made
> to such Beneficiary from any balance in the Designated Account.
> Following any payment to a Subparagraph (a) Beneficiary, the Court shall
> designate the Subparagraph (b) Cy Pres Beneficiaries and determine how
> much of the available cy pres funds each such beneficiary shall receive.

---

[1]      To prevail on a Track B claim, a claimant was required to show by a preponderance of the
evidence that he (1) "is an African-American who farmed, or attempted to farm, between January 1, 1981,
and December 31, 1996"; (2) "owned or leased, or attempted to own or lease, farm lands"; (3) "applied . . .
for a specific farm credit transaction(s) or non-credit benefit(s) at a USDA office between January 1, 1981,
and December 31, 1996"; (4) was denied the requested loan or benefits, or was provided a loan or benefits
late, on terms less favorable than those requested, or subject to "restrictive condition[s]"; (5) sustained
economic damages as a result of USDA's handling of the application for a loan or benefits; (6)
"complained of discrimination to an official of the United States Government on or before July 1, 1997,
regarding USDA's treatment of him or her in response to the application"; and (7) that "treatment of the
[claimant's] loan application(s) by [the] USDA was less favorable than that accorded a specifically
identified, similarly situated white farmer."  *Id.*

Settlement Agreement § V.E.13, ECF No. 405 (Modification Order).  It further provides

that the agreement "may be modified only with the written agreement of the Parties and

with the approval of the Court, upon such notice to the Class, if any, as the Court may

require."  Settlement Agreement § XVIII, ECF No. 170-2.

On November 30, 2010, Congress passed the Claims Resolution Act of 2010,

which the President signed into law on December 8, 2010.  The Act "appropriated to the

Secretary of Agriculture $1,150,000,000, to remain available until expended, to carry out

the terms of the Settlement Agreement [in *In re Black Farmers Discrimination*

*Litigation*] if the Settlement Agreement is approved by a court order that is or becomes

final and nonappealable[.]"  Claims Resolution Act § 201(b).  The Act provided that "the

use of the funds appropriated . . . shall be subject to the express terms of the Settlement

Agreement," defined as "the settlement agreement dated February 18, 2010 (including

any modifications agreed to by the parties and approved by the court under that

agreement)."  *Id.* §§ 201(a)(1), 201(c).  The statute further instructed that "[i]f any of the

funds appropriated . . . are not obligated and expended to carry out the Settlement

Agreement, the Secretary of Agriculture shall return the unused funds to the Treasury and

may not make the unused funds available for any purpose related to [the 2008 Act], for

any other settlement agreement executed in *In re Black Farmers Discrimination*

*Litigation*, No. 08-511 (D.D.C.), or for any other purpose."  *Id.* at § 201(d).

After the Court preliminarily approved the Settlement Agreement, a detailed

description of the agreement was sent to all individuals who, according to the records of

the *Pigford I* facilitator, made any written request to participate in the *Pigford I* claims

resolution process between October of 1999 and June 18, 2008.  *See In re Black Farmers*,

856 F. Supp. 2d at 14.  Notice also was disseminated widely through radio, television, print, and online advertising.  *Id.*  After a lengthy fairness hearing and careful consideration of arguments made by plaintiffs and the defendant, as well as the comments and objections offered by interested parties, this Court granted final approval of the terms of the Settlement Agreement on October 27, 2011.  *See id.*  On July 25, 2012, the D.C. Circuit dismissed the consolidated appeals challenging this Court's final approval of the Agreement.  *See* Order, 11-5326 (D.C. Cir. July 25, 2012).  At no time during this lengthy process did any party challenge the *cy pres* provision of the agreement.

The claims period began on November 14, 2011 and ended on May 11, 2012, subject to the limited exceptions identified in the September 14, 2012, and February 14, 2013, Court Orders.  *See* ECF Nos. 304 & 346.  More than 42,000 individuals submitted claims, of which approximately 18,000 have been approved and 24,000 have been denied, withdrawn, or were untimely.  A total of approximately $1.088 billion has been paid to claimants and to the IRS on behalf of claimants.  While the precise amount of remaining funds that would be available for a *cy pres* fund is not yet known, it is estimated to be about $9.5 million, or less than one percent of the settlement fund.

