**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **In re BLACK FARMERS DISCRIMINATION LITIGATION** | ) | **Misc. No. 08-mc-0511 (PLF)** |
| **This document relates to:** | ) | |
| **ALL CASES** | ) | |

**MOTION FOR RELIEF BASED ON FAILURE TO PROVIDE COURT-ORDERED NOTICE AND REQUEST TO REOPEN THE RECORD**

## INTRODUCTION

The Black Belt Justice Center (BBJC), through its Executive Director Tracy Lloyd McCurty, Esq., respectfully seeks limited relief necessary to cure the failure of Lead Class Counsel to provide the notice directed by the Court's September 23, 2026 Order [Dkt. No. 544 at 5]. The Court ordered notice to specified interested parties and Attorney McCurty falls within the designated group. Notably, Attorney McCurty attended the In Re Black Farmers Discrimination Litigation Phase II Cy Pres Fund Black Farmers Conference in Atlanta, GA, in 2018; she served as a representative on the Black Farmers Council established by Lead Class Counsel; and since 2018 she has communicated with Lead Class Counsel on several occasions pertaining to the development of the Southern Farmers Financial Association (SFFA) (formerly known as the Black Farmer Financial Association) business plan and final recommendation.

Although Lead Class Counsel had the contact information for Attorney McCurty (i.e., email, phone, and physical address), she received no notice of the October 6 cy pres motions hearing. Moreover, Lead Class Counsel never contacted Attorney McCurty as a member of the

Black Farmers Council before the October 6 hearing to afford her the opportunity to present her position before the hearing.

The BBJC has an interest in the final distribution of the remaining $8M cy pres fund due to its extensive advocacy on behalf of Black legacy farmers in their pursuit to obtain federal legislative remedies, including full debt cancellation and just monetary compensation from the U.S. Department of Agriculture (USDA), to address decades of well-documented, systemic racial discrimination resulting in crippling farm debts and foreclosures. The BBJC possesses material information that should be included in the complete record to inform the Court's deliberations regarding the final distribution of the remaining $8M cy pres fund.

Given the fact that the Court has not yet entered an order resolving Leading Class Counsel's pending cy pres distribution motion, BBJC respectfully requests that the Court enforce the September 23 Order pertaining to due process notice to attendees of the 2018 Black Farmers Conference, reopen the record concerning the pending cy pres distribution motions, permit BBJC to file its Opposition to Lead Class Counsel's Motion to Approve Distribution of Remaining Cy Pres Funds [Dkt. No. 531], and Motion for Alternative Distribution of Remaining Cy Pres Funds, defer consideration of the ultimate distribution of the remaining $8M cy pres fund until the notice and objection periods have expired and the BBJC has had an opportunity to submit its opposition, and grant such other limited relief as the Court deems appropriate.

## BACKGROUND

On May 4, 2026, Lead Class Counsel moved the Court to approve the distribution of the $8M remaining cy pres fund to the Federation of Southern Cooperatives/Land Assistance Fund as the fiscal sponsor for the SFFA [Dkt. No. 531 at 3]. Movants John Boyd, Jr. and the National Black Farmers Association (NBFA) filed an Opposition and Motion for Alternative Distribution

[Dkt. No. 534]. The government opposed both the cy pres distribution proposals of Lead Class Counsel and the NBFA. *See* Defendant's Opposition to Motion to Approve Distribution of Remaining Cy Pres Funds [Dkt. No. 532]; Defendant's Response to Motion [Dkt. No. 537].

On September 23, 2026, the Court entered an Order directing Lead Class Counsel to provide notice of the October 6 hearing by U.S. mail and/or email to the address last known to Lead Class Counsel for (1) the 24 organizations that were recipients of awards as part of the first phase of the cy pres distributions in 2018 and (2) other interested parties who attended the Black Farmers Conference in Atlanta, GA, on March 16-17, 2018 [Dkt. No. 544 at 5]. Additionally, the Court ordered Lead Class Counsel to copy both the government and the Ombudsman on its notice email or letters to all interested parties [Dkt. No. 544 at 5].

Eight years prior, on January 10, 2018, the Court issued an Order [Dkt. No. 500] approving Lead Class Counsel's motion [Dkt. No. 496] requesting partial distribution of cy pres funds, specifically $4,208,425 of the total $12,030,716, to designated cy pres beneficiaries pursuant to the Section V.E.12 of the In Re Black Farmers Discrimination Litigation Settlement Agreement [Dkt. No. 170, Ex. 2]. Lead Class Counsel recommended the largest cy pres awards to the following organizations: Federation of Southern Cooperatives/Land Assistance Fund ($1.5M), National Black Farmers Association ($300,000), Arkansas Land and Farm Development Corporation ($250,000), Southwest Georgia Project ($250,000), and the Oklahoma Black Historical Research Project ($250,000) [Dkt. No. 500]. The Court also approved Lead Class Counsel's request to distribute up to $100,000 from the remaining cy pres funds to the Federation of Southern Cooperatives/Land Assistance Fund for the dedicated purpose of organizing and funding the Phase II Cy Pres Fund Conference under the direction of Lead Class Counsel [Dkt. No. 500 at 3].

Attended by over 100+ farmers, advocates, attorneys, and Black-led community-based organizational leaders, the historic Black Farmers Conference convened in Atlanta, GA, on March 16-17, 2018 [Ex. A, Decl. at 2].[1] During the conference Lead Class Counsel established the Black Farmers Council, an eight-member representative council charged with leading a collaborative process with conference attendees in the development of recommendations for the remaining $8M Phase II cy pres fund to be provided to Lead Class Counsel and submitted for final judicial consideration [Decl. at 3]. The following community members were selected to serve on the Black Farmers Council: Dr. Jifunza Wright-Carter, Executive Director of the Black Oaks Center for Sustainable Renewable Living (Table 1); Shirley Sherrod, Executive Director of Southwest Georgia Project (Table 2); Tamara Jones, Executive Director of Southeastern African American Farmers Organic Network (Table 3); Barbara Norman, third-generation Michigan Blueberry Farmer and Owner of Barbara's Blueberry Patch (Table 4); Calvin King, Executive Director of the Arkansas Land and Farm Development Corporation (Table 5); Cornelius Blanding, Executive Director of the Federation of Southern Cooperatives/Land Assistance Fund (Table 6); Tracy Lloyd McCurty, Esq., Executive Director of the Black Belt Justice Center (BBJC)[2] (Table 7); and Jerry Pennick, Rural Policy Coordinator for Tuskegee University and

---

[1] *See* Declaration of Tracy Lloyd McCurty, Esq., Executive Director of the Black Belt Justice Center, attached hereto as Exhibit A.

[2] Established in 2012, the BBJC is a legal and advocacy 501(c)3 nonprofit organization that serves Black/African Diasporic farmers, landowners, and communities in the Black Belt region in efforts to retain and increase landownership; to create sustainable land-based cooperatives and entrepreneurial businesses; and to ensure intergenerational and community wealth [Decl. at 1]. Decades of farmer-led organizing combined with BBJC's steadfast leadership over the last five years advanced several historic federal legislations and agricultural policies including a U.S. Department of Agriculture (USDA) foreclosure moratorium; $3.1B in debt cancellation for "economically distressed" farmers authorized in the Inflation Reduction Act of 2022; and $2.2B in direct payments to farmers for past discrimination authorized in the Inflation Reduction Act of 2022 [Decl. at 2]. A copy of the media advisory for the press event to discuss the significance of the historic American Rescue Plan Act of 2021 that provided $5B in direct USDA debt relief and related services for Black farmers and other farmers of color is attached hereto as Exhibit B;

former Director of the Land Assistance Fund for the Federation of Southern Cooperatives (Table 8) [Decl. at 3].

Since 2018, Attorney McCurty in her role as Table 7 representative on the Black Farmers Council has communicated with Lead Class Counsel at various significant milestones regarding the exclusion of broader input from conference attendees as well as the larger Black agrarian community in the development of initial recommendations, the SFFA business plan [Ex. C], the final recommendation to Lead Class Counsel [Decl. at 3].[3] In an email from Attorney McCurty to Lead Class Counsel dated September 16, 2021, Attorney McCurty shared insightful feedback from Lloyd Wright, Former Director of the Office of Civil Rights, USDA (1997-1998) and present Board Member of the National Policy Center at Alcorn State University (formerly known as the Socially Disadvantaged Farmers and Ranchers Policy Research Center at Alcorn State University)[4], regarding numerous deficiencies in the SFFA business plan [Decl. at 3].[5] Mr. Wright stated that the SFFA proposal needed additional input and evaluation from the National Policy Center [Ex. D at 2]. Mr. Wright further opined that review by the National Policy Center would provide supplemental expertise from within the Black agrarian community to ensure the

---

[Decl. 1-2]. Senators Reverend Raphael Warnock, Cory Booker, and Elizabeth Warren joined the media event along with several Black legacy farmer leaders from across the country [Decl. at 2]. The press event was organized by the BBJC, the Justice for Black Farmers Coalition, and the Environmental Working Group [Decl. at 2].