On September 3, 2015, this Court issued a Memorandum Opinion and Order stating that before class counsel begins identifying potential *cy pres* beneficiaries as contemplated by the Settlement Agreement, the Court "should determine whether a *cy pres* distribution should be made in this action or whether, instead, some or all of the unclaimed settlement funds should be distributed to Class Members."  Order at 2.  To assist the Court in its consideration of this and related questions, the Court directed the

parties to file briefs addressing five specific questions, listed below.  Defendant

respectfully submits this memorandum in response to the Court's Order.


DISCUSSION

**1.      If the case law presumes that identifiable class members are entitled to the distribution of any excess funds, when feasible, why shouldn't the Court attempt to further that goal, which was of course the whole purpose of this litigation, rather than providing those funds to disinterested third parties?**

As explained below, any unilateral modification of the Settlement Agreement to

distribute excess funds to class members would violate the express terms of the parties'

carefully-negotiated compromise, which exclusively governs the distribution of funds in

this action.  The law is clear that a settlement agreement "must be discerned within its

four corners, and not by reference to what might satisfy the purposes of one of the parties

to it."  *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971).  Here, the

unambiguous language of the agreement — which was negotiated by the parties,

sanctioned by Congress, approved by this Court, and upheld on appeal — requires that

any unclaimed funds be distributed to *cy pres* beneficiaries.  Accordingly, any general

trend away from the use of *cy pres* distributions does not override the mandatory

language of this final agreement.

As an initial matter, the Government respectfully disagrees with the Court's

characterization of the relevant case law as "suggesting that unclaimed settlement funds

ordinarily should not be distributed on a *cy pres* basis except when it is not feasible to

make further distributions to class members."  Order at 1.  While some courts have

concluded that "identifiable class members are entitled to the distribution of any excess

funds, when feasible," *id.* at 2, these cases are largely inapposite, as they involve *cy pres*

9

remedies unilaterally imposed by a court or *cy pres* provisions challenged on direct appeal from a district court's final approval of an agreement.  Similarly, the American Law Institute's principles cited in the Court's Order "address whether to use a *cy pres* remedy in the first place," not whether a court has the authority to unilaterally rewrite settlement terms over the parties' objections.  *Keepseagle v. Vilsack*, No. 99-3119 (EGS), 2015 WL 4510837, at *13 (D.D.C. July 24, 2015).  The question here, in contrast, "is not which distribution method the Court should choose in a vacuum; rather, the Court is presented with specific and mandatory language in a final settlement." *Id.* at *12.  Under these circumstances, the Court cannot delete the mandatory language in the final agreement over the objections of the parties.[2]

The Court cites *Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468 (5th Cir. 2011) in support of its assertion that "unclaimed settlement funds ordinarily should not be distributed on a *cy pres* basis."  Order at 2.  In *Klier*, the Fifth Circuit concluded that the "district court abused its discretion by ordering a *cy pres* distribution in the teeth of the bargained-for terms of the settlement agreement, which required residual funds to be distributed within the class." *Id.* at 471.  In reversing the district court's unilateral imposition of a *cy pres* distribution, the Fifth Circuit was careful to explain that "[t]his is not a case where the settlement agreement itself provides that residual funds shall be distributed via *cy pres*.  Quite the opposite: the district court's decision to distribute the

---

[2]    Numerous other courts in this district have recently approved settlement agreements involving comparatively large *cy pres* distributions.  *See, e.g.*, *In re Dep't of Veterans Affairs Data Theft Litig.*, 653 F. Supp. 2d 58, 61 (D.D.C. 2009) (approving settlement agreement including *cy pres* award likely to be more than $14 million compared to $2.1 million directly distributed to plaintiffs); *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 75 (D.D.C. 2011) (approving settlement agreement including *cy pres* award of $3.69 million with $8 million in direct distribution); *Diamond Chem. Co. v. Akzo Nobel Chemicals B. V.*, 517 F. Supp. 2d 212, 215, 220-21 (D.D.C. 2007) (approving *cy pres* distribution of $5.1 million out of $12.9 million settlement fund).

unused funds via *cy pres* finds no support in the text of the settlement documents." *Id.* at 476-77.  That is not the situation here.  Instead, the unambiguous terms of the agreement in this action explicitly provides for the distribution of any unclaimed settlement funds to *cy pres* beneficiaries, and no party contends otherwise.  Consistent with the Fifth Circuit's opinion in *Klier* and that of nearly every other court of appeals, these terms "must be followed by the court and the parties alike."  *Klier*, 658 F.3d at 475-76; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 n.7 (3d Cir. 2013) ("In contrast with *cy pres* distributions agreed to by the parties as part of a settlement, courts of appeals have greeted with more skepticism *cy pres* distributions imposed by trial courts over the objections of the parties.").