[3] A copy of the Black Farmer Financing Association business plan that was provided to the Black Farmer Council during its meeting in Atlanta, GA, on November 20, 2024 is attached hereto as Exhibit C. Lead Class Counsel requested the convening of the Black Farmers Council [Decl. at 3].

[4] Authorized in the 2014 Farm Bill to be located at an 1890 land-grant university, the National Policy Center at Alcorn State University was created to serve as a leading authority for farmers and ranchers in policy advocacy and to ensure that data driven information is available for Congress and other stakeholders. The mission of the National Policy Center is to conduct research, analyze policy, and make recommendations seeking to achieve equitable and economic integration of USDA programs and policies for farmers, ranchers, communities, and rural landowners.

long-term financial viability of the SFFA as well as contribute to the production of a more intellectually robust final recommendation to Lead Class Counsel [Ex. D at 2].

In yet another email from Attorney McCurty to Lead Class Counsel dated September 23, 2021, Attorney McCurty challenged the representation of Cornelius Blanding, Executive Director of the Federation of Southern Cooperatives/Land Assistance Fund, that the final recommendation advancing the SFFA was accepted unanimously by the Black Farmers Council [Ex. E, Decl. at 3].[6] Attorney McCurty voted against the SFFA recommendation due to the absence of broad-based community input, rigorous review, and overwhelming approval by the larger Black agrarian community [Ex. E, Decl. at 3].

Attorney McCurty first learned of the October 6 hearing from Eboni Thomas, Executive Assistant to Cornelius Blanding, Federation of Southern Cooperatives/Land Assistance Fund, in an email dated October 19, 2026 [Ex. G, Decl. at 3].[7] The email was addressed to all eight representatives of the Black Farmers Council [Ex. G, Decl. at 3]. Despite Lead Class Counsel having Attorney McCurty's contact information (i.e., phone, email, and physical address), Lead Class Counsel failed to comply with the notice procedure directed by the Court in its September 23 Order.

## LEGAL STANDARD

Because the cy pres distribution motions have not been finally adjudicated, Fed. R. Civ. P 54(b) governs, triggering the "as justice requires" standard set forth in *Cobell v. Norton*, 355

---

[5] A copy of the September 16, 2021email communication from Attorney McCurty to Lead Class Counsel is attached hereto as Exhibit D.

[6] A copy of the September 23, 2021 email communication from Attorney McCurty to Lead Class Counsel as well as the Black Farmers Council summary authored by Cornelius Blanding are attached hereto as Exhibit E and Exhibit F.

[7] A copy of the October 9, 2026 email communication from Executive Assistant Eboni Thomas to members of the Black Farmers Council is attached hereto as Exhibit G.

F.Supp.2d 531, 539 (D.D.C. 2005).[8] Under the "as justice requires" standard, judicial reconsideration is warranted where the court "patently misunderstood a party, has made a decision outside the adversarial issues presented," made "an error not of reasoning but of apprehension," including a failure to consider "controlling decisions or data," or where there has been a change in law or facts. *Singh v. George Washington University*, 383 F.Supp.2d 99, 101 (D.D.C. 2005). Courts also grant reconsideration of an interlocutory order on a showing of an intervening change in law, new evidence, or clear error. *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 123 F.Supp.3d 83, 84-85 (D.D.C. 2015).

## ARGUMENT

### I. The Notice Failure Was Prejudicial Because It Excluded Material Information Concerning Support For and Feasibility of the SFFA

The Court's September 23 Order mandating notice to interested parties is tied to the constitutional doctrine of due process. In the seminal due process case *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314-315, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950), the Court asserted that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Moreover, the Court opined that where "the names and post office addresses of those affected by a proceeding are at hand," there is "no tenable ground for dispensing with a serious effort to inform them personally." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 318, 70 S. Ct. 652, 659, 94 L. Ed. 865 (1950).

The September 23 Order directed Lead Class Counsel to notify Phase I cy pres beneficiaries as well as attendees of the 2018 Black Farmers Conference regarding the October 6 hearing [Dkt. No.544 at 5]. Recognizing that the October 6 hearing was a consequential

[8] Fed. R. Civ. P 54(b) governs reconsideration of orders that do not constitute final judgements in

milestone toward the ultimate distribution of the remaining cy pres funds, the Court sought material information from Phase I cy pres beneficiaries as well as 2018 conference attendees to ensure that the proposed final disbursement of the remaining $8M cy pres funds to the SFFA was widely supported as an effective solution to capital access barriers impacting Black elder and next generation farmers.[9]

Attorney McCurty attended the conference and was selected to serve as Table 7 representative on the Black Farmers Council. For nearly eight years, she communicated directly with Lead Class Counsel, most recently regarding the SFFA recommendation. These email communications substantiate that Attorney McCurty was a known, reachable conference attendee and an engaged representative on the Black Farmers Council. Nevertheless, she received no notice of the October 6 hearing.

*Singh* is applicable in the present case. The Court presumed that Lead Class Counsel effectuated court-ordered notice to the enumerated parties and thus proceeded with the October 6 hearing. However, the BBJC and potentially other interested parties did not receive court-ordered notice. Consequently, Attorney McCurty, a diligent representative on the Black Farmers Council, was excluded from contributing substantive information, a dissenting perspective, regarding support for and financial viability of the SFFA. Thus, the Court was presented with an incomplete, flawed record by Lead Class Counsel. The harm to BBJC was the lost opportunity to present to the Court material information bearing on the accuracy of Lead Class Counsel's claims of broad-based support for the SFFA recommendation and its feasibility.

---

a case. *See Cobell v. Norton*, 355 F.Supp.2d 531, 539 (D.D.C. 2005).

[9] In *Keepseagle v. Vilsack*, 307 F.R.D. 233, 245 (D.D.C. 2014), the Court emphasized that "the point of cy pres is to benefit the class as closely as possible, using third parties only as vehicles for providing that benefit to the class when direct distribution is infeasible."

## II. Limited Relief is Necessary to Cure the Defect and Permit an Informed Judicial Decision

Presently, the BBJC seeks only a circumscribed opportunity to place material information before the Court so that the final distribution of the remaining cy pres funds can be decided on a complete record. If the BBJC had received court-ordered notice and was afforded the opportunity to contest the SFFA recommendation at the October 6 hearing, the BBJC would have addressed the following issues before the Court: (1) whether the SFFA recommendation actually had unanimous Black Farmers Council support; (2) whether the SFFA recommendation had received sufficiently broad input from conference attendees and the affected Black agrarian community; and (3) whether the SFFA recommendation presented to the Court by Lead Class Counsel addressed the numerous deficiencies surfaced by Mr. Wright.

For example, according to its own solvency standard, the SFFA is already a failing, severely undercapitalized endeavor. If court approved, the SFFA would launch with a meager $8M seed capitalization compared to the additional $47M first-year capitalization estimate cited in the Black Farmer Financing Association Feasibility Assessment (Sept. 21, 2021) attached to Lead Class Counsel's September 2021 Interim Status Report Concerning Disbursement of Remaining Cy Pres Funds [Dkt. No. 526, Ex.1 at 2]. Furthermore, Lead Class Counsel failed to address concretely how the SFFA would restore the $20M in funds awarded through a 2024 USDA Rural Business-Cooperative Service Financial Assistance Agreement that was effectively terminated in May 2025 [Dkt. No. 531 at 4]. Dubiously, Lead Class Counsel contends that the SFFA work plan remains "valid and persuasive" despite the termination of a $20M contract award [Dkt. No. 531 at 4].

## CONCLUSION

For the aforementioned reasons stated, BBJC respectfully requests that the Court enforce the September 23 Order pertaining to due process notice to attendees of the 2018 Black Farmers Conference, reopen the record concerning the pending cy pres distribution motions, permit BBJC to file its Opposition to Lead Class Counsel's Motion to Approve Distribution of Remaining Cy Pres Funds [Dkt. No. 531], and Motion for Alternative Distribution of Remaining Cy Pres Funds, defer consideration of the ultimate distribution of the remaining $8M cy pres fund until the notice and objection periods have expired and the BBJC has had an opportunity to submit its opposition, and grant such other limited relief as the Court deems appropriate.