The Court also cites *BankAmerica Corp. Securities Litigation*, 775 F.3d 1060 (8th Cir. 2015), in which the Eighth Circuit found the *cy pres* provision of a settlement agreement "void" because it failed to comply with Eighth Circuit precedent.  As explained by another court of this Circuit, the *BankAmerica* court's "reasoning for overruling a final settlement is unpersuasive."  *Keepseagle*, 2015 WL 4510837, at *18. Relying on the Ninth Circuit's decision in *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011), the *BankAmerica* court concluded that *cy pres* distributions must comply with legal standards governing whether *cy pres* is appropriate "regardless of whether the award was fashioned by the settling parties or the trial court."  *BankAmerica*, 775 F.3d at 1066 (quoting *Nachshin*, 663 F.3d at 1040).  But the Eighth Circuit's reliance on *Nachshin* was misplaced, as *Nachshin* involved a direct review of a district court's approval of a settlement agreement.  "At that stage, a court obviously must apply the doctrine governing the appropriate disposition of unclaimed funds.  *Nachshin* does not

address a court's role after final approval and affirmance on appeal (or when no appeal is filed)." *Keepseagle*, 2015 WL 4510837, at *17.  Similarly, as noted above, the American Law Institute's principles on which the *BankAmerica* court relied address whether to use a *cy pres* remedy in the first place, not whether — as here — a court has authority to rewrite the parties' final agreement that has been approved by the district court and affirmed on appeal.

   In misconstruing the Ninth Circuit's decision in *Nachshin*, the *BankAmerica* court improperly rewrote the parties' compromise, apparently long after the agreement was noticed to the class and approved by the court without objection or appeal.  Such an approach unbalances the bargain of the parties and upends the finality of the settlement. But this Court need not decide whether it agrees with the Eighth Circuit's holding.  There is no similar controlling precedent in this Circuit — to the contrary, at least one court in this Circuit has rejected the Eight Circuit's reasoning, *see id.* — and there is no argument that the *cy pres* provision here is "void."  Accordingly, this Court should decline to follow the Eighth Circuit's approach and should instead enforce the unambiguous terms of the parties' agreement, as the law of this Circuit requires.  *See, e.g.*, *In re Black Farmers*, 950 F. Supp. 2d at 200 ("As our court of appeals has rhetorically asked: 'Who would sign a consent decree if district courts had free-ranging interpretive or enforcement authority untethered from the decree's negotiated terms?'  The same can be said about a carefully negotiated settlement agreement whose terms were approved in a final order and judgment.") (quoting *Pigford v. Veneman*, 292 F.3d 918, 925 (D.C. Cir. 2002)); *Makins v. District of Columbia*, 277 F.3d 544, 546 (D.C. Cir. 2002) ("[C]learly established law in this Circuit directs that settlement agreements are in the nature of

contracts."); *Mesa Air Grp, Inc. v. Dep't of Transp.*, 87 F.3d 498, 503 (D.C. Cir. 1996)

("[T]he judicial task in construing a contract is to give effect to the mutual intentions of

the parties . . . . Where the language of a contract is clear and unambiguous on its face, a

court will assume that the meaning ordinarily ascribed to those words reflects the

intentions of the parties.").