Respectfully submitted,

/s/ Tracy Lloyd McCurty
Tracy Lloyd McCurty, Esq.
D.C. Bar No. 488510
BLACK BELT JUSTICE CENTER
4323 F Street SE
Washington, DC 20019
Telephone: (202) 486-9857

Dated: November 6, 2026

**CERTIFICATE OF SERVICE**

I certify that on November 6, 2026, I served the attached Motion for Relief Based on Failure to Provide Court-Ordered Notice and Request to Reopen the Record via ECF on all counsel of record.

/s/ Tracy Lloyd McCurty
Tracy Lloyd McCurty, Esq.
D.C. Bar No. 488510
BLACK BELT JUSTICE CENTER
4323 F Street SE
Washington, DC 20019
Telephone: (202) 486-9857

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re BLACK FARMERS DISCRIMINATION LITIGATION** ) | **Misc. No. 08-mc-0511 (PLF)** |
| **This document relates to:** ) **ALL CASES** ) | |

**PROPOSED ORDER**

Upon consideration of the Motion for Relief Based on Failure to Provide Court-Ordered Notice and Request to Reopen the Record, and the entire record herein, it is hereby

ORDERED that Lead Class Counsel shall within twenty (20) days provide court-ordered notice to all interested parties who attended the 2018 Black Farmer Conference.

ORDERED that the objection period before any final ruling on the distribution of the remaining $8M cy pres funds shall be sixty (60) days after Lead Class Counsel completes court-ordered notice to all interested parties who attended the 2018 Black Farmer Conference.

ORDERED that the Black Belt Justice Center shall within thirty (30) days submit its Opposition to Lead Class Counsel's Motion to Approve Distribution of Remaining Cy Pres Funds and Motion for Alternative Distribution of Remaining Cy Pres Funds.

ORDERED that the Court shall defer any decision pending resolution of the Black Belt Justice Center's Motion for Relief Based on Failure to Provide Court-Ordered Notice and Request to Reopen the Record.

SO ORDERED.

PAUL. L. FRIEDMAN
United States District Judge

DATE:

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In re BLACK FARMERS DISCRIMINATION LITIGATION** ) | **Misc. No. 08-mc-0511 (PLF)** |
| **This document relates to:** ) **ALL CASES** ) | |

**DECLARATION OF TRACY LLOYD MCCURTY, ESQ. IN SUPPORT OF MOTION FOR RELIEF BASED ON FAILURE TO PROVIDE COURT-ORDERED NOTICE AND REQUEST TO REOPEN THE RECORD**

I, Tracy Lloyd McCurty, make the following declaration pursuant to 28 U.S.C. § 1746:

1. My name is Tracy McCurty. I am older than eighteen years of age. The statements in this Declaration are based upon my personal knowledge.

2. I am the Executive Director of the Black Belt Justice Center (BBJC), a legal and advocacy 501(c)3 nonprofit organization established in 2012 serving Black/African Diasporic farmers, landowners, and communities in the Black Belt region in efforts to retain and increase landownership; to create sustainable land-based cooperatives and entrepreneurial businesses; and to ensure intergenerational and community wealth.

3. Over the last five years, I provided extensive advocacy to support Black legacy farmers in their pursuit(s) to obtain federal legislative remedies, including full debt cancellation and just monetary compensation from the U.S. Department of Agriculture (USDA), to address decades of well-documented, systemic racial discrimination resulting in crippling farm debts and foreclosures.

4. In 2019, I provided pro bono legal representation to five *Pigford v. Glickman* legacy farmers from Georgia in their appeal before the U.S. Court of Appeals for the District of Columbia Circuit.

5. In 2018, Senator Elizabeth Warren engaged with advocates and farmers from the USDA Coalition of Minority Employees, the Justice for Black Farmers Group, the BBJC, and others to expand her public position as to the root cause of the steady erosion of the Black agricultural land base—shifting dramatically from the narrow analysis of the heirs property phenomenon to the persistent malfeasance of the USDA against Black farmers, which is well-documented in congressional hearings, investigative reports, peer-reviewed

publications, and documentary films. Encouraging a community-based participatory policymaking process that included the BBJC and other Black farmers and advocates, Senator Warren produced a comprehensive policy platform to dismantle institutional discrimination within the USDA.

6. Our Coalition worked closely with Senator Cory Booker in the development of the Justice for Black Farmers Act (JBFA), originally submitted to the Senate in 2020 and refiled in 2021. Guided in purpose to address the history of systemic discrimination against Black farmers as well as compel substantive reforms within USDA, the JBFA promoted targeted, ameliorative initiatives to advance reparative justice for Black farmers. Of significant importance, a provision in the JBFA provided debt cancellation of USDA direct and guaranteed loans, federal and state tax relief, and the return of debt offsets to *Pigford v. Glickman* legacy farmers.

7. While the JBFA was never enacted, two pivotal sections of the bill were further developed by Senator Reverend Raphael Warnock and inserted into the American Rescue Plan Act of 2021 (signed into law in March 2021 by President Joe Biden). These two sections, 1005 and 1006, provided debt cancellation of USDA direct and guaranteed loans as well as a $1B Fund for outreach and other technical assistance services for farmers of color. Section 1006 also included a provision to provide direct payments to farmers who had experienced past discrimination including farmers who had to repay USDA through private bank loans to maintain ownership of their multigenerational family farms.

8. The BBJC, the Justice for Black Farmers Coalition, and the Environmental Working Group organized a press event to discuss the significance of the historic American Rescue Plan Act of 2021 that provided $5B in direct USDA debt relief and related services for Black farmers and other farmers of color. Senators Reverend Raphael Warnock, Cory Booker, and Elizabeth Warren joined our press event along with several Black legacy farmer leaders from across the country.

9. Working closely with Congresswoman Alma Adams and Senators Cory Booker and Reverend Raphael Warnock, our Coalition secured $3.1B in debt cancellation for "economically distressed" farmers and $2.2B in cash payments for past discrimination in the Inflation Reduction Act of 2022. According to USDA data, the combined debt of Black farmers was less than $210M and the combined debt of BIPOC farmers was less than $1.8B. Only 2,416 Black farmers were eligible for debt cancellation (less than 8 percent of all Black farmers).

10. I attended the Phase II Cy Pres Fund Black Farmers Conference held in Atlanta, GA, March 16-17, 2018. The Conference was organized by the Federation of Southern Cooperatives/Land Assistance Fund under the direction of Lead Class Counsel. The conference was attended by over 100+ Phase I cy pres grant recipient organizations, African American farmers and ranchers, advocates, attorneys, and other stakeholders.

11. During the conference Lead Class Counsel established the Black Farmers Council, an eight-member representative council charged with leading a collaborative process with conference attendees in the development of recommendations for the remaining $8M Phase II cy pres fund to be provided to Lead Class Counsel and submitted for final judicial consideration.

12. I was selected to serve as Table 7 Representative on the Black Farmers Council along with the following community members: Dr. Jifunza Wright-Carter, Executive Director of the Black Oaks Center for Sustainable Renewable Living (Table 1); Shirley Sherrod, Executive Director of Southwest Georgia Project (Table 2); Tamara Jones, Executive Director of Southeastern African American Farmers Organic Network (Table 3); Barbara Norman, third-generation Michigan Blueberry Farmer and Owner of Barbara's Blueberry Patch (Table 4); Calvin King, Executive Director of the Arkansas Land and Farm Development Corporation (Table 5); Cornelius Blanding, Executive Director of the Federation of Southern Cooperatives/Land Assistance Fund (Table 6); and Jerry Pennick, Rural Policy Coordinator for Tuskegee University and former Director of the Land Assistance Fund for the Federation of Southern Cooperatives (Table 8).

13. Since 2018, I have communicated with Lead Class Counsel at various significant milestones regarding the exclusion of broader input from conference attendees as well as the larger Black agrarian community in the development of initial recommendations, the SFFA business plan, and the final recommendation to Lead Class Counsel.

14. In an email I sent to Lead Class Counsel dated September 16, 2021, I shared insightful feedback from Lloyd Wright, Former Director of the Office of Civil Rights, USDA (1997-1998) and present Board Member of the National Policy Center at Alcorn State University (formerly known as the Socially Disadvantaged Farmers and Ranchers Policy Research Center at Alcorn State University), regarding numerous deficiencies in the SFFA business plan.

15. In an email I sent to Lead Class Counsel dated September 23, 2021, I challenged the representation of Cornelius Blanding, Executive Director of the Federation of Southern Cooperatives/Land Assistance Fund, that the final recommendation advancing the SFFA was accepted unanimously by the Black Farmers Council. I voted against the SFFA recommendation due to the absence of broad-based community input, rigorous review, and overwhelming approval by the larger Black agrarian community.

16. I attended the Black Farmers Council meeting convened in Atlanta, GA, on November 20, 2024. Lead Class Counsel requested the convening of the Black Farmers Council. During the meeting, Mr. Blanding provided each representative with a copy of the Black Farmer Financing Association business plan.