　　　　As case law in this Circuit and others makes clear, where the parties have agreed

to a *cy pres* distribution, and that agreement has been approved by the district court and

upheld on appeal, a court "may not replace the terms of [the agreement] with its own, no

matter how much of an improvement it would make in effectuating the [agreement's]

goals." *United States v. Int'l Bhd. of Teamsters*, 998 F.2d 1101, 1107 (2d Cir. 1993);

*Rosen v. Tennessee Com'r of Fin. and Admin.*, 288 F.3d 918, 925 (6th Cir. 2002) (same);

*Keepseagle*, 2015 WL 4510837 (same).  This is because "[s]ettlement agreements are

contracts, and courts interpret them accordingly.  In such situations, the judicial task is to

give effect to the mutual intent of the parties, and when the language of a contract is clear

and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to

those words reflects the intention of the parties." *Lindell v. Landis Corp. 401(k) Plan*,

640 F. Supp. 2d 11, 15 (D.D.C. 2009).

　　　　Indeed, the Supreme Court has cautioned against interpretations of settlement

agreements derived from amorphous purposes thought to underlie the agreement:

> Naturally, the agreement reached normally embodies a compromise; in
> exchange for the saving of cost and elimination of risk, the parties each
> give up something they might have won had they proceeded with the
> litigation.  Thus the *decree* itself cannot be said to have a purpose; rather
> the *parties* have purposes, generally opposed to each other, and the
> resultant decree embodies as much of those opposing purposes, generally
> opposed to each other, as the respective parties have the bargaining power
> and skill to achieve.  For these reasons, the scope of a consent decree must

be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

*Armour & Co.*, 402 U.S. at 681-82 (emphasis in original).  Other Supreme Court decisions echo these principles.  For example, in *Hughes v. United States*, 342 U.S. 353 (1952), the Government sought to construe a consent decree that gave the defendant the option of selling his stock or putting it in a voting trust as requiring him to sell the stock within a reasonable time because the pro-competitive purpose of the decree otherwise would be frustrated.  The *Hughes* Court opined:

> It may be true as the Government now contends that Hughes' large block of ownership in both types of companies endangers the independence of each.  Evidence might show that a sale by Hughes is indispensable if competition is to be preserved.  However, in section V [of the consent decree] the parties and the District Court provided their own detailed plan to neutralize the evils from such ownership.  Whatever justification there may be now or hereafter for new terms that require a sale of Hughes' stock, we think there is no fair support for reading that requirement into the language of section V.

*Id.* at 357 (quoted in *Armour & Co.*, 402 U.S. at 682).  *See also United States v. Atl. Refining Co.*, 360 U.S. 19, 22-23 (1959) ("The Government contends that the interpretation [of the consent decree] it now offers would more nearly effectuate the basic purpose of the Elkins and Interstate Commerce Acts that carriers are to treat all shippers alike.  This may be true.  But it does not warrant our substantially changing the terms of a decree to which the parties consented without any adjudication of the issues.").  Here, the language of the Settlement Agreement unambiguously calls for a *cy pres* distribution of any excess funds, and the parties do not allege otherwise.  Accordingly, the Court may not *sua sponte* ignore those clear terms.

Adhering to the parties' final agreement also furthers the public's important interest in the finality of judgments.  *See, e.g., Summers v. Howard Univ.*, 374 F.3d 1188,

1193 (D.C. Cir. 2004); *see also Massaro v. United States*, 538 U.S. 500, 504 (2003)

(referring to "the law's important interest in the finality of judgments").  Finally, even if

there were some justification for modification of the *cy pres* provision in the parties'

agreement, additional funds should not be distributed to class members because such

relief would provide a windfall to claimants, would exceed the damage remedy

authorized by Congress in creating the *Pigford II* cause of action, and would violate the

express terms of the Claims Resolution Act.  *See Klier*, 658 F.3d at 475 (holding that an

additional distribution of unused funds to claimants would be inappropriate because it

"would provide a windfall to class members with liquidated-damages claims that were

100 percent satisfied by the initial distribution"); *In re Lupron Marketing and Sales*

*Practices Litig.*, 677 F.3d 21, 35 (1st Cir. 2012) ("It is well accepted that protesting class

members are not entitled to windfalls in preference to *cy pres* distributions.").  Indeed, as

discussed below, even if the Court were to conclude that a *cy pres* distribution is

impractical or unwarranted for whatever reason, the alternative Congress provided for

was not an additional distribution to claimants but rather a reversion of unused funds to

the United States Treasury.  *See* Claims Resolution Act of 2010 § 201(d).  To be sure,

this Court has a role to play in approving any proposed *cy pres* distribution, but it cannot

nullify that provision of the Claims Resolution Act in order to make an additional

distribution to class members.