17. I first learned of the October 6 hearing from Eboni Thomas, Executive Assistant to Cornelius Blanding, Federation of Southern Cooperatives/Land Assistance Fund, in an email dated October 19, 2026. The email was addressed to all eight representatives of the Black Farmers Council.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

This, the 6 day of November 2026.

Tracy Lloyd McCurty, Esq.
D.C. Bar No. 488510
BLACK BELT JUSTICE CENTER
4323 F Street SE
Washington, DC 20019
Telephone: (202) 486-9857

# Exhibit B

BLACK AGRARIAN FUND

Black Belt Justice Center, Fiscal Sponsor
PO Box 2521
Washington DC 20013

## Media Advisory

# Senators Reverend Raphael Warnock, Cory Booker and Elizabeth Warren Join Black Farmers to Highlight the $5B in Debt Relief Included in the Stimulus Bill Signed by President Biden

WASHINGTON DC – At 11:00am EST on Monday, March 22, 2021, several members of the U.S. Senate and a group of Black farmers from across the country will hold a briefing to discuss the historic action taken earlier this month when President Biden signed the American Rescue Plan Act of 2021 into law that includes $5 billion in direct USDA debt relief and related services for Black farmers and other farmers of color.

The call will be moderated by Tracy Lloyd McCurty, Esq., Executive Director of the Black Belt Justice Center and Co-Organizer, Cancel Pigford Debt Campaign, and Lawrence Lucas, President Emeritus of the USDA Coalition of Minority Employees and Representative, Justice for Black Farmers Group. They will be joined by **Sen. Reverend Raphael Warnock (D-GA)** who authored the debt relief provisions in the Senate bill, as well **as Sens. Cory Booker (D-N.J.) and Elizabeth Warren (D-Mass.**) who were original co-sponsors of the proposal and will each make remarks at the opening of the call.

The following farmers will deliver short remarks and will then take questions from the press.

- Bernice Atchison, Farmer from Chilton County, Alabama and *Pigford* Historian
- Bernard Bates, Farmer from Hill City, Kansas
- Carolyn Jones, Farmer and Executive Director for Mississippi Minority Farmers Alliance
- Anthony Sigue, Sugarcane Farmer from Iberia Parish, Louisiana
- Eddie Slaughter, Farmer from Buena Vista, Georgia
- Lloyd Wright, Farmer from Westmoreland County, Virginia and Former Director of the USDA Civil Rights Office

The call comes the same week that the US House Agriculture Committee will hold a hearing on USDA's decades-long discriminatory policies targeted at Black farmers.

**Details for the Zoom event**
11:00am-12:00pm EST on Monday, March 22, 2021

**NOTE:** If you are interested in attending the virtual event with Senators Warnock, Booker, Warren and the Black farmers, please RSVP to one of the following staff at Environmental Working Group for the log-in information. Sarah Graddy: sarah@ewg.org; Alex Formuzis: alex@ewg.org

# Exhibit C

# BLACK FARMER FINANCING ASSOCIATION BUSINESS PLAN

**Mission**

To support under-resourced Black agricultural producers in 12 southern states (primarily, Black farmers) with accessible short-term financing for their operations.

**Business Plan Strategic Objectives**

Phase 1:

a. To incorporate the Black Farmer Financial Association (BFFA) as a non-regulated, financial cooperative under the State of Delaware statutes.[1]
b. To organize the BFFA cooperative structure.[2]
c. To submit application for Community Development Financial Institution (CDFI) certification immediately after convening the Board and hiring officers.

Phase 2:

a. To strategically build a portfolio that is representative of member clients, which provides a clear demonstration of due diligence warranting CDFI certification, and which meets the requirements to apply for a National Credit Union Administration Charter.
b. To apply for guaranteed lender status with the US Department of Agriculture-Farm Service Agency (USDA-FSA) to address risk management and potentially lower the risk mitigation fund requirements.

Table 1: Proposed Timeline for Phase 1 and 2.

| | | | |
|---|---|---|---|
| | Proposed Timeline | | |
| 3 months | 3-12 months | 12-36 months | >36 months |
| Phase 1a | | Phase 2a | |
| Phase 1b | Phase 2b Phase 1c | | |

The intentional creation of these specific institutional structures builds on (successful) precedent and ensures that the BFFA would be sufficiently flexible to qualify members for substantive and impactful wealth growth and management. The trajectory also builds the regulatory and oversight due diligence to ultimately, following Phase 2, enable access to Federal programs such as USDA-FSA guaranteed loan program, as well as relief programs such as the Emergency Capital Investment Program (ECIP)[3] under the Consolidated Appropriations Act, 2021, and other more specific crisis management tools as outlined in the Emergency Relief for Farms of Color Act proposed by Senator Raphael Warnock et al in February 2021.[4]

---

[1] Draft application attached in Appendix 1.

[2] Draft Bylaws attached in Appendix 2.

[3] https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/emergency-capitalinvestment-program. See Appendix 3.

[4] https://www.congress.gov/bill/117th-congress/senate-bill/278/text See Appendix 4 and 5.

**Statement of Need**

---

There has been considerable documentation of the historical impact of US agricultural policy and interpretation of that policy relating to the disparity of opportunity for black farmers.[5] Over the past 30 years consolidation of farmland and agribusinesses to achieve economies of scale necessary to support the increasingly complex supply chains of US and global markets, and to meet quality and safety criteria, has disrupted the food, feed, fiber, and energy sectors. However, those without equal and competitive access to the means to support these transitions have been more greatly disrupted and disadvantaged.

The past decade has seen increasing focus on managing food security gaps globally, with the dislocation of US food supplies aligned with COVID19 an uncomfortable home-truth. While responses have leaned towards further enhancement of large-scale commodity production and processing, a significant difference could be realized by better enabling producers to meet local and regional (short) supply chains. The proposed BFFA would leverage existing capacity and capability, particularly in the southern states, and provide the means for producers to adopt new technology and data-based management practices. Precision and designed-for-purpose equipment, as well as user-friendly decision and management tools are ubiquitous in higher education agriculture, horticulture, and agribusiness degree programs but graduates must have the ability to access these technologies and tools to effect change.

The justification for the BFFA is as much about providing the means for current farmers to effectively meet critical food security needs in the US as it is about their being able to compete effectively in the marketplace. The US cannot afford to ignore the need to invest in, and enhance, the capacity and effectiveness of local and regional production capacity.

The settlement of Pigford I and II addressed the impact of past history of policy implementation and the USDA is actively implementing institutional changes aligned with the core issues of the class action suit. But the fundamental challenge of loss of trust remains, with many Black farmers disenfranchised[6]. The BFFA is proposed as a vehicle for developing equity in agricultural financing; a recognition that the protocols developed e.g., for credit worthiness, do not necessarily reflect the economic environment of all participants in the market but that there are institutional structures that can be adapted to provide for these differences.

**Market Analysis for Agricultural Loans**

A November 2021 McKinsey Article[6] succinctly documents the declining presence and representation of Black farm operators in the US agriculture sector over the last century. The greatest decline has occurred post-WWII from approximately 10 percent of all US agricultural producers to 1.3 percent based on the USDA 2017 Census of Agriculture[7] and represent less than 0.5 percent of total US farm sales.

---

[5] USDA publication RR194 "Black Farmers in America 1865-2000. [6]
See Appendix 6 – Black Farmers 2018 Conference Report.
[6] Aminetsah, D. *et al.* (November 2021) "Black farmers in the US: The opportunity for addressing racial disparities in farming," McKinsey & Company.
[7] USDA, National Agricultural Statistics Service (NASS), Census of Agriculture, 2017, Tables 52 and 62. [9]
US Bureau of Census.

Approximately 44 percent of Black farmers indicate farming as their primary occupation with a marginally higher 1.4% of all US agricultural producers. The McKinsey team analysis indicates a 25 percent higher 2019 median income for Black farmers compared with Black Americans[9]. Significantly, their analysis indicates a 43-fold difference in median net worth of Black farm households over Black households.

Based on the USDA 2017 Census of Agriculture there were approximately 35,000 Black or African American producers in the targeted 12 states[8]. In 2020 the USDA Farm Service Agency (FSA) reported that 386 FSA direct loans and 14 guaranteed loans were made to African American farmer owners and operators in these 12 states. There are other sources of financial support for operating loans as well as capital/asset investment in land and equipment but, regardless of discriminatory practices, there is indication of significant potential for improvement in access to agribusiness loans. However, under the American Rescue Plan Act of 2021, debt relief was provided to Socially Disadvantaged Farmers and Ranchers (SDFR) with FSA Direct or Guaranteed farm loans. Thus, only 400 loans from 2020 would be eligible for this relief.