     In short, the Court cannot override the mandatory language of the final agreement,

which was agreed upon by all parties, approved by this Court, upheld on appeal, and, as

discussed below, sanctioned by Congress.  *See infra* pp. 22-24.

**2.      Absent agreement of the parties, does the Court have the authority under the Settlement Agreement, Rule 60 of the Federal Rules of Civil Procedure, or otherwise, to provide for the distribution of unclaimed settlement funds to Class Members rather than to cy pres beneficiaries?**

Absent agreement of the parties, the Court does not have authority under the Settlement Agreement, Rule 60 of the Federal Rules of Civil Procedure, or otherwise to provide for the distribution of unclaimed settlement funds to class members rather than to *cy pres* beneficiaries.

A.    The Court Lacks Authority Under the Settlement Agreement to Provide for the Distribution of Unclaimed Funds to Class Members

As explained above, the parties' Settlement Agreement instructs that unclaimed settlement funds will be distributed to *cy pres* beneficiaries, rather than to class members. *See* Agreement § XX.  It further provides that any modification of the agreement must be "upon written agreement of the Parties and with the approval of the Court, upon such notice to the Class, if any, as the Court may require."  *Id.* § XVIII.  Here, no party has petitioned the Court to modify the agreement to provide for the distribution of unclaimed funds to class members.  Moreover, the Government does not consent to any such amendment, as such a modification would not preserve the essence of the bargain reached by the parties and would violate the express terms of the Claims Resolution Act. Accordingly, the Court lacks authority to provide for the distribution of unclaimed funds to class members.

B.    The Court Lacks Authority Under Federal Rule of Civil Procedure 60 to Provide for the Distribution of Unclaimed Funds to Class Members

Like other judgments and decrees, settlement agreements are subject to Federal Rule of Civil Procedure 60.  *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378-83 (1992).  Rule 60 provides that "[o]n motion and just terms, the court may relieve a

party or its legal representative from a final judgment, order, or proceeding" under certain circumstances. Fed. R. Civ. P. 60(b).  The only two provisions that are arguably relevant here are Rule 60(b)(5), which allows a court to provide relief from a final judgment when applying the judgment prospectively "is no longer equitable"; and Rule 60(b)(6), which allows a court to provide relief based on "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(5), Fed. R. Civ. P. (b)(6).[3]  Here, neither provision authorizes the Court to unilaterally modify the *cy pres* provision of the parties' agreement.  *See In re Black Farmers*, 29 F. Supp. 3d at 5 ("Where no significantly changed circumstances have been shown, disregarding the terms of the carefully negotiated Settlement Agreement in a manner that benefits [certain claimants], over the defendant's objections, would be inconsistent with Rule 60(b), with [the Supreme Court's decision in] *Rufo*, and with the 'contractual character' of the Settlement Agreement as approved by the related Order and Judgment.").

### 1. Rule 60(b)(5)

"Rule 60(b)(5) allows a court to amend any judgment that has prospective effect." *Kapar v. Islamic Republic of Iran*, No. 2-cv-78, —— F. Supp. 3d ——, ——, 2015 WL 2452754, at *3 (D.D.C. May 22, 2015).  The D.C. Circuit has described the prospective-effect requirement as follows:

> Virtually every court order causes at least some reverberations into the future, and has, in that literal sense, some prospective effect; even a money judgment has continuing consequences, most obviously until it is

---

[3]     Federal Rule of Civil Procedure 60(b) authorizes a court to relieve a party from a previous judgment or order for six enumerated reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or other misconduct by an opposing party; (4) a void judgment; (5) "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable"; or (6) "any other reason justifying relief from the operation of the judgment."  Fed. R. Civ. P. 60(b).

> satisfied, and thereafter as well inasmuch as everyone is constrained by his
> or her net worth.  That a court's action has continuing consequences,
> however, does not necessarily mean that it has 'prospective application'
> for the purposes of Rule 60(b)(5).

*Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988).  The

standard a court applies "in determining whether an order or judgment has prospective

application within the meaning of Rule 60(b)(5) is whether it is 'executory' or involves

the supervision of changing conduct or conditions." *Id.* at 1139.  "The consensus among

Courts of Appeal, including the D.C. Circuit, is that a claim for money damages is not

'prospective' for the purposes of Rule 60(b)(5)." *Keepseagle*, 2015 WL 4510837, at *20.