Recognizing the hindrances and opportunities, the McKinsey article outlined eight actions that public and private stakeholders can consider to support Black farmers and the next generation of Black Farmers, including two which would be directly addressed by the BFFA;

- Increase capital and market access: Provide farmers with access to financing and operating capital or supplier diversity programs to enter opportunities like contract farming or expanding total land operated.
- Provide attractive startup financing: Partner with private and/or public sources of financing interested in investing in black-owned farmers to build farm enterprises.

Ownership of assets, such as land and equipment, does not automatically generate wealth. Wealth generation depends on the ability to use assets productively. Productive use, and sustaining the value, of assets provides the opportunity to generate income and wealth. There is potential opportunity for the BFFA to assist Black farmers in achieving parity on an individual farm basis through competitive opportunity to access all inputs, including financial.

## Company Description[9]

The BFFA mission is to provide capital and loan financing to finance agricultural and agribusiness operations of Black farmers. The BFFA will have a narrow product portfolio, consisting mostly of short and intermediate term loans to finance operations of agricultural producers.

This institution will focus on underserved Black farmers in 12 southern states (Texas, Mississippi, Alabama, Louisiana, Georgia, South Carolina, Florida, North Carolina, Oklahoma, Virginia, Arkansas, and Tennessee). Prior analyses demonstrate that a greater percent of Black farmers in this geographic region do not align with the profile, and protocols, of credit worthiness typically applied by regulated financial institutions. Non-regulated financial institutions have greater flexibility in measuring loan portfolio risk which can mitigate conventional challenges of requiring land or property ownership with title as loan collateral or a successful history of credit repayment. These farmers tend to be highly leveraged.

---

[8] US Bureau of Census

[9] Audrie McCauley, CoBank, and Bill Melton, Farm Credit Association (retired) 2021, "BFFA Feasibility Assessment Summary"

To maximize accessibility to affordable loans for the targeted customers, the institution will work quickly to develop the due diligence history to secure loan guarantees from the USDA-FSA and establish partnerships with other service support entities, such as insurance companies, that create competitive and sustainable market opportunities.

**Organization and Governance**

The proposed organization builds on familiarity of the target market with the cooperatives structure. A critical objective of the BFFA is that participants trust the underlying institutional and governance structure and the 'culture' of the organization; that there is recognition of their needs and that they 'belong' in this place of business.

The proposed approach does not create precedent and has parallel underlying *raison d'etre* to the evolution of Lakota Funds and the Lakota Federal Credit Union (LFCU), both of which are separately CDFI certified and the LFCU is also a USDA-FSA guaranteed lender[10].

Cooperative structure:
It is proposed that the cooperative is organized under the State of Delaware statutes as providing the greatest flexibility in achieving the stated objectives of the BFFA. The Minneapolis office of Dorsey and Whitney, LLP[11] has provided *pro bono* guidance to the necessary and appropriate organizing framework to address the needs of the American black farmer. Attached in Appendix 1 is the application to the state of Delaware for organization of the BFFA and in Appendix 2 a draft of the proposed by-laws for the cooperative. There are few law firms that have the depth and breadth of experience in food and agribusiness, particularly in cooperatives, as well as banking and financial institutions.

Community Development Financial Institutions (CDFI)[12]:
CDFI's provide access to affordable financial products and services to underserved communities. CDFI certification by the Department of the Treasury qualifies the organization to apply for technical and financial assistance awards, some of which are available during the application and initial certification process. Maintenance of certification also requires accountability to the defined market (community of black farmers), access to training, and operational and financial accountability oversight.

BFFA Credit Union[13]:
Consideration has been given to the evolution of the proposed BFFA to apply for a Federal Credit Union Charter[14]. The application would require much of the information and demonstration of need and participation that would be generated in the formation of the BFFA cooperative and CDFI certification

---

[10] Tawney Brunsch, Executive Director, Lakota Funds and Director, Lakota Federal Credit Union. https://lakotafunds.org/, http://lakotafcu.org/

[11] David Swanson, partner, has served as lead resource for Dorsey and Whitney, LLP, guidance. https://www.dorsey.com/services/food-beverage-and-agribusiness

[12] Credit Union National Association (CUNA) https://www.cuna.org/about.html

[13] Cathie Mahon, Executive Director, Inclusive, https://www.inclusiv.org/about-us/

[14] National Credit Union Administration, https://www.ncua.gov/regulation-supervision/manuals-guides/federalcredit-union-charter-application-guide/introduction

process. Although depositary services are not the initial objective of the BFFA they would provide an additional form of generating loan capital. Furthermore, the additional level of oversight would meet the requirements to qualify as a Farm Service Agency (FSA) guaranteed loan lender.

US Department of Agriculture-Farm Services Agency (USDA-FSA)[15]:
The Farm Service Agency Certified Lender Program permits lenders who meet the requirement of acceptable oversight to process loans that meet the FSA program criteria. The benefit to the lender is that FSA guarantees 90 percent of any loss the lender might incur if the loan fails. This certification would follow that of being certified as a CDFI and providing the due diligence and history of successful loan completions to meet the Federal Credit Union Charter application process.

**Selection Committee(s) of the Board Members (appointed) and the Management Team**

An independent selection committee is recommended to maintain independence of decisions in the initial formation of the BFFA. At a minimum the selection committee would comprise representation from:

1. A minority lending association or credit union,
2. An independent member of the Federation of Southern Cooperatives,
3. An individual with deep experience in agricultural/agribusiness cooperatives organization and governance, and
4. A facilitator/coordinator to provide continuity and timely performance in the search and hiring of an appropriately qualified and experienced management team and the initial slate of Board members.

**Organizat ion and Management** [18]




[15] USDA-FSA, https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/minority-and-womenfarmers-and-ranchers/index
https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/2019/guaranteed-lender-eligibilityfactsheet-19.pdf [18] See footnote 6

**Governance**

The Association will be governed by a Board of Directors (Board). Ownership will consist of members/stockholders and, possibly, investors who have a vested interest in the Association via a prescribed stock requirement. The Association's corporate structure will be that of a cooperative. The name and geographic footprint of the Association will be defined by its charter. While the charter will not be issued by a governmental entity, it will be developed by the Board of Directors with assistance from outside counsel. Likewise, bylaws will be established by the Board with guidance from outside counsel. The Board will hire management and establish management's roles and responsibility through policies and delegated authorities. The Association will be a non-regulated financial institution that will be eligible for funding from a Farm Credit Bank as per other financing institutions.[16]

- **Board**[17]: The BFFA Board will initially consist of three individuals, two of which will have the credentials to be deemed financial and accounting experts, and one with significant experience in cooperatives management, preferably financial cooperatives. These positions would initially be appointed by an Advisory Committee. Future Board members will be elected in a manner prescribed by the BFFA's bylaws. As a non-regulated financial institution, the CEO may be considered as one of the board members. To the extent possible, unpaid, or paid advisors with loan origination skills will be used to provide expertise to the Board.
- **Advisory Committee:** An Advisory Committee comprising representatives of the two organizations representing the Black farmers in the post-Pigford I and II outcomes and a designated financial advisor of the entity holding the remaining *Cy Pres* funds (approximately $8 million). This Advisory Committee will be critical in Phase I of the business plan to ensure enfranchisement of the target market participants.
- **Chief Executive Officer:** Until the BFFA breaks even, the CEO may serve a dual role either as the Chief Credit/Lending Officer or Chief Operations Officer, with Board approval. The dual roles would be eliminated when the Association becomes profitable.
- **Chief Financial Officer or Controller:** Initially, the CFO role could be filled by a Controller who has earned the designation of Certified Public Accountant (CPA).
- **Lending and/or Business Development Officers**: The number of Lending Officers will be determined by the geographic footprint and the projected number of minority farmers within that footprint.
- **Underwriters and Analysts:** The number of underwriters and analysts will be proportional to the number of loans forecasted in the Business Plan and managed by the Chief Credit/Lending Officer. Should the Association have an automated underwriting tool, the number of underwriters and analysts needed will be reduced.
- **Loan Closers and Processors:** Initially, it is assumed the senior staff will have sufficient experience and skills to handle the underwriting, analysis, closing, and processing of loans, with the support of approved outside legal counsel. As the number of applications increases, staff will be added as deemed appropriate by senior management. Industry metrics will be applied in determining the number of loans an experienced employee can underwrite/analyze/process prior to hiring additional employees. Seasonal employment for roughly 4.5 months during the busiest season is assumed in the first few years of operations.

---

[16] See §611.1205 and §614.4130.