The *cy pres* provision in this case lacks this type of binding effect on a party's

future behavior that makes a judgment prospective within the meaning of Rule 60(b)(5).

It does not "compel [anyone] to perform, or order [anyone] not to perform, any future act;

it d[oes] not require the court to supervise any continuing interaction between [anyone]

and the other parties to the case." *Twelve John Does*, 841 F.2d at 1139.  And "[a]lthough

Class Counsel has a limited responsibility to propose recipients under the Agreement,

that is not the same thing as a party to the case being subject to limitations on future

conduct, and courts have emphasized the need for such limitations if a judgment is to be

considered prospective." *Keepseagle*, 2015 WL 4510837, at *20.  Here, as in

*Keepseagle*, the *cy pres* provision of the agreement is "thus akin to unpaid damages: The

mere fact that they have yet to be paid out, leaving some administrative responsibilities to

be executed, does not render them prospective." *Id.*  Accordingly, Rule 60(b)(5) does not

apply.

Even if the *cy pres* provision were prospective, there have been no changed

circumstances that warrant relief under Rule 60(b)(5).  "Under Rule 60(b)(5), a party

seeking modification of a [settlement agreement] bears the burden of demonstrating 'a significant change either in factual conditions or in law' that warrants revision of the [agreement]." *In re Black Farmers*, 29 F. Supp. 3d at 3 (quoting *Rufo*, 502 U.S. at 383-84). This is a "stringent" standard. *Id.* In meeting this threshold inquiry, a moving party "may not . . . challenge the legal conclusions on which a prior judgment or order rests." *Horne v. Flores*, 557 U.S. 433, 447 (2009). Rather, it must point to "a significant change either in factual conditions or in law" that renders continued enforcement of a final judgment inequitable. *Id.* (quoting *Rufo*, 502 U.S. at 384).

To establish a change in law, the moving party must generally demonstrate that "the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Rufo*, 502 U.S. at 388. For a change in facts, the moving party must demonstrate (1) that "changed factual conditions make compliance with the decree substantially more onerous"; (2) that "a decree proves to be unworkable because of unforeseen obstacles"; or (3) that "enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384. A moving party alleging a "significant change in facts" faces an additional burden. Ordinarily, the party may not rely on "events that actually were anticipated at the time it entered into a decree." *Id.* at 385. For example, in *Agostini v. Felton*, the Supreme Court rejected a claim of changed factual circumstances based on the "exorbitant costs of complying," because both parties were "aware that additional costs would be incurred" due to the court's judgment. 521 U.S. 203, 215-16 (1997). "That these predictions of additional costs turned out to be accurate does not constitute a change in factual conditions warranting relief under Rule 60(b)(5)."

*Id.* at 216.  In short, the moving party must demonstrate a significant and unanticipated change in facts.

Here, circumstances have not changed in a way that requires or permits the Court to alter the fundamental bargain the parties struck by ordering additional payments to class members.  The possibility of leftover funds was anticipated and provided for in the Settlement Agreement, of which the class members received notice and to which they did not object.  Moreover, there are no grounds to find that that the disposition of a relatively small sum of leftover funds to approved *cy pres* beneficiaries would be "onerous," much less "substantially more onerous" or "unworkable."  *See Rufo*, 502 U.S. at 384.[4]  There is no reason that the leftover funds cannot be distributed as described in the parties' agreement, and implementation of the *cy pres* provision would have no negative impact on the class members, who have already received the individual benefits they bargained for and have no property interest in the leftover funds.  Indeed, no party contends otherwise.  Accordingly, Rule 60(b)(5) does not authorize any unilateral modification of the *cy pres* provision.