[17] The Director's Role: A Guide to Leading Your Institution Effectively (fca.gov)

- **Administrative Support:** Administrative support should initially be limited to one employee with experience as an executive assistant and/or paralegal until the Association has grown to a size that warrants additional support staff. In the start-up year, it is anticipated that officers will be self-sufficient, to the extent possible.
- **Outsourced functions:** To reduce costs, Accounting, Credit Underwriting, HR/Payroll, and Information Technology will be outsourced during the first five years of operations.

**Products and Development Services**

---

BFFA will make or guarantee loans and provide similar financial assistance to black farmers, ranchers and aquatic producers to meet their full credit needs for operating expenses and working capital necessary for the production of agricultural and aquatic products. Additionally, BFFA will provide intermediate credit loans to meet black farmers, ranchers and aquatic producers' credit need for machinery, processing equipment, and other major capital expenditures necessary for the production of agricultural and aquatic products. Finally, the BFFA also provide operating, working capital, and intermediate credit to agricultural processing and marketing entities and other small minority-owned business that support the success of black farmers, ranchers, and aquatic producers. Loans made will be consistent with the credit underwriting standards and policies of the BFFA.

**Strategic Marketing**

---

An essential part of the marketing strategy will be developing loan products and services that address the loss of Black farmers' trust in the agricultural financial system. This will require significant engagement across the input-farm-first handler level in the supply chain, increased touchpoints with non-participants as well as participants, and managing the emotional response associated with those disenfranchised by previous experiences with financial institutions and government agencies. Such experiences can take generations to overcome but, in the fast pace of the post-COVID19 economy (globally) time is an enemy to the Black farmer.

Employing a regional or national agricultural marketing and communications company, such as Paulsen Marketing[18] would incur significant costs at market rates. It is possible that these can be negotiated through collaboration. In all actions during Phase I the first consideration must be that products and materials are at the highest level of integrity and portray the expectations of both Phase I and II of the BFFA.

Leveraging grass-roots support, the 1890's Land Grant Historically Black Colleges and Universities (HBCU), advisory partnerships and collaborators and, particularly, the breadth of those who came together for the initial summit[19] that identified the need for the BFFA will be essential to a rapid roll-out, awareness, and active membership in the BFFA. Although the pandemic disrupted plans for the BFFA there are benefits in transformation of communications platforms and tools that can reduce initial and ongoing costs of some of the marketing plan.

---

[18] Paulsen Marketing, https://www.paulsen.agency

[19] Black Farmers Conference Report, March 16-17, 2018, Atlanta, Georgia, Appendix 6.

A general challenge in the agricultural sector, regardless of race, is the age of the decision-maker and succession planning. The increasing age exacerbates the loss of trust challenge for the BFFA since there is a longer history of disadvantage to overcome. A key part of the strategy must engage the younger, possibly (preferably) 3rd generation working, or hoping to work, in the family agribusiness ultimately. They are unlikely to be the current decision-maker but can influence by their actions and knowledge. There are activities that can accomplish some of the basic needs while simultaneous building awareness and engaging the 18-25 year-old demographic.

- National Agri-Marketing Association professional and student chapters:

Leadership of the National Agri-Marketing Association[20] include many who first practiced their craft as members of student chapters across the US and competed in the annual marketing plan and the new sales competition. This competition involves student teams identifying a product or service and developing a fully researched 3-year marketing and financial plan. Most student chapters are sponsored by their regional professional association and leadership of those serve as mentors to the student teams as reviewers of the written and presented components. Many of the teams practice their presentations in front of the regional chapter prior to the competition. Teams start their identification of their product or service in the fall semester and are likely to invest over 100 hours of time (each student) prior to the competition in April.

NAMA Student Chapters would also be a source of part-time student workers as well as interns since members of the chapters draw from agricultural economics, agribusiness, agricultural leadership, education and communication programs, and all agricultural sciences disciplines. Students in communications, journalism, and graphic design are often employed as student workers on campus for university and college marketing and communications teams. During and post-COVID19 these positions are often supported as remote work opportunities.

Both activities can be used to identify future full-time employees.

- HBCU and Cooperative Extension Systems (Land Grant Institutions)[21]:

Twelve of the southern states which comprise the target market for the BFFA are within the geographic region of the nineteen HBCU's that constitute the 1890 land-grant system. The alumni and current students of the Land Grant system comprise the most likely talent market for leadership and employment for the BFFA but also for continued collaboration, outreach through the cooperative extension system, undergraduate and graduate research, internships, and part-time (remote) employment.

Collaboration through the Association of Extension Administrators has the potential to impact programming for the 2022-3 academic and fiscal year.

- Collaboration with other farm financial entities and their workshops conferences:
  - Farm Credit Administration
  - American Bankers Association, Agricultural Banking Associations[22]

---

[20] National Agri-Marketing Association, https://www.nama.org

[21] http://1890aea.org Association of Extension Administrators (1890's Land-Grant Universities)

[22] Agricultural Bankers Conference | American Bankers Association (aba.com)

- Collaboration with industry journals and publications to provide appropriate articles and interviews that communicate, promote, and increase awareness of the BFFA.

**Financial Feasibility**[23]

The objective of the proposed BFFA is to support underserved agricultural producers in 12 southern states) with accessible short-term financing for their operations. This study assesses the feasibility of creating and sustaining an institution under three scenarios – Worst Case, Most Likely Case, and Best Case under a set of assumptions derived from analysis of the farm business, farm size, and likely size of loan. In the Most Likely Case, the Association would break even 4 years after being created, with a loan volume of $96 million.

An important caveat to this estimation is that the funding required to start this operation in year one is approximately seven times higher than the "seed money" currently available for it ($8 million). The rest of the funds required to make this a financially viable operation by year 4, would need to be secured through access to the American Rescue Plan Act relief funds approved by Congress, specifically to support the same customer segments targeted by this institution, or through partnerships/sponsorships from Farm Credit System institutions, and/or philanthropy outreach efforts focused on organizations/individuals aligned with the objective of serving these farmers.

The initial, fixed, and operating costs of establishing, building due diligence and loan performance to the critical stage of institutional management of risk, i.e., USDA-FSA loan guarantees, is preclusive of a staged market growth model across the geographic scope and scale of the proposed market.

By decreasing from 12 southern states to only 5 (Texas, Mississippi, Louisiana, Georgia, and Florida) it would drop the number of principal producers from 35K to 26K. This in turn would result in significant impact to the model. For example, if only focusing on the 5 states, the model shows that BFFA would not breakeven in the first 5 years in the Worst Case or the Most Likely Scenario. In the Best Case scenario it would take until year 5 to breakeven.

Based on those results, it is recommended that the BFFA still focus on key states in the first year or two to manage the initial scope of the portfolio, but it is imperative that all 12 southern states be included in the business plan to be financially feasible. The cost of getting started is too high when only 5 states are included in the target market. In order to scale this business to be a success, the potential loan demand from all 12 southern states will be needed.

**Operating Expense Projection**[24]

---

As part of the feasibility analysis completed in July 2021 an operating budget was developed incorporating the same basic assumptions regarding the worst, most likely, and best-case scenarios.

[23] Appendix 7a and b, BFFA Feasibility Assessment Summary and BBFA Feasibility Assessment 3 Scenarios Audrie McCauley, CoBank and Bill Melton, Farm Credit Association (retired)

[24] Appendix 7b – operating expense on page 2. Audrie McCauley, CoBank and Bill Melton, Farm Credit Association (retired)

Specific costs per annum, such as marketing and legal costs, will depend on the collaboration with partners and opportunity for *pro bono* expert support. Table 2 below provides the operating costs incorporated in the feasibility study but the prevailing economic conditions in mid-2022 have already changed many of the critical elements. Specialized financial labor market costs have increased, but the ability to perform some of these functions remotely has likely decreased some of the operational employee costs as well as availability of qualified employees.

Additional costs not included in the operational expense assumptions include:
Search and hiring cost associated with the management team.

- Operational costs associated with the selection processes,
- Cost of a facilitator/coordinator between the Management Team and appointed Board of Directors selection committee and the Advisory Committee to keep these processes on track,
- Initial costs associated with specific requirements of web design for a lending institution,
- Costs associated with oversight of registering and implementing the specific institutional structures called out in Phase 1 and II that are not provided *pro bono*.