### 2. *Rule 60(b)(6)*

Rule 60(b)(6), which provides for modification of a judgment for "any other reason that justifies relief," is also inapplicable in the present case.  "Supreme Court cases have required a movant seeking relief under Rule 60(b)(6) to show extraordinary circumstances justifying the reopening of a final judgment," *Salazar ex rel. Salazar v.*

---

[4]    In *Keepseagle*, a significantly larger than expected amount of money (approximately $380 million) remained in the *cy pres* fund.  *Keepseagle*, 2015 WL 4510837, at *1.  Class counsel there explained that, given this large sum, it would be difficult and inefficient to distribute the funds following the procedures outlined in the settlement agreement and moved for a modest revision of the agreement to promote efficient distribution of those funds.  The government did not oppose that motion in light of the public interest in efficient distribution of those funds.  *See generally id.* at *7.  These concerns are not present in the instant case, and therefore modification of the agreement is unwarranted.

*District of Columbia*, 633 F.3d 1110, 1116 (D.C. Cir. 2011), and "[i]ntervening

developments in the law by themselves rarely constitute [such] extraordinary

circumstances," *Agostini*, 521 U.S. at 203.  *See also Bowyer v. District of Columbia*, 779

F. Supp. 2d 159, 163 (D.D.C. 2011) (explaining that Rule 60(b)(6) "applies only in

extraordinary situations and is to be sparingly used").  In *Salazar*, the D.C. Circuit

"emphasized that Rule 60(b)(6) should be only sparingly used and may not be employed

simply to rescue a litigant from strategic choices that later turn out to be improvident."

*Id.* at 1120.  The Court further noted that "a more compelling showing of inequity or

hardship is necessary to warrant relief under subsection (6) than under subsection (5);

otherwise, the ready availability of subsection (6) would make meaningless the limitation

of subsection (5) to judgments with prospective application."  *Id.* at 1120-21.

   That demanding standard cannot be satisfied here.  The class members received

the full benefit of the bargain reached and there is no "hardship" whatsoever that justifies

modification of the agreement.  All successful claimants received full relief for their

claims, as provided by Congress in the 2008 Act, and those claims have been

extinguished under the terms of the Settlement Agreement.  Further, nothing about the *cy

pres* provision harms the class members.  On the contrary, the provision explicitly states

that *cy pres* beneficiaries must provide assistance to class members who have received an

award under the settlement or provide other specified services to African American

farmers.  Just as in *Keepseagle*, here there "has been no suggestion of the kinds of

extraordinary representational failings or complete lack of notice that has animated prior

grants of relief under Rule 60(b)(6)."  2015 WL 4510837, at *22.

C.   No Other Grounds Authorize the Court to Provide for the Distribution of
     Unclaimed Funds to Class Members

There are no other grounds that authorize the Court to disregard the *cy pres*

provision of the Settlement Agreement, which was negotiated by the parties, approved by

the Court pursuant to Federal Rule of Civil Procedure 23, and affirmed on appeal.

Indeed, as discussed below, the 2008 Act and the Claims Resolution Act of 2010

specifically preclude this possibility.  Moreover, the agreement is a final judgment and, as

such, the Court's authority is circumscribed.  As this Court has previously explained,

"[a]part from Rule 60(b), 'district courts enjoy no free-ranging 'ancillary' jurisdiction to

enforce consent decrees, but are instead constrained by the terms of the decree and

related order.'"  *In re Black Farmers*, 950 F. Supp. 2d at 200 (quoting *Pigford*, 292 F.3d

at 924).


**3.      Do any acts of Congress pertinent to this case, such as the Food,
Conservation, and Energy Act of 2008 or the Claims Resolution Act of 2010, bear on
whether it would be permissible or appropriate to provide for the distribution of
unclaimed settlement funds to Class Members?**

Modification of the Settlement Agreement's *cy pres* provision to provide for the

distribution of unclaimed settlement funds to class members would contradict clear

statutory language and unambiguous congressional intent.  First, Congress specifically

instructed that settlement funds must be used pursuant to the express terms of the final

agreement and that any remaining funds not used to carry out the agreement must revert

to the United States Department of Treasury.  Accordingly, because a distribution of

unclaimed settlement funds to class members is not authorized by the express terms of

the parties' agreement, this Court is not authorized to provide for such a distribution.

Second, any distribution of excess funds to class members also would be inconsistent with the 2008 Act, which created the cause of action under which this case was brought and explicitly authorized successful Track A claimants to receive $50,000 in liquidated damages.