Table 2: Feasibility Study Operational Assumptions

| Feasibility Assessment | | | | | |
|---|---|---|---|---|---|
| **Operational Expense Assumptions** | | | | | |
| **Key Assumptions** | **Metric** | **Metric Used** | **Low** | **Mid** | **High** |
| **Operating Expense** | | | | | |
| Annual Wage Adjustment | | [illegible] | | | |
| Non-Labor Annual Expense Growth | | [illegible] | | | |
| Office Space | Square Feet | [illegible] | | | |
| **Labor** | | | | | |
| Management | Average Salary Per FTE | $ [illegible] | | | |
| Operational Employees | Average Salary Per FTE | $ [illegible] | | | |
| Other Compensation (Outsourced) | Average Salary Per FTE | $ [illegible] | | | |
| Burden | | [illegible] | | | |
| Full Time Management Employees | | | | | |
| Year 1 | Number of FTE | | [illegible] | [illegible] | [illegible] |
| Year 2 | | | [illegible] | 4 | [illegible] |
| Year 3 | | | [illegible] | 5 | [illegible] |
| Year 4 | | | 4 | 5 | [illegible] |
| Year 5 | | | 5 | [illegible] | 6 |
| Other Compensation (Outsourced) | Full Time Equivalents | | [illegible] | [illegible] | [illegible] |
| **Per Loan** | | | | | |
| Loan Origination Fee | Cost Per Loan | $ [illegible] | | | |
| Loan Fee for Returning Customers | | $ [illegible] | | | |
| Loan Productivity | Average Loans per Year per Employee | [illegible] | | | |
| Seasonal Employment | | [illegible] | | | |
| **Number of Operational Employees Needed** | | | | | |
| Year 1 | | | 4 | 3 | 2 |
| Year 2 | | | 5 | 4 | 3 |
| Year 3 | | | 6 | 5 | 4 |
| Year 4 | | | 7 | 6 | 5 |
| Year 5 | | | 8 | 7 | 6 |
| **Marketing** | | | | | |
| Marketing and Advertising | Cost per Year | $ [illegible] | | | |
| **General Operating** | | | | | |
| Operating Expenses, Supplies, Utilities, Maint | Cost per Square Foot | $ [illegible] | | | |
| **G&A** | | | | | |
| IT, Insurance, Professional Fees | Cost per FTE | $ [illegible] | | | |
| **Rent** | | | | | |
| Fixed Rent/Taxes | Cost per Square Foot | $ [illegible] | | | |

**Current Economic Environment Impacting the Analysis**

The feasibility analysis and operating expenses were projected in 2020/21 with expected agricultural input costs, interest rates, salaries, and facility costs prevailing at the time. The economic climate has changed significantly in the subsequent two years but also the market prices for agricultural and horticultural products. The current global inflationary economic environment, and the macroeconomic policies being engaged to control inflation, add to uncertainty regarding the data used in the supporting analysis. Regardless of the prevailing economic uncertainty, the underlying justification for the BFFA remains unchanged; if not heightened since these conditions are likely to exacerbate the equity gap.

# Exhibit D

**Subject:** FW: Pigford II Cy Pres Fund Proposal Next Steps
**Date:** Thursday, September 16, 2021 at 1:14:23 AM Eastern Daylight Time
**From:** tmccurty blackbeltjustice.org
**To:** Hank Sanders, Andrew Marks, gfrancis@realtoughlawyers.com
**Attachments:** image001.png, image002.png

FYI.

Tracy Lloyd McCurty, Esq. (Nile Sirius Asantewaa)
Executive Director of Black Belt Justice Center
Co-Alchemist of Acres of Ancestry Initiative/Black Agrarian Fund
Email: tmccurty@blackbeltjustice.org
Linktree: https://linktr.ee/acresofancestry

*To us in Africa land was always recognized as belonging to the community. Each individual within our society had a right to use the land, because otherwise he could not earn his living and one cannot have the right to life without also having a right to some means of maintaining life. But the African's right to land was simply the right to use it; he had no other right to it, nor did it occur to him to try and claim one.*
-Julius Nyerere

***Black Belt Justice Center** is a legal and advocacy nonprofit organization dedicated to assisting African American farmers, landowners and communities in the Black Belt region in efforts to retain and increase landownership; to create sustainable, land-based cooperatives and entrepreneurial businesses; and to ensure intergenerational and community wealth.*

***Acres of Ancestry Initiative/Black Agrarian Fund** is a multidisciplinary, cooperative ecosystem rooted in Black ecocultural traditions and textile arts to regenerate custodial landownership, ecological stewardship, and food and fiber economies in the South.*

This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, confidential, and exempt from disclosure under applicable law or may constitute as attorney work product. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication. Thank you.

**From:** Lloyd Wright <lew52841@aol.com>
**Reply-To:** Lloyd Wright <lew52841@aol.com>
**Date:** Wednesday, September 15, 2021 at 10:19 PM
**To:** "tmccurty@blackbeltjustice.org" <tmccurty@blackbeltjustice.org>
**Cc:** Eloris Speight <espeight@alcorn.edu>
**Subject:** Re: Pigford II Cy Pres Fund Proposal Next Steps

Tracy,

I reviewed the Black Farmer Financing Association Feasibility Assessment

I support the creation of a credit financing organization owned and controlled by Black farmers and landowners. In the short term the credit organization should provide operational loans to Black and other minority farmers and ranchers. In the long term, the credit organization should also provide farm ownership loans to purchase farm land.

However, my concern with this proposal is that it needs additional input and evaluation from the Socially Disadvantaged Farmers and Ranchers Policy Research Center at Alcorn State University. The review by the Policy Center will bring more of the Black Farmer community to the table in developing a major new organization to support Black farming in America. It will also serve to get more Black ownership of the new organization.

I have a number of questions on how the credit organization will be created and operated. These questions can be addressed with a review by the Policy Center. The Policy Center was created to ensure that major new programs that impact Black farmers are developed with input from the Black Farmer community and is supported by the Black community.

Once the review has been made by the Policy Center, it might be appropriate to provide the organization the $8 million from Pigford funds as well as the $47 million from the America Rescue Plan Act. Additional funding might also be needed in order to keep interest rates at the level used by USDA FSA.

In a message dated 9/15/2021 11:13:02 AM Eastern Standard Time, tmccurty@blackbeltjustice.org writes:

> Grand Rising Greg, Hank, and Andy,

Last week, I received the attached proposal from Cornelius Blanding, Federation of Southern Cooperatives/Land Assistance Fund. This is the first communication that I had received from Mr. Blanding regarding the Cy Pres Fund in the last three years. I have reviewed the proposal and it my position that the proposal needs to receive broader input from the Black agrarian community and from individuals with financial expertise. As you are aware, I raised these substantive issues three years ago. Moreover, I have shared the proposal with several of the Pigford legacy farmers. They, too, have concerns with the proposal as written. Lloyd Wright serves on Board of Directors for the Alcorn State University Socially Disadvantaged Farmers and Ranchers Policy Research Center. As we move forward, I am requesting that all proposals be vetted through the Policy Center and the larger Black agrarian community (I included Mr. Wright on this email thread). I look forward to hearing from you. Thank you.

In community,

Tracy

Tracy Lloyd McCurty, Esq. (Nile Sirius Asantewaa)

Executive Director of Black Belt Justice Center

Co-Alchemist of Acres of Ancestry Initiative/Black Agrarian Fund

Email: tmccurty@blackbeltjustice.org

Linktree: https://linktr.ee/acresofancestry

*To us in Africa land was always recognized as belonging to the community. Each individual within our society had a right to use the land, because otherwise he could not earn his living and one cannot have the right to life without also having a right to some means of maintaining life. But the African's right to land was simply the right to use it; he had no other right to it, nor did it occur to him to try and claim one.*
-Julius Nyerere

***Black Belt Justice Center*** *is a legal and advocacy nonprofit organization dedicated to assisting African American farmers, landowners and communities in the Black Belt region in efforts to retain and increase landownership; to create sustainable, land-based cooperatives and entrepreneurial businesses; and to ensure intergenerational and community wealth.*

***Acres of Ancestry Initiative/Black Agrarian Fund*** *is a multidisciplinary, cooperative ecosystem rooted in Black ecocultural traditions and textile arts to regenerate custodial landownership, ecological stewardship, and food and fiber economies in the South.*

This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, confidential, and exempt from disclosure under applicable law or may constitute as attorney work product. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication. Thank you.