The Claims Resolution Act of 2010 prohibits the distribution of excess funds to class members.  The Act provides:

> (c) USE OF FUNDS. — The use of the funds appropriated by subsection (b) shall be subject to the express terms of the Settlement Agreement.
>
> (d) TREATMENT OF REMAINING FUNDS. — If any of the funds appropriated by subsection (b) are not obligated and expended to carry out the Settlement Agreement, the Secretary of Agriculture shall return the unused funds to the Treasury and may not make the unused funds available for any purpose related to section 14012 of the Food, Conservation, and Energy Act of 2008, for any other settlement agreement executed in *In re Black Farmers Discrimination Litigation*, No. 08-511 (D.D.C.), or for any other purpose.

Claims Resolution Act § 201.  When Congress enacted this provision, it was fully aware of the Settlement Agreement's *cy pres* provision, which directed that "[i]n the event there is a balance remaining in the Designated Account after the last check has been cashed, the last check has been invalidated due to passage of time, and after the passage of time set forth in Section V.E.12, Class Counsel may then move the Court to designate 'Cy Pres Beneficiaries' and propose an allocation of the available cy pres funds among such proposed Cy Pres Beneficiaries."  Agreement VI.E.13; *see also Cannon v. University of Chicago*, 441 U.S. 677, 698-99 (1979) (explaining that one may presume that Congress is aware of the legal landscape in which it legislates).  Thus, in directing that funds may only be used to carry out the express terms of the Settlement Agreement, Congress sanctioned the distribution of any unused funds to *cy pres* beneficiaries, as provided in the parties' agreement.  Moreover, Congress expressly prohibited the use of unused funds

23

for "any other purpose," including any purpose related to the *Pigford II* litigation. Considering this clear statutory command that excess funds either be distributed to *cy pres* beneficiaries or revert to the Treasury, this Court is not authorized to *sua sponte* provide for the distribution of excess funds to class members, even if this Court believes that such a distribution would further the "purpose of this litigation."

Furthermore, as discussed above, the 2008 Act created a new cause of action for individuals who, due to late filing, were unable to obtain a determination on the merits of their *Pigford I* claims.  In creating the cause of action, Congress capped the damages to which successful claimants were entitled.  Specifically, the statute provides that successful claimants who elect the expedited claims procedure are entitled to "liquidated damages of $50,000," loan forgiveness, and tax relief.  *See In re Black Farmers*, 856 F. Supp. 2d at 12.  The claims period is now closed and claimants have received all of the money to which they are entitled under the 2008 Act.  This Court is not authorized to enlarge the damage awards available to successful claimants by providing for the distribution of excess funds to class members.  Indeed, such a modification of the Settlement Agreement would impermissibly rewrite the terms of the 2008 Act, thereby undermining congressional intent.

**4.     If the Court has the authority to act *sua sponte* to provide for the distribution of unclaimed settlement funds to Class Members, either through modification of the Settlement Agreement or through other means, what legal standard(s) should the Court apply in determining whether taking such action would be appropriate?**

As discussed above, the Court does not have the authority to act *sua sponte* to provide for the distribution of unclaimed settlement funds to class members.

**5.      In the interests of transparency, should the Court schedule a public hearing inviting Class Members to offer their views regarding these issues?**

The Government believes that a public hearing regarding the *cy pres* provision is unnecessary.  The Court already held a lengthy fairness hearing and considered the oral and written comments of class members and other interested individuals before approving the Settlement Agreement.  *See In re Black Farmers*, 856 F. Supp. 2d at 6-7, 15 & n.1.  More importantly, as discussed above, the Court has no authority to modify the *cy pres* provision.  Therefore, any public hearing would be an exercise in futility and would unnecessarily waste the class members' and the Court's limited resources.

CONCLUSION

For the forgoing reasons, the Court should enforce the final Settlement Agreement pursuant to its express terms and should instruct class counsel to begin the process contemplated by the Settlement Agreement of identifying potential *cy pres* beneficiaries and proposing an allocation of unclaimed settlement funds.

Dated: December 4, 2015              Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Megan A. Crowley*
MEGAN A. CROWLEY
N.Y. Bar No. 4930376
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW, Room 7221

25

Washington, D.C. 20001
Email: megan.a.crowley@usdoj.gov
Telephone: (202) 305-0754
Fax: (202) 616-8470

*Attorneys for Defendant*