# Exhibit E

---

| | |
|---|---|
| **Subject:** | Follow-up Regarding $8M Pigford II Cy Pres Fund |
| **Date:** | Thursday, September 23, 2021 at 8:16:24 PM Eastern Daylight Time |
| **From:** | tmccurty blackbeltjustice.org |
| **To:** | Hank Sanders, Andrew Marks, gfrancis@realtoughlawyers.com |
| **CC:** | Stephen Carpenter, Alva Waller, Cornelius Blanding, scarpenter@inreblackfarmersombudsman.com |
| **BCC:** | Bernice Atchison, Eddie Slaughter, lawrlcl@aol.com, Lloyd Wright, Carolyn Jones, evieb1948@gmail.com, TILLERY@aol.com, Abraham Carpenter, Shone Sigue, Provost Farm, Pamela Moon, Karla Adams, Howard Conyers, Mighty Edible, Kara Boyd, Gordon Reed, Karen, Tammy (Women, Miessha Stennis, Daaiyah Salaam, Eddie Lewis, Howard, wilbursr1@aol.com, seven.harvestinc@gmail.com, Grow You, Michael Jr. |
| **Priority:** | High |
| **Attachments:** | image001.png, image002.jpg, Cy Pres Update Letter to Conference Participants .pdf |

Good Evening Hank, Greg, and Andy,

For the record, the vote of the council was not unanimous. As Table 7 representative, I voted against the proposed recommendation because the Black Farmers Council refused to honor their commitment to provide the recommendation to the larger Black agrarian community for feedback/input before submission to Lead Class Counsel. The Black Farmers Council bypassed the agreed upon process and submitted the recommendation to Lead Class Counsel without broad based approval from the conference participants. I have all of the email communications from three years ago that challenge the misrepresentation of facts by Mr. Blanding. Thank you.

In community,

Tracy Lloyd McCurty, Esq.

Tracy Lloyd McCurty, Esq. (Nile Sirius Asantewaa)
Executive Director of Black Belt Justice Center
Co-Alchemist of Acres of Ancestry Initiative/Black Agrarian Fund
Email: tmccurty@blackbeltjustice.org
Linktree: https://linktr.ee/acresofancestry

*To us in Africa land was always recognized as belonging to the community. Each individual within our society had a right to use the land, because otherwise he could not earn his living and one cannot have the right to life without also having a right to some means of maintaining life. But the African's right to land was simply the right to use it; he had no other right to it, nor did it occur to him to try and claim one.*
-Julius Nyerere

***Black Belt Justice Center*** *is a legal and advocacy nonprofit organization dedicated to assisting African*

*American farmers, landowners and communities in the Black Belt region in efforts to retain and increase landownership; to create sustainable, land-based cooperatives and entrepreneurial businesses; and to ensure intergenerational and community wealth.*

***Acres of Ancestry Initiative/Black Agrarian Fund** is a multidisciplinary, cooperative ecosystem rooted in Black ecocultural traditions and textile arts to regenerate custodial landownership, ecological stewardship, and food and fiber economies in the South.*

This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, confidential, and exempt from disclosure under applicable law or may constitute as attorney work product. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication. Thank you.

---

**From:** ebonithomas <ebonithomas@federation.coop> on behalf of ebonithomas <ebonithomas@federation.coop>
**Date:** Thursday, September 23, 2021 at 5:36 PM
**To:** Cornelius Blanding <cornelius@federation.coop>
**Subject:** Cy Pres Update/ Conference Report

Good afternoon.

I hope this email finds you well.

I am sending the attached report from Cornelius on behalf of the elected committee. Please follow up with the committee or your table representative with any questions or concerns.

Cooperatively,

**Eboni Thomas**
Executive Assistant
Federation of Southern Cooperatives/
Land Assistance Fund
2769 Church Street
East Point, GA 30344
404-765-0991 (o)
404-765-9178 (f)

www.federation.coop

*Support us year round through Amazon Smile* smile.amazon.com/ch/58-1026695

# Exhibit F

# 2018 BLACK FARMERS CONFERENCE (RE: CY PRES FUNDS)

September 22, 2021

Dear Black Farmers Conference Participants/Group,

It has been nearly four years since we met in Atlanta Georgia. Over one hundred farmers, leaders and activists representing 68 organizations were in attendance. Also in attendance were facilitators and the Cy Pres attorneys representing the Pigford (Black Farmers) settlement.

The purpose of this meeting was to afford this diverse group the opportunity to provide the attorneys with recommendations on how best to use funds (approximately eight million dollars) left over from the settlement. The attorneys would then submit a, final recommendation to the judge for his consideration. The attorneys made it clear that the judge would not be bound by our recommendation.

After two days of robust discussion the group decided to select a committee of eight who would review and analyze all the information, including numerous recommendations, gathered at the meeting. Based on that analysis the committee would provide one recommendation to the attorneys –they in turn would submit that recommendation to the judge.

Immediately following the Atlanta meeting, the committee began developing a process through which it would operate. A chairperson was elected and at times a mediator was used in order to make sure all voices were heard and considered. All deliberations and discussions were considered in the context of the information, both written and verbal, gathered at the Atlanta meeting. A number of options were vigorously debated and were narrowed down to the following:

- A revolving loan fund
- A foundation
- Grants to farmers
- A hybrid of the above
- Other Financing Institution (OFI)

Each member was given the opportunity to present their case –pro and con – on each option. The guiding principles as we discussed, debated and voted were: 1) what is best for the farmer in both the short and long term and 2) what would be the best vehicle to ensure sustainability 3) which vehicle could best attract additional funds. While there were strengths and weaknesses in each of the above recommendations it was unanimously decided that an OFI would best meet most of our criteria... This would also be a Black owned and operated lending institution that gives us the opportunity to not only impact individual farmers but indirectly the communities in which they live; importantly the impact would be intergenerational.

An OFI (as defined by the Farm Credit Act), is any national or state bank, trust company, agricultural credit corporation, incorporated livestock loan company, savings institution, credit union or any association of agricultural producers engaged in the making of loans to farmers and ranchers, and any corporation engaged in the making of loans to producers or harvesters of aquatic products.

The recommendation was submitted to the attorneys who requested more detail. An expert consultant was brought in –at no cost to the Cy Pres funds. . The consultant provided an overall assessment of the OFI as it relates to our goals and vision. That assessment was delivered to the attorneys for further consideration. If approved, a comprehensive business plan will be prepared – again by expert consultants at no cost to the Cy Pres funds.

We know this has been a long process with many stops and starts, some were self-inflicted, others were out of our control. The most important thing to keep in mind is that even with the ups and downs of the process, in the end the final recommendation was accepted unanimously by the committee.

We thank you and are honored that you chose us for this important task – although it is not yet complete, we believe this phase is a major step toward that goal.

If you have any questions, you can contact the person selected to represent your group/table or any of the other committee members. Their names and email addresses are listed below.

BLACK FARMER COUNCIL

Jifunza Wright-Carter (Table 1)
blackoakscenter@gmail.com

Shirley Sherrod (Table 2)
shirleymsherrod@gmail.com

Tamara Jones (Table 3)
(Note: removed herself from the committee since taking a new job)

Barbara Norman (Table 4)
Barbarajames612@gmail.com

Calvin King (Table 5)
calvinrkingsr@yahoo.com

Cornelius Blanding (Table 6)
cornelius@federation.coop

Tracy McCurty (Table 7)
tmccurty@blackbeltjustice.org

Jerry Pennick (Table 8)
pennick3@gmail.com

# Exhibit G

**Tuesday, November 3, 2026 at 6:22:49 AM Eastern Standard Time**

---

**Subject:** Cy Pres Hearing Update
**Date:** Monday, October 19, 2026 at 1:08:06 PM Eastern Daylight Time
**From:** Eboni Thomas
**To:** barbarajames612@gmail.com, pennick3@gmail.com, calvinrkingsr@yahoo.com, shirleymsherrod@gmail.com, tmccurty blackbeltjustice.org, blackoakscenter@gmail.com, Cornelius Blanding, tamara.jones@cleanenergyworks.org
**CC:** cjarrett@sffacredit.com
**Priority:** High

Greetings!

As you all may know by now, there was a Cy Pres Hearing last week (10/6) in Washington, DC. The hearing was ordered by the judge to hear testimony for and opposition against the proposed use of the remaining $8mil CyPres funds. All involved in the Black Farmers & Advocates Conference we had back in 2018 should have gotten an email notification regarding the hearing.

As you recall, we - the group of 8 selected as representatives of our tables from the conference - proposed a black farmer bank structured as a cooperatively owned financial institution as the entity to receive and disburse the funds to black farmers as inclusive capital. The bank was established as the Southern Farmers Financial Association (SFFA), systems were developed, and a CEO was hired.

The Department of Justice (DOJ) opposed the bank; thus, the judge ordered a hearing. Shirley Sherrod, Cedric Jarret (CEO of SFFA), and I testified on behalf of SFFA in receiving the funds, while DOJ and John Boyd opposed the motion to distribute the funds to SFFA.

The judge heard all testimony and opposition and gave DOJ and Boyd 2 weeks to submit any additional questions to lead counsel. Lead Counsel then has 2 weeks to respond, and the judge will make the final ruling.

If there are additional questions regarding this update, please do not hesitate to call me, Shirley, or Calvin, as the subcommittee you selected to move the proposal forward.

Cooperatively,

Cornelius
404-765-0